**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JENNIFER ZERBATO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ALLOVIR, INC., DIANA M. BRAINARD, and VIKAS SINHA,<br><br>Defendants. | Case No. 1:24-cv-10152-DJC<br><br><br>**ORAL ARGUMENT REQUESTED** |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

Caroline H. Bullerjahn
Justin D. Ward
Brendan Blake
Laura Noerdlinger
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA 02210

*Counsel for Defendants AlloVir, Inc., Diana M. Brainard, and Vikas Sinha*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................................... 1

BACKGROUND ........................................................................................................................... 3

      A.    AlloVir Develops Posoleucel and Warns Investors of Risks of the Clinical
           Trials. .......................................................................................................................... 3

      B.    AlloVir's Phase 3 Trials for Posoleucel.................................................................... 4

      C.    AlloVir Discontinues the Trials, and This Action Is Filed. ...................................... 6

LEGAL STANDARD..................................................................................................................... 7

ARGUMENT.................................................................................................................................. 9

I.      The Section 10(b) Claim Should Be Dismissed. ................................................................. 9

      A.    The AC Fails to Allege a Strong Inference of Scienter. ......................................... 9

           1.    The AC's Scienter Allegations Rest on Speculation, Not Well-
                Pleaded Facts. .............................................................................................. 9

           2.    The Absence of Any Plausible Motive Undermines Scienter. ................ 13

           3.    The AC's Other Boilerplate Scienter Allegations Also Fail.................... 16

           4.    Nonfraudulent Inferences Outweigh Any Inference of Scienter. ............ 16

      B.    The AC Fails to Allege Any Actionable Misstatement. ....................................... 19

           1.    The AC Fails to Allege with Particularity that Any Statement Was
                False or Misleading When Made. ............................................................... 19

            2.    The AC Challenges Forward-Looking Statements Immunized by
                 the PSLRA. ................................................................................................. 21

            3.    The AC Challenges Inactionable Statements of Opinion. ....................... 23

            4.    The AC Challenges Inactionable Puffery. ............................................... 24

            5.    The AC Does Not Allege Any Misstatements by Mr. Sinha................... 25

II.     The Section 20(a) Claim Should Be Dismissed.................................................................. 25

CONCLUSION............................................................................................................................. 25

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases:**

*ACA Financial Guaranty Corp. v. Advest Inc.*,
512 F.3d 46 (1st Cir. 2008)..................................................................................................25

*Angelos v. Tokai Pharms., Inc.*,
494 F. Supp. 3d 39 (D. Mass. 2020) ......................................................................................9

*In re Aratana Therapeutics Sec. Litig.*,
315 F. Supp. 3d 737 (S.D.N.Y. 2018)..................................................................................23

*In re Biogen Inc., Sec. Litig.*,
193 F. Supp. 3d 5 (D. Mass. 2016), *aff'd* 857 F.3d 34 (1st Cir. 2017)..................................24

*In re Biogen Inc. Sec. Litig.*,
857 F.3d 34 (1st Cir. 2017)............................................................................................14, 19

*In re Bos. Sci. Corp. Sec. Litig.*,
2011 WL 4381889 (D. Mass. Sept. 19, 2011),
*aff'd*, 686 F.3d 21 (1st Cir. 2012) ........................................................................................15

*Brennan v. Zafgen, Inc.*,
199 F. Supp. 3d 444 (D. Mass. 2016), *aff'd*, 853 F.3d 606 (1st Cir. 2017)............................15

*City of Bristol Pension Fund v. Vertex Pharm. Inc.*,
12 F. Supp. 3d 225 (D. Mass. 2014) ....................................................................................20

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*,
699 F. Supp. 2d 331 (D. Mass. 2010) ...................................................................................17

*City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.*,
46 F.4th 22 (1st Cir. 2022)..................................................................................................8

*Cody v. Conformis, Inc.*,
199 F. Supp. 3d 409 (D. Mass. 2016) ...................................................................................10

*Corban v. Sarepta Therapeutics, Inc.*,
2015 WL 1505693 (D. Mass. Mar. 31, 2015)........................................................................23

*Corban v. Sarepta Therapeutics, Inc.*,
868 F.3d 31 (1st Cir. 2017)...................................................................................................7

*Coyne v. Metabolix, Inc.*,
943 F. Supp. 2d 259 (D. Mass. 2013) ...................................................................................15

*In re Eaton Vance Corp. Sec. Litig.*,
206 F. Supp. 2d 142 (D. Mass. 2002) ......................................................................................15

*Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*,
778 F.3d 228 (1st Cir. 2015)...............................................................................................7, 19

*In re Gander Mountain Co. Sec. Litig.*,
2006 WL 140670 (D. Minn. Jan. 17, 2006).............................................................................14

*Ganem v. InVivo Therapeutics Holdings Corp.*,
845 F.3d 447 (1st Cir. 2017).............................................................................................8, 20

*In re Genzyme Corp.*,
2012 WL 1076124 (D. Mass. Mar. 30, 2012),
*aff'd*, 754 F.3d 31 (1st Cir. 2014) .............................................................................................8

*Gregory v. ProNAi Therapeutics Inc.*,
297 F. Supp. 3d 372 (S.D.N.Y. 2018), *aff'd*, 757 F. App'x 35 (2d Cir. 2018)........................22

*Harrington v. Tetraphase Pharms. Inc.*,
2017 WL 1946305 (D. Mass. May 9, 2017)...........................................................17, 21, 24

*In re iRobot Corp. Sec. Litig.*,
527 F. Supp. 3d 124 (D. Mass. 2021) .........................................................................9, 16, 18

*Kader v. Sarepta Therapeutics, Inc.*,
2016 WL 1337256 (D. Mass. Apr. 5, 2016) ......................................................................20, 21

*Leavitt v. Alnylam Pharms., Inc.*,
451 F. Supp. 3d 176 (D. Mass. 2020) .....................................................................................23

*Leavitt v. Alnylam Pharms., Inc.*,
525 F. Supp. 3d 259 (D. Mass. 2021) .....................................................................................16

*Lerner v. Nw. Biotherapeutics*,
273 F. Supp. 3d 573 (D. Md. 2017) ..................................................................................11, 20

*Leung v. bluebird bio, Inc.*,
599 F. Supp. 3d 49, 65 (D. Mass. 2022) .................................................................................15

*Levy v. Gutierrez*,
2017 WL 2191592 (D.N.H. May 4, 2017)..................................................................................8

*Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.*,
838 F.3d 76 (1st Cir. 2016).................................................................................13, 14, 15, 19

*Local No. 8 IBEW Ret. Plan v. Vertex Pharms. Inc.*,
140 F. Supp. 3d 120 (D. Mass. 2015), *aff'd*, 838 F.3d 76 (1st Cir. 2016)................................7

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
  144 S. Ct. 885 (2024) ..................................................................................................20

*Metzler Asset Mgmt. GmbH v. Kingsley*,
  928 F.3d 151 (1st Cir. 2019) ....................................................................................7, 16

*In re N. Telecom Ltd. Sec. Litig.*,
  116 F. Supp. 2d 446 (S.D.N.Y. 2000) ............................................................................18

*New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
  537 F.3d 35 (1st Cir. 2008) ............................................................................................11

*O'Hara v. Diageo-Guinness, USA, Inc.*,
  306 F. Supp. 3d 441 (D. Mass. 2018) .............................................................................13

*In re Ocular Therapeutix, Inc. Sec. Litig.*,
  2019 WL 1950399 (D. Mass. Apr. 30, 2019), *aff'd sub nom. Mehta v. Ocular
  Therapeutix, Inc.*, 955 F.3d 194 (1st Cir. 2020) ..........................................................16

*Omnicare, Inc. v. Laborers Dist. Counsel Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) .......................................................................................................23

*Pizzuto v. Homology Medicines, Inc.*,
  2024 WL 1436025 (D. Mass. Mar. 31, 2024) ..........................................................11, 20, 21, 22

*In re Praecis Pharms., Inc. Sec. Litig.*,
  2007 WL 951695 (D. Mass. Mar. 28, 2007) .............................................................22, 23

*Quinones v. Frequency Therapeutics, Inc.*,
  106 F.4th 177 (1st Cir. 2024) .....................................................................................9, 17

*Quinones v. Frequency Therapeutics, Inc.*,
  665 F. Supp. 3d 156 (D. Mass. 2023), *aff'd*, 106 F.4th 177 (1st Cir. 2024) ..............16

*Sanders v. AVEO Pharms., Inc.*,
  2015 WL 1276824 (D. Mass. Mar. 20, 2015) ....................................................... *passim*

*Sousa v. Sonus Networks, Inc.*,
  261 F. Supp. 3d 112 (D. Mass. 2017) ...............................................................14, 15, 17

*Squeri v. Mount Ida Coll.*,
  954 F.3d 56 (1st Cir. 2020) ..............................................................................................1

*In re Stone & Webster, Inc. Sec. Litig.*,
  414 F.3d 187 (1st Cir. 2005) ...........................................................................................21

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ...........................................................................................2, 7, 8, 17

iv

*Terumo Americas Holding, Inc. v. Tureski*,
    2016 WL 5376300 (D. Mass. May 23, 2016)................................................................10

*In re Textron, Inc.*,
    811 F. Supp. 2d 564 (D.R.I. 2011)..............................................................................25

*Tran v. XBiotech Inc.*,
    2016 WL 5408382 (W.D. Tex. Sept. 23, 2016)...........................................................11

*Vallabhaneni v. Endocyte, Inc.*,
    2016 WL 51260 (S.D. Ind. Jan. 4, 2016)........................................................12, 17, 24

*In re Wayfair, Inc. Sec. Litig.*,
    471 F. Supp. 3d 332 (D. Mass. 2020) ................................................................8, 10, 15

*In re WEBMD Health Corp. Sec. Litig.*,
    2013 WL 64511 (S.D.N.Y. Jan. 2, 2013) .....................................................................18

*In re Wet Seal, Inc. Sec. Litig.*,
    518 F. Supp. 2d 1148 (C.D. Cal. 2007) .......................................................................14

**Statutes:**

15 U.S.C. § 78u-4 .....................................................................................................2, 7, 8

15 U.S.C. § 78u-5 ...........................................................................................................21

Private Securities Litigation Reform Act of 1995 ................................................. *passim*

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ..........7, 9, 25

Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a)...................25

**Rules:**

Fed. R. Civ. P. 9(b) ..................................................................................................2, 8, 20

**Other Authorities:**

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ..........................................................................7

Establishment and Operation of Clinical Trial Data Monitoring Committees,
    2006 WL 1001638 (FDA Mar. 2006).........................................................................18

Use of Data Monitoring Committees In Clinical Trials: Guidance For Industry,
    2024 WL 666725 (FDA Feb. 2024)............................................................................4, 18

**PRELIMINARY STATEMENT**

Plaintiffs' "fraud by hindsight" claim should be dismissed because it rests solely on speculation, not factual allegations. During 2023, biotechnology company AlloVir, Inc. ("AlloVir" or the "Company") conducted double-blinded Phase 3 clinical trials for posoleucel, a drug candidate intended to prevent and treat viral infections in transplant patients. AlloVir warned investors that the trials could be prematurely terminated for a number of reasons, including if Data Safety Monitoring Boards ("DSMBs")—independent bodies appointed to review the interim results of each of the studies—recommended discontinuing the trials as futile. That risk came to pass on December 22, 2023, when AlloVir disclosed that it was discontinuing the trials after learning that the DSMBs recommended termination based on their pre-planned futility analyses.

The AC[1] tries to spin this negative news into fraud, but with no factual support. Plaintiffs baselessly assert that the DSMBs' recommendations must have been formulated and communicated to AlloVir months earlier, starting in January 2023, relying on faulty, back-of-the-envelope math to try to support this speculation. There are, however, no well-pleaded allegations—such as confidential witnesses or internal documents—suggesting that AlloVir received the DSMBs' termination recommendations before December 2023. Indeed, the clinical trial protocols that the AC relies upon actually ***contradict*** Plaintiffs' claimed timeline, indicating that the DSMBs had not yet even started their respective futility analyses until late 2023. And since the trials were double-blinded, AlloVir had no way of accessing the underlying data that the DSMBs would

---

[1] The Amended Complaint (ECF No. 51) will be cited as the "AC." The exhibits to this motion, attached to the accompanying declaration of Caroline H. Bullerjahn, will each be cited as "Ex." The exhibits may be considered on this motion to dismiss because each is incorporated by reference in the AC and/or a public filing with the SEC or National Institutes of Health susceptible to judicial notice. *See, e.g.*, *Squeri v. Mount Ida Coll.*, 954 F.3d 56, 61 (1st Cir. 2020) ("On a motion to dismiss, we may also consider documents incorporated by reference in the complaint, matters of public record, and other matters susceptible to judicial notice."). Unless noted, quotation marks, internal citations, and alterations in the original have been omitted in citations, and emphasis has been added.

analyze for futility. Plaintiffs' unfounded conjecture therefore fails as a matter of law to support a securities fraud claim.

*First*, the AC does not allege any particularized facts supporting a strong inference of scienter as required by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b)(2). Plaintiffs merely speculate about when the DSMBs might have shared their recommendations with AlloVir, but such speculation is not sufficient under First Circuit law to support an inference of scienter. Moreover, the AC's fraud theory does not make sense. There is no explanation for how AlloVir's executives gained anything by delaying bad news about the DSMB recommendations by just a few months, then disclosing it in December 2023. The AC does not allege that executives sold stock or received large bonuses during the course of 2023 (in fact, executives ultimately received no incentive bonuses for 2023). Moreover, despite having ample cash on hand, the Company raised money in June 2023 so it could fund the posoleucel trials well into 2024, which would make no sense if executives knew the trials would be discontinued just six months later. This creates a compelling "inference of nonfraudulent intent": AlloVir's executives did ***not*** know that the trials would be terminated. *Tellabs, Inc. v. Makor Issues & Rts., Ltd*., 551 U.S. 308, 314 (2007). The AC's conjecture and boilerplate allegations cannot overcome this inference.

*Second*, the AC does not identify any actionable misstatement. Based solely on Plaintiffs' speculative theory about the timing of the DSMB recommendations, the AC challenges numerous statements during the period from January 11, 2023 through December 21, 2023 (the "Class Period"). Under the PSLRA and Rule 9(b), however, such speculation is insufficient to plead that a statement was false or misleading when made. Moreover, many of the alleged misstatements are inactionable forward-looking statements, opinions statements, or puffery.

2

The AC should be dismissed in its entirety and with prejudice.

## BACKGROUND

### A.    AlloVir Develops Posoleucel and Warns Investors of the Risks of Clinical Trials.

AlloVir is a "clinical-stage cell therapy company developing highly innovative allogeneic T cell therapies to treat and prevent devastating viral diseases." AC ¶ 26. In 2023, AlloVir's lead product candidate was posoleucel, a "multi-VST therapy that targets six viruses: adenovirus, or AdV, BK virus, or BKV, cytomegalovirus, or CMV, Epstein-Barr virus, or EBC, human herpesvirus 6, or HHV-6, and JC virus, or JCV." AC ¶ 28. These viruses commonly affect patients who have received transplants (such as stem cell transplants used to treat certain cancers), giving posoleucel the potential to significantly improve health outcomes for transplant patients. *Id.*

Prior to the Class Period, AlloVir announced positive Phase 2 trial results for posoleucel. Ex. 11 (12/11/21 Press Release); *see also* AC ¶ 39. In light of the positive Phase 2 results, AlloVir proceeded with multiple Phase 3 trials. AC ¶ 41–42.

AlloVir expressed hope that posoleucel could "fundamentally transform the treatment landscape for transplant patients by substantially reducing or preventing disease morbidity and mortality, thereby dramatically improving patient outcomes." AC ¶ 28. At the same time, AlloVir warned that the clinical trials might not live up to these hopes, for example warning that:

- "We could also encounter delays if a clinical trial is suspended or terminated . . . by a Data Safety Monitoring Board for such trial . . . . Such authorit[y] may impose such a suspension or termination due to a number of factors, including . . . failure to demonstrate a benefit from using a drug." *E.g.*, Ex. 18 (FY 2022 Form 10-K) at 67.

- "Clinical trials may be delayed, suspended or prematurely terminated for a variety of other reasons, such as . . . a recommendation by a data safety monitoring board . . . to suspend or terminate clinical trials at any time for safety issues or for any other reason." *E.g.*, *id.* at 66–67.

- "The success of our product candidates . . . will depend on many factors, including . . . completion of preclinical studies and clinical trials with positive results." *E.g.*, *id.* at 62.

3

- "Clinical testing is expensive and can take many years to complete, and its outcome is inherently uncertain. Failure can occur at any time during the clinical trial process." *E.g.*, *id.* at 66; *see also* Ex. 2 (chart detailing AlloVir's risk disclosures).

**B.    AlloVir's Phase 3 Trials for Posoleucel.**

By the beginning of the Class Period in January 2023, AlloVir had initiated three Phase 3 clinical trials for posoleucel, all in patients who had received hematopoietic cell transplants. AC ¶ 29. Each Trial studied the use of posoleucel for a different potential indication: one to prevent infections for multiple viruses (the "Prevention Trial"), AC ¶ 47; another to treat hemorrhagic cystitis (the "Cystitis Trial"), AC ¶ 64; and a third to treat adenovirus infections (the "Adenovirus Trial"), AC ¶ 81 (collectively, the "Trials"). The Trials were double-blinded and placebo-controlled, which means that neither the patients, doctors, nor the sponsor (AlloVir) knew whether the patient was given posoleucel or a placebo. AC ¶¶ 35, 49, 66, 83; Ex. 18 (2022 10-K) at 21–25. Each Trial had a study protocol ("Protocol") that set forth how it would be conducted, as well as a statistical analysis plan ("SAP") for how Trial data would be analyzed. AC ¶¶ 54–60, 71–77, 85–95. Those documents are cited heavily, but notably incompletely, in the AC.

Pursuant to the Protocols and SAPs, each Trial would be subject to a pre-planned futility analysis carried out by an independent DSMB comprised of independent experts, and assisted by an independent statistician. AC ¶¶ 36, 60, 74, 88. While such futility analyses are not required by Food and Drug Administration ("FDA") rules, it has become "common for industry-sponsored trials to include interim monitoring" by DSMBs in clinical trials. Use of Data Monitoring Committees In Clinical Trials: Guidance For Industry (FDA Feb. 2024), 2024 WL 666725, at *3, *13. Each futility analysis would be conducted after a sufficient number of enrolled patients had gotten far enough along in the Trial to permit an interim analysis. Ex. 4 (Prevention Trial SAP) at 12 ("after the first 121 subjects have completed Week 14"); Ex. 10 (Adenovirus Trial SAP) at § 2.2.4 ("after approximately 40 participants have completed Day 29 of the Primary Study

Period"); Ex. 8 (Cystitis Trial SAP) at 26 ("based on primary efficacy endpoint data for the first approximately 60 participants"). If a DSMB determined that a Trial was futile in light of the interim results, it would recommend that AlloVir discontinue the trial. AC ¶ 46; *see also* AC ¶¶ 57–60, 74–77, 88–89.

During the course of 2023, AlloVir updated investors on the status of trial enrollment. At the beginning of the Class Period in January, AlloVir told investors that "[c]ompletion of enrollment of all three posoleucel Phase 3 registrational trials anticipated by the end of 2023." Ex. 14 (1/9/23 Press Release). Similarly, during a presentation the next day, Dr. Brainard stated "we're targeting now to finish enrollment of our 3 Phase III trials by the end of this year." AC ¶ 105. By the fall, however, enrollment was still not complete. In November, AlloVir said that it was "working with urgency to complete enrollment," and that "patients continue to enroll with data anticipated from all three trials in the second half of 2024." Ex. 28 (11/2/23 Press Release).

The Protocols and SAPs indicated that the DSMB analyses were in fact not complete by mid-2023. The Prevention Trial Protocol dated May 2023 stated that "[a] futility analysis . . . *will* be conducted in Phase 3." Ex. 3 (Prevention Trial Protocol) at 61. Similarly, the Prevention Trial SAP from June 2023 said the DSMB futility analysis would be performed in the future. *See* Ex. 4 (Prevention Trial SAP) at 12, 22. As late as November 2023, both the Cystitis Trial SAP and Adenovirus Trial Protocol noted that futility analyses for those Trials would be performed in the future. Ex. 8 (11/14/23 Cystitis Trial SAP) at 26–27 ("[I]nterim analysis *will be conducted.*"); Ex. 9 (11/20/23 Adenovirus Trial Protocol) at 63 ("A sample size re-estimation (SSRE) and a futility analysis *will* be performed . . . .").[2]

In fact, in May 2023, AlloVir changed the admission criteria for the Prevention Trial,

---

[2] By contrast, the SAP for the Adenovirus Trial, dated January 12, 2024 (after the DSMB recommendations were received), acknowledged that "the study is terminated due to futility." Ex. 10 (Adenovirus Protocol SAP) § 1.

meaning enrollment of a sufficient number of patients for a futility analysis could not have been completed by that time. Specifically, until April 2023, AlloVir accepted patients into that Trial from 15 to 42 days after they had undergone a cell transplant. Ex. 5 (4/13/23 Prevention Trial Protocol Summary). In May 2023, Amendment 6 to the Prevention Trial Protocol changed that criterion to target patients who had received transplants more recently, requiring that treatment with posoleucel start no more than 30 days after transplant "with emphasis on dosing at engraftment up to day 25." *Id.* at 83, 102; *see also* Ex. 6 (7/14/23 Prevention Trial Protocol Summary from Clinical Trial Website reflecting change). Of course, enrolling patients in the Prevention Trial based on new criteria would take time. Thus, as noted above, the amended Prevention Trial Protocol from May 2023 explained that a DSMB analysis remained to be done.

### C.      AlloVir Discontinues the Trials, and This Action Is Filed.

On December 22, 2023, AlloVir announced that it would "discontinue its three global Phase 3 posoleucel studies," a determination it made "following three pre-planned analyses by three independent Data Safety Monitoring Boards (DSMBs) each of which recommended stopping its respective trial for futility after a review of the data suggested that each study was unlikely to meet its primary endpoint." Ex. 30 (12/22/23 Press Release); AC ¶¶ 53, 70, 84, 95. The press release noted that the Company "expected the trials would require substantial additional capital to bring them to completion. With these current results, we will immediately shift our focus to preserve our substantial remaining capital, review our pipeline, and assess strategic options." Ex. 30 (12/22/23 Press Release). AlloVir's stock price declined. AC ¶ 13. AlloVir then announced "a reduction [in] its workforce by approximately 95%." Ex. 31 (1/1/2024 Press Release).

This action was filed on January 19, 2024. *See* ECF No. 1. Plaintiffs were appointed lead plaintiffs on April 17, 2024, *see* ECF No. 42, and filed the AC on June 17, 2024, *see* ECF No. 51.

The AC challenges numerous statements about posoleucel during the Class Period as

6

fraudulent, including: (1) statements about positive results from the Phase 2 trials of posoleucel, (2) statements that the Trials were ongoing, (3) statements about the timing of the Trials' results, and (4) general optimistic statements about AlloVir. *See* AC ¶¶ 102–155. Defendants' Exhibit 1 provides further detail concerning the many alleged misstatements. Each statement was allegedly misleading for the same reason: Plaintiffs speculate that all three DSMBs ***might*** have completed their futility analyses and recommended discontinuing the Trials prior to the end of the Class Period. *See id.* ¶¶ 62, 79, 91. More specifically, Plaintiffs speculate that each respective DSMB recommended discontinuing: (i) the Prevention Trial by January 10, 2023, *id.* ¶ 62; (ii) the Cystitis Trial by September 2, 2023, *id.* ¶ 79; and (iii) the Adenovirus Trial by October 10, 2023, *id.* ¶ 91.

### LEGAL STANDARD

"To state a claim under Section 10(b) . . . , plaintiffs must adequately plead (1) a material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Metzler Asset Mgmt. GmbH v. Kingsley*, 928 F.3d 151, 158 (1st Cir. 2019). "Congress has raised the standard of pleading for Section 10(b) and Rule 10b-5 securities fraud claims." *Local No. 8 IBEW Ret. Plan v. Vertex Pharms. Inc.*, 140 F. Supp. 3d 120, 129 (D. Mass. 2015), *aff'd*, 838 F.3d 76 (1st Cir. 2016).

First, the PSLRA "imposes a rigorous pleading standard on allegations of scienter," which is "a mental state embracing intent to deceive, manipulate, or defraud." *Fire & Police Pension Ass'n of Colo. v. Abiomed, Inc.*, 778 F.3d 228, 240 (1st Cir. 2015). The complaint must allege particularized facts that "giv[e] rise to a strong inference that the defendant acted with the required state of mind." *Corban v. Sarepta Therapeutics, Inc.*, 868 F.3d 31, 37 (1st Cir. 2017) (quoting 15 U.S.C. § 78u-4(b)(2)). A strong inference is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. The Court "must consider, not only inferences urged by the plaintiff, . . . but also

7

competing inferences rationally drawn from the facts alleged." *Id.* Courts within this District have repeatedly held that a strong inference of scienter must rest on particularized factual allegations, not mere speculation. *See, e.g.*, *In re Wayfair, Inc. Sec. Litig.*, 471 F. Supp. 3d 332, 345 (D. Mass. 2020) (dismissing where "rather than supplying any facts bearing on the mindset of the top executives of the company, the plaintiffs merely speculate about what they might have known or thought"); *In re Genzyme Corp.*, 2012 WL 1076124, at *12 (D. Mass. Mar. 30, 2012) (dismissing where "the plaintiffs' assertions, while numerous, are too speculative to give rise to a strong inference of scienter"), *aff'd*, 754 F.3d 31 (1st Cir. 2014).

Second, "in order to survive a motion to dismiss, the plaintiff must 'specify each statement alleged to have been misleading and the reason or reasons why the statement is misleading.'" *Ganem v. InVivo Therapeutics Holdings Corp.*, 845 F.3d 447, 455 (1st Cir. 2017) (quoting 15 U.S.C. § 78u-4(b)(1)). Under this standard, allegations of falsity must be supported by "well-pleaded facts," not the plaintiff's "speculation and conjecture." *Id.* at 456.

"Additionally, Federal Rule of Civil Procedure 9(b) requires plaintiffs claiming fraud to state with particularity the circumstances constituting fraud." *City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.*, 46 F.4th 22, 30 (1st Cir. 2022). Here too, speculation is insufficient. *See, e.g.*, *Levy v. Gutierrez*, 2017 WL 2191592, at *24 (D.N.H. May 4, 2017) ("Allegations in the form of mere conclusions, accusations, or speculation are not sufficient to meet Rule 9(b)'s particularity requirement without supporting facts surrounding the scheme to defraud or a basis for believing such a scheme existed.").

**ARGUMENT**

**I.      The Section 10(b) Claim Should Be Dismissed.**

      **A.      The AC Fails to Allege a Strong Inference of Scienter.**

            **1.      The AC's Scienter Allegations Rest on Speculation, Not Well-Pleaded Facts.**

The AC's scienter theory rests on sheer speculation about the timing of the DSMBs' recommendations: Plaintiffs assert that the first such recommendation was received by AlloVir on January 10, 2023, but provide zero factual support. That cannot support scienter.

The AC provides no particularized allegations that anyone within AlloVir learned of the DSMBs' recommendations before they were announced in December 2023. There are no confidential witness statements or internal documents suggesting that the DSMBs' recommendations were communicated to AlloVir at an earlier time. The AC thus fails to plead any of the "factors that the First Circuit has found to support an inference of scienter." *Angelos v. Tokai Pharms., Inc.*, 494 F. Supp. 3d 39, 57 (D. Mass. 2020) (listing factors); *see also In re iRobot Corp. Sec. Litig.*, 527 F. Supp. 3d 124, 139–40 (D. Mass. 2021) (Casper, J.) ("[S]atisfactory evidence of scienter includes clear allegations of admissions, internal records or witnessed discussions suggesting that defendants were aware that they were withholding vital information or at least were warned by others that this was so when they made the misleading statements."). Moreover, because the Trials were double-blinded, *see* AC ¶¶ 35, 49, 66, 83, Defendants had no way of knowing what the data showed until the DSMBs told them. *See Quinones v. Frequency Therapeutics, Inc.*, 106 F.4th 177, 182 (1st Cir. 2024) ("Given that the study was double-blind, even the clinicians could not have known which participants were in that group until the end of December.").

With no particularized facts, the AC turns to speculation. For the Prevention Trial, Plaintiffs build a house of cards from the following speculative assumptions: (1) after initial

enrollment started on March 22, 2022, enrollment progressed at a constant, consistent rate of four to five patients per week; (2) enrollment of 121 patients was complete by October 4, 2022; (3) the week fourteen endpoint was achieved for all 121 patients by January 10, 2023; and (4) as soon as the data was available, the DSMB immediately completed its futility analyses and conveyed its recommendation to terminate the trial to AlloVir. AC ¶ 62. Plaintiffs rely on the same speculative approach to conclude that the DSMBs made their recommendations for the Cystitis and Adenovirus Trials on September 2 and October 10, 2023, respectively. AC ¶¶ 64–92.

Such speculation is facially insufficient to support a strong inference of scienter. Where "plaintiffs are left simply to speculate as to what [defendants] might have known or thought," such "guesswork does not measure up to the standard required by the PSLRA." *Cody v. Conformis, Inc.*, 199 F. Supp. 3d 409, 421 (D. Mass. 2016). In analyzing the AC, the Court is required to set aside such "mere speculation, which [the Court is] not to accept as true," and focus solely on well-pleaded factual allegations. *Wayfair*, 471 F. Supp. 3d at 344. That is fatal to the claims in the AC, because once Plaintiffs' speculation is removed, there is nothing left.

Moreover, Plaintiffs' speculative assumptions do not make sense. The AC assumes that AlloVir enrolled patients in the Trials linearly at an exactly steady and consistent cadence, without any interruption. *See, e.g.*, AC ¶ 61 (assuming for Prevention Trial that because AlloVir "enrolled 377 patients in the 89-week period from March 22, 2022 to December 9, 2023," patients must have been enrolled at a rate of "4-5 new patients . . . per week"); *see also* AC ¶ 79 (similar analysis for Cystitis Trial). But as courts in this District have recognized, in reality, trial enrollment is often uneven. *See*, *e.g.*, *Terumo Americas Holding, Inc. v. Tureski*, 2016 WL 5376300, at *3 (D. Mass. May 23, 2016) ("During the first year of the Trial, enrollment was slower than anticipated. . . .

10

Although it increased during the second year, as of June 2014, enrollment remained incomplete.").[3]

The AC also makes the utterly implausible (if not impossible) assumption that the trial data was analyzed *immediately* after becoming available and that the analyses were completed and communicated to AlloVir that very same day. *See, e.g.*, AC ¶ 79 ("The week 24 primary endpoint . . . would have been reached by at least September 2, 2023. The DSMB performed its futility analysis at that time, finding that proceeding with the VHC Phase 3 Trial for FDA approval of posoleucel was futile, by September 2, 2023."); *see also id.* ¶¶ 62, 91. It simply defies logic that such complex data analysis can be completed instantaneously. *Pizzuto v. Homology Medicines, Inc.*, 2024 WL 1436025, at *17 (D. Mass. Mar. 31, 2024) (noting that "[i]t seems highly unlikely that Homology would have had sufficient time to analyze the results" of a clinical trial in "[o]nly one day").[4] Moreover, pursuant to the Protocols, the data was first analyzed "by an independent unblinded statistician" before the DSMBs' review even began. Ex. 7 (Cystitis Trial Protocol) at 67; *see also* Ex. 9 (Adenovirus Trial Protocol) at 63; Ex. 4 (Prevention Trial SAP) at 22.

Another court has rejected indistinguishable speculation about how long it takes to conduct a DSMB analysis. *See Lerner v. Nw. Biotherapeutics*, 273 F. Supp. 3d 573, 589–90 (D. Md. 2017). In that case, defendants had announced that a DSMB analysis was still ongoing. *Id.* The plaintiffs alleged that was false because "the review of efficacy data by the DSMB was not pending and would easily have been completed," suggesting "that Defendants somehow delayed announcing

---

[3] *See also Tran v. XBiotech Inc.*, 2016 WL 5408382, at *4 (W.D. Tex. Sept. 23, 2016) ("Patient enrollment, a significant factor in the time of clinical trials, is affected by many factors including the size and nature of the patient population, the proximity of subjects to clinical sites, the eligibility criteria for the trial, the design of the clinical trial, ability to obtain and maintain patient consents, risk that enrollment subjects will drop out before completion, competing clinical trials and clinicians' and patients' perceptions as to the potential advantages of the drugs being studied in relation to other available therapies, including any new drugs that may be approved for the indications we are investigating.").

[4] *See also New Jersey Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 45 (1st Cir. 2008) ("A statement cannot be intentionally misleading if the defendant did not have sufficient information at the relevant time to form an evaluation that there was a need to disclose certain information and to form an intent not to disclose it.").

conclusive results." *Id.* In support, the plaintiffs relied on an "expert" medical opinion that "there is absolutely no reason why an interim analysis could not be completed within a few weeks." *Id.* The court rejected these allegations, concluding that "[p]laintiffs may not substitute factual allegations with the speculation of their expert witness." *Id.* The only difference here is that Plaintiffs did not even bother with an expert.

Plaintiffs' speculation is also contrary to the very documents they rely on: the Protocols and SAPs. To the extent these documents were dated during the Class Period (May and June 2023 for the Prevention Trial, November 2023 for the Cystitis and Adenovirus Trials), each stated that the DSMB recommendations would be made at some point *in the future*. *See* Ex. 4 (6/22/23 Prevention Trial SAP) at 12 ("A formal interim futility analysis . . . *will be conducted* . . . ."); Ex. 8 (11/14/23 Cystitis Trial SAP) at 26–27 ("[I]nterim analysis *will be conducted.*"); Ex. 9 (11/30/23 Adenovirus Trial Protocol) at 63 ("A sample size re-estimation (SSRE) and a futility analysis *will be performed* . . . .").[5] By contrast, the Adenovirus Trial SAP, as revised in January 2024 after AlloVir publicly announced the DSMB recommendations, acknowledged that "the study is terminated due to futility." Ex. 10 (1/12/24 Adenovirus Trial SAP) § 1.

Finally, the AC further ignores that the patient admission criteria for the Prevention Trial changed in May 2023 to target patients in the first two weeks after transplants occurred. Ex. 3 (Prevention Trial Protocol) at 83, 102–03. Given that the enrollment criteria changed in May 2023, it is impossible that the patient enrollment threshold necessary for the DSMB's analysis and recommendation could have been reached months earlier, in January 2023. How AlloVir supposedly "knew that the Phase 3 study was not demonstrating efficacy . . . months before the new protocol was even approved . . . is entirely unexplained in the Amended Complaint."

---

[5] *See also* Ex. 3 (Prevention Trial Protocol) at 31 ("A futility analysis . . . *will be conducted* . . ..").

*Vallabhaneni v. Endocyte, Inc.*, 2016 WL 51260, at \*10 (S.D. Ind. Jan. 4, 2016) (rejecting confidential witness allegations that the Phase 3 trials "would not, or were not, demonstrating efficacy" because they were not "supported by any corroborating facts"). Thus, the very documents that supposedly support Plaintiffs' speculation, when read in their entirety, fatally undercut it. This alone warrants dismissal. *See, e.g.*, *O'Hara v. Diageo-Guinness, USA, Inc.*, 306 F. Supp. 3d 441, 450 (D. Mass. 2018) ("When such a document [incorporated by reference into the complaint] contradicts an allegation in the complaint, the document trumps the allegation."), *on reconsideration*, 370 F. Supp. 3d 204 (D. Mass. 2019).

### 2. The Absence of Any Plausible Motive Undermines Scienter.

Scienter is further undermined by the fact that the AC does not allege any colorable motive for AlloVir's executives to have delayed disclosing the DSMBs' recommendations. *See, e.g.*, *Loc. No. 8 IBEW Ret. Plan & Tr. v. Vertex Pharms., Inc.*, 838 F.3d 76, 84 (1st Cir. 2016) (finding no scienter where "several facts strongly suggest that at least Vertex's CEO, . . . had no motive to ignore an error that was obvious and that would therefore soon become known"). Plaintiffs speculate that Dr. Diana Brainard and Vikas Sinha (the "Individual Defendants") hid the DSMBs' recommendations, only to terminate the Trials in December 2023, at which point the recommendations would inevitably "become known." *See id.* For the Prevention Trial, this delay allegedly lasted eleven months, from January to December 2023. *See* AC ¶¶ 11, 62. For the other two Trials, the alleged delays were much shorter (three months for the Cystitis Trial, and two months for the Adenovirus Trial). *See* AC ¶¶ 79, 91.

The AC does not identify any personal benefit to Allovir's executives from these purported delays. There is no allegation, for example, that executives sold shares or received bonuses during that time period. *Infra* pp. 18–19; *see Sanders v. AVEO Pharms., Inc.*, 2015 WL 1276824, at \*10 (D. Mass. Mar. 20, 2015) (Casper, J.) (finding no scienter where "[t]here is no allegation of insider

13

trading; no divergence of internal reports and external statements on the same subject; no personal gain to the Defendants (i.e., there are no allegations of the Defendants' compensation, whether such compensation was tied to FDA approval or the capital call, discussed below) or other allegations that reflect motive").[6] If anything, the timing of the Trial terminations in December 2023 shows that the Individual Defendants were ***not*** trying to benefit themselves. Companies typically measure performance on an annual basis. Executives seeking to defraud investors would not release bad news in December; they would hide the news until the next fiscal year in hope of achieving their annual targets.[7] *See, e.g.*, *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 44 (1st Cir. 2017) (stating that "[t]he defendants' compensation structure and stock holdings also weaken[s] any inference of scienter" where the individual defendants' "compensation was keyed in part to revenue growth").[8]

The AC also points out that AlloVir raised money in a June 2023 stock offering, AC ¶ 173, but that too undermines scienter. The public filings cited in the AC show that AlloVir was not facing a cash crunch in 2023. As of March 31, 2023, before the offering, AlloVir held more than $115 million in cash and cash equivalents, and more than $86 million in short-term investments. Ex. 23 (Q1 2023 Form 10-Q) at 4. It reported that these short-term assets were "sufficient to fund planned operations for at least twelve months." *Id.* at 9. The only reason to seek additional funding

---

[6] *See also Sousa v. Sonus Networks, Inc.*, 261 F. Supp. 3d 112, 120 (D. Mass. 2017) (dismissing where the complaint did not allege "any of the telltale motives that have been found to strengthen an inference of scienter, such as insider stock sales or financial incentives far beyond the usual compensation packages").

[7] AlloVir was no exception:  its executives received annual performance bonuses, and as a result of the termination of the Trials, the Individual Defendants did not earn a bonus for 2023. *Compare* Ex. 32 (4/23/24 Form 14A) at 21 ("[O]ur compensation committee determined that the Company had not achieved its corporate goals for 2023 and, as a result, our named executive officers did not earn any bonus under our annual bonus program."), *with* Ex. 19 (3/31/23 Form 14A) at 18 (showing Annual Cash Incentive Bonuses were paid to Individual Defendants in 2021 and 2022).

[8] *See also, e.g.*, *Vertex Pharms.*, 838 F.3d at 84 (no scienter where defendant was "not alleged to have sold any stock during the class period"); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1165 (C.D. Cal. 2007) (no scienter where defendant "argue[d] persuasively that [] he did not receive a bonus for FY 2003 . . . [and] virtually ensured that he would also not receive a bonus for FY 2004"); *In re Gander Mountain Co. Sec. Litig.*, 2006 WL 140670, at *8 (D. Minn. Jan. 17, 2006) (plaintiff's motive theory "implausible because [the defendant] did not receive a performance bonus in fiscal year 2004 because [the company] did not perform as well as management had anticipated in 2004").

was for longer-term operations—*i.e.*, to continue to fund the ongoing Trials and seek FDA approval for posoleucel into 2024. Yet in December 2023, after the Trials were terminated, AlloVir began reducing its workforce by 95% to lower costs and preserve capital. Ex. 31 (1/1/2024 Press Release). Had Defendants actually known the "truth" about the Prevention Trial that was later disclosed, they would have been **un**motivated to raise money in June 2023. *See, e.g.*, *Wayfair*, 471 F. Supp. 3d at 349 ("It is difficult to find wholly plausible that Defendants would intentionally make a revenue projection in one month that they knew to be likely wrong, with the almost certain prospect of having to publicly correct the projection just a little over a month later.").[9]

Ultimately, the AC can offer only boilerplate allegations that Defendants wanted to keep AlloVir's stock prices high and raise money. AC ¶¶ 171–173. But such "generalized motive and opportunity pleading that would apply in nearly every business [] is not enough, by itself, to give rise to a strong inference that the defendants acted with scienter." *In re Eaton Vance Corp. Sec. Litig.*, 206 F. Supp. 2d 142, 154 (D. Mass. 2002); *see AVEO Pharms.*, 2015 WL 1276824, at *10 (no motive where the "complaint . . . does not provide any factual allegations regarding how the capital raise was critical to [the company]'s bottom line or its future").[10]

---

[9] *See also Vertex Pharms.*, 838 F.3d at 84 (finding that executive had "no motive to ignore an error that was obvious and that would therefore soon become known"); *Sonus Networks*, 261 F. Supp. 3d at 121 (D. Mass. 2017) (finding no motive to commit fraud where "it would clearly have been better for [defendant] to announce a modified projection in February to prepare the market for the foreboding bad news").

[10] *See also Coyne v. Metabolix, Inc.*, 943 F. Supp. 2d 259, 271–72 (D. Mass. 2013) ("allegations . . . that the Defendants had the motive to lie in order to inflate the Metabolix stock price" represented a "classic, hornbook example of insufficient motive pleading" that "could apply to any corporate executive at any company anywhere in the United States" and "therefore cannot give rise to a strong inference of scienter"); *In re Bos. Sci. Corp. Sec. Litig.*, 2011 WL 4381889, at *15 (D. Mass. Sept. 19, 2011) ("[T]he existence of a public offering during the period of alleged misrepresentations cannot itself lead to an inference of scienter."), *aff'd*, 686 F.3d 21 (1st Cir. 2012); *Brennan v. Zafgen, Inc.*, 199 F. Supp. 3d 444, 468 (D. Mass. 2016) ("incentives to increase a company's earnings and stock price exist for almost every executive at every company" and fail to support scienter), *aff'd*, 853 F.3d 606 (1st Cir. 2017); *Leung v. bluebird bio, Inc.*, 599 F. Supp. 3d 49, 65 (D. Mass. 2022) (Casper, J.) (allegations that company "sorely needed capital" and "ha[d] incurred losses since inception and to date ha[d] financed its operations primarily through the sale of shares" were insufficient to show scienter).

15

### 3.    The AC's Other Boilerplate Scienter Allegations Also Fail.

The remaining allegations are also boilerplate that cannot support an inference of scienter.

The AC purports to invoke the "core operations" doctrine. AC ¶ 174. "Courts, however, have been hesitant to apply significant weight to 'core operations' allegations without other significant evidence of a defendant's intent or recklessness, or a 'plus factor.'" *bluebird bio*, 599 F. Supp. 3d at 66.[11] Here, there are no "plus factors," just generic statements such as "[p]osoleucel was of paramount importance to AlloVir." *See* AC ¶¶ 174–76.

The AC fares no better by generally alleging that the Individual Defendants were "highly educated doctors and experienced pharmaceutical executives." AC ¶ 163. Such allegations do nothing to explain how the Individual Defendants learned of the DSMBs' recommendations before December 2023, and courts routinely reject "education and experience" allegations as insufficient. *See, e.g.*, *Leavitt v. Alnylam Pharms., Inc.*, 525 F. Supp. 3d 259, 266 (D. Mass. 2021) ("Just because the Individual Defendants are highly educated pharmaceutical executives familiar with clinical trial design and FDA practice does not mean, ipso facto, they 'must have known' that the design of APOLLO III rendered dual indication approval for Patisiran radically implausible.").

### 4.    Nonfraudulent Inferences Outweigh Any Inference of Scienter.

Taken individually or collectively, Plaintiffs' allegations do not support an inference of scienter. "[P]laintiffs cannot amalgamate a series of sketchy brushstrokes and call it a van Gogh."

---

[11] *See also iRobot*, 527 F. Supp. 3d at 141 (fact that statements concerned a core product was insufficient absent a "plus factor"); *Metzler*, 928 F.3d at 165 ("[P]laintiffs fail to identify any allegations in the complaint that show that anyone in the company had knowledge regarding the drug's safety profile and sales that contradicted the company's public representations. So, the 'core operations' theory also does little to aid the plaintiffs' case."); *In re Ocular Therapeutix, Inc. Sec. Litig.*, 2019 WL 1950399, at *9 (D. Mass. Apr. 30, 2019) (rejecting core operations allegations as a "non sequitur[]" and "nothing more than a rhetorical flourish, without supporting factual allegations"), *aff'd sub nom. Mehta v. Ocular Therapeutix, Inc.*, 955 F.3d 194 (1st Cir. 2020); *Quinones v. Frequency Therapeutics, Inc.*, 665 F. Supp. 3d 156, 180 (D. Mass. 2023) ("[T]he core operation doctrine cannot itself bootstrap an otherwise insufficient complaint above the high pleading standard imposed by the PSLRA. Given the absence of a plus factor here, [Plaintiffs'] 'core operation' argument fails."), *aff'd*, 106 F.4th 177 (1st Cir. 2024).

16

*Frequency Therapeutics*, 106 F.4th at 184. Even if there were an inference of scienter, however, it would be far outweighed by the nonculpable alternative inference: Defendants did not disclose the DSMB recommendations until December 2023 because that is when Defendants learned about them. Under the PSLRA's "strong inference" standard, any inference of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. This "inquiry is inherently comparative," requiring the Court to ask: "How likely is it that one conclusion, as compared to others, follows from the underlying facts?" *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 699 F. Supp. 2d 331, 341 (D. Mass. 2010) (citing *Tellabs*, 551 U.S. at 323–24). The "court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* The AC itself contains multiple bases for a compelling nonfraudulent inference.

**First**, "the First Circuit has noted that when a pharmaceutical company makes the investment necessary to design and perform a study, the company must have thought that positive results were possible, even if not probable." *Harrington v. Tetraphase Pharms. Inc.*, 2017 WL 1946305, at *6 (D. Mass. May 9, 2017). Here, Defendants spent time and money on successful Phase 2 trials and the Phase 3 Trials through December 2023, so they "must have thought that positive results were possible, even if not probable." *Id.*; *see also Endocyte*, 2016 WL 51260, at *13 (that defendant "continued to fund the Phase 3 studies . . . undermin[ed] any inference that [defendant] knew that the Phase 3 study was futile from the start and would never demonstrate Vintafolide's efficacy"). Defendants even raised money in June 2023 to fund these Trials, which would make no sense if Defendants already knew they would be discontinued. AC ¶173.

**Second**, Defendants would not have chosen to include futility studies by independent DSMBs in the Protocols for the Trials only to ignore the results. *See Sonus Networks*, 261 F. Supp.

17

3d at 120–21 ("ignor[ing] an error that was obvious and that would therefore soon become known . . . might be consistent with fingers-crossed wishful thinking, but that is quite a different mental state than the scienter required to support a cause of action for securities fraud"). DSMB futility analyses are not required by FDA regulations. *See* Use of Data Monitoring Committees In Clinical Trials, 2024 WL 666725, at *3 ("Under FDA regulations, sponsors are not required to use DMCs[12] in clinical trials except under 21 CFR 50.24(a)(7)(iv), where an institutional review board (IRB) can approve a clinical trial in an emergency setting without requiring informed consent from all research subjects, provided certain requirements are met, including the establishment of an independent DMC."); *see also* AC ¶¶ 36, 58–60, 74–77, 88–89.[13] It makes no sense to infer that Defendants voluntarily planned futility analyses, while intending to hide the results from investors.

*Third*, as explained above, the Individual Defendants gained nothing by waiting to disclose the DSMBs' recommendations until December 2023. *Supra* p. 14 & n.7; *iRobot*, 527 F. Supp. 3d at 143 (finding no scienter where there was "no personal gain to the Defendants or other allegations that reflect motive other than an implicit suggestion that the Defendants acted in self-interest to preserve their positions and, presumably, their salaries"); *see also In re WEBMD Health Corp. Sec. Litig.*, 2013 WL 64511, at *13 (S.D.N.Y. Jan. 2, 2013) (inference of scienter less compelling than nonfraudulent alternative where "Plaintiffs have shown no benefit to the individual Defendants"); *In re N. Telecom Ltd. Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000) (finding no scienter where "no individual defendant could have benefitted from the alleged misrepresentations").

*Finally*, the Individual Defendants' stock holdings cut against an inference of scienter.

---

[12] The term "DMC" is synonymous with DSMB. *See* Use of Data Monitoring Committees, 2024 WL 666725, at *1.
[13] Earlier guidance similarly stated: "a DMC is not required or recommended for most clinical studies." Establishment and Operation of Clinical Trial Data Monitoring Committees (FDA Mar. 2006), 2006 WL 1001638, at *4.

Increases in "the individual defendants . . . stock holdings in [the Company] during the [c]lass [p]eriod, and [the fact] that defendants in fact suffered losses as a result of [the Company]'s decline in stock price . . . cut[] against scienter." *Biogen*, 857 F.3d at 44; *see also AVEO Pharms.*, 2015 WL 1276824, at *10 (finding that lack of stock sales "undermin[ed] any scienter inference" and "the absence of such trading . . . is significant, particularly when coupled with a dearth of other specific, factual allegations about motive").[14] Here, both Individual Defendants increased their stockholdings over the class period. *See* Ex. 33 (Dr. Brainard's Forms 4); Ex. 34 (Mr. Sinha's Forms 4). As a result of the December 22, 2023 stock price drop, the Individual Defendants suffered significant financial losses. *See* AC ¶ 186. "[D]efendants' personal losses cut against [an] inference of scienter." *Biogen Inc*, 857 F.3d at 44.

### B.    The AC Fails to Allege Any Actionable Misstatement.

In addition to failing to plead scienter, Plaintiffs' fraud claim fails for another, independent reason: the AC does not identify any actionable misstatement. Not only does the AC fail to plead any false or misleading statement with particularity, but many of the challenged statements are also inactionable forward-looking statements, opinion statements, or puffery.

### 1.    The AC Fails to Allege with Particularity that Any Statement Was False or Misleading When Made.

The AC challenges four categories of statements: (1) statements about AlloVir's successful phase 2 trials,[15] (2) statements that the Trials were ongoing,[16] (3) statements about the expected

---

[14] *See also Abiomed*, 778 F.3d at 246 (fact that defendant "increased his holdings of Abiomed stock by 9.2% during the Class Period . . . negates any inference that he had a motive to artificially inflate Abiomed's stock during that period"); *Vertex Pharms.*, 838 F.3d at 84 (no scienter where individual defendant was "not alleged to have sold any stock during the class period").

[15] *E.g.*, AC ¶ 113 (citing FY 2022 Press Release) ("In January 2023, final data from the CHARMS Phase 2 study of posoleucel for the treatment of viral infections in treatment-refractory allo-HCT patients were published in Clinical Cancer Research. The data demonstrated that 95% of patients with one or more treatment-refractory infections achieved a clinical response with posoleucel."); *see also* AC ¶¶ 103, 105, 107, 109, 113, 122, 130, 135, 140, 145, 152.

[16] *E.g.*, AC ¶ 103 (citing J.P. Morgan Healthcare Conference) ("[W]e have 3 Phase III ongoing global registrational trials for first-to-market indications in treatment and in prevention"); *see also* AC ¶¶ 103, 105, 107, 109, 111, 113, 115, 118, 120, 122, 125, 128, 130, 132, 138, 142, 147, 150, 152, 154.

timing of trial results;[17] and (4) general statements of optimism about the Company's operations.[18] *See also* Ex. 1 (chart of alleged misstatements). The AC alleges that each of these statements was misleading[19] for the same speculative reason: Defendants' alleged omission that the Trials were "futile and thus posoleucel would not obtain FDA approval and become commercially viable." *E.g.*, AC ¶ 104. As explained above, that theory rests on flawed assumptions about when the DSMBs handed down their recommendations to terminate the Trials, and is contrary to the very Protocols and SAP cited in the AC. *Supra* pp. 9–13. The AC does not identify any other basis to challenge these statements. It does not allege, for example, that Defendants misstated the positive results of the earlier Phase 2 trials, or inaccurately described the design of the Phase 3 Trials.

Under the PSLRA and Rule 9(b), such "speculation and conjecture . . . cannot substitute for well-pleaded facts" establishing falsity. *InVivo Therapeutics*, 845 F.3d at 456; *see also Homology Medicines*, 2024 WL 1436025, at *12 (dismissing where "Plaintiffs' claims rely on speculation—that Homology must have concealed some risk since the FDA issued a clinical hold. This speculation is not enough."); *Nw. Biotherapeutics*, 273 F. Supp. 3d at 590 ("Plaintiffs may not substitute factual allegations with the speculation of their expert witness."). The Court need not take Plaintiffs' allegations as true if "the bareness of the factual allegations makes clear that the plaintiff is merely speculating about the fact alleged and therefore has not shown that it is plausible that the allegation is true." *Kader v. Sarepta Therapeutics, Inc.*, 2016 WL 1337256, at *14 (D. Mass. Apr. 5, 2016). Dismissal is warranted because, once Plaintiffs' speculation is set aside, there is "a distinct lack of information as to *how* [the statements] were misleading." *City of*

---

[17] *E.g.*, AC ¶ 113 (citing 2/15/23 earnings press release) (stating that "first-to-market indications anticipated by end of 2023 and data readouts in 2024"); *see also* AC ¶¶ 105, 107, 113, 115, 120, 128, 130, 132, 138, 140, 142, 154.

[18] *E.g.*, AC ¶ 150 (citing 11/2/23 earnings press release) (stating that "AlloVir is in a position of strength with significant financial resources to support operations"); *see also* AC ¶¶ 103, 113.

[19] While analysts may have been "surprised" by the DSMB futility analyses, AC ¶ 12, Defendants had no duty to disclose the details of the Protocols or SAPs in the absence of a misleading statement. *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 144 S. Ct. 885, 889 (2024).

*Bristol Pension Fund v. Vertex Pharm. Inc.*, 12 F. Supp. 3d 225, 238 (D. Mass. 2014).

This case is no different from *Sarepta*, where the plaintiff alleged "that at the start of the Class Period in April 2014, the FDA had already informed Sarepta that its existing dystrophin data was insufficient to support an NDA." *Sarepta*, 2016 WL 1337256, at *14. However, there were "no facts directly supporting Plaintiffs' contention," only speculative inferences drawn "from the timing, diction, and tone" of a later FDA statement from October 30, 2014. *Id.* As a result, the plaintiff's claim about the timing of the FDA communications was not a well-pleaded allegation entitled to a presumption of truth, but a "threadbare or speculative" assertion that "fail[ed] to cross the line between the conclusory and the factual." *Id.* The same is true of Plaintiffs' assertions about the timing of the DSMBs' recommendations, which are speculative on their face.

### 2. The AC Challenges Forward-Looking Statements Immunized by the PSLRA.

Many of the alleged misstatements are independently inactionable because they are forward-looking statements immunized by the PSLRA's safe harbor, 15 U.S.C. § 78u-5. Under this safe harbor, forward-looking statements are immune from challenge if either (i) accompanied by sufficient cautionary language or (ii) made without actual knowledge of falsity. *In re Stone & Webster, Inc. Sec. Litig.*, 414 F.3d 187, 212 (1st Cir. 2005).

The AC challenges numerous statements that are forward-looking. "Forward-looking statements are, generally speaking, statements that speak predictively of the future." *Stone & Webster*, 414 F.3d at 195 (citing 15 U.S.C. § 78u-5(i)(1)).[20] Statements such as "first-to-market

---

[20] *See also AVEO Pharms., Inc.*, 474 F. Supp. 3d at 478 ("despite Plaintiff's claims to the contrary, Defendants' statements about the projected timeline for receiving and analyzing topline results were clearly forward-looking" because "[a] forward-looking statement is a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer"); *Tetraphase Pharms.*, 2017 WL 1946305, at *4, *7–8 (statements like defendants "look[ed] forward to reporting top-line results from the pivotal portion of [its trial] mid-year" were forward looking); *Homology Medicines*, 2024 WL 1436025, at *14 (statements about clinical trials forward-looking).

indications anticipated by end of 2023 and data readouts in 2024" (from a February 15, 2023 press release, AC ¶ 113)[21] were identified as forward-looking[22] and are forward-looking on their face.

These statements are immune from challenge because they were accompanied by meaningful cautionary language. AlloVir warned investors that "clinical trials may be . . . prematurely terminated for a variety of other reasons, such as . . . *a recommendation by a data safety monitoring board* . . . to suspend or terminate clinical trials at any time for safety issues or for any other reason . . . [or] failure to demonstrate a benefit from using a product candidate." Ex. 18 (FY 2022 10-K) at 66–67. AlloVir also warned of the "significant risk that any potential product candidate will fail to demonstrate adequate effect," *id.* at 86, "[t]he results of preclinical studies or earlier clinical trials are not necessarily predictive of future results," *id.* at 69, and "we do not know whether clinical trials . . . will be completed on schedule," *id.* at 66.[23] These detailed and specific warnings were more than adequate to alert investors to potential risks of the clinical trial process, and courts have found indistinguishable cautionary language to be sufficient.[24]

Moreover, and independently, the AC does not plead actual knowledge—a higher bar than the general scienter standard of severe recklessness—because the AC's allegations of scienter are

---

[21] *See also id.* ¶¶ 103, 105, 107, 109, 111, 113, 115, 118, 120, 128, 130, 132, 135, 138, 140, 142, 147, 150, 152, 154.

[22] Ex. 17 (2/15/23 Press Release) at 4 ("This press release contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 . . . ."); *see also* Ex. 15 (1/10/23 J.P. Morgan Healthcare Conference Transcript) at 4; Ex. 16 (1/10/23 J.P. Morgan Healthcare Conference Slide Deck) at 2; Ex. 18 (2/15/23 FY 2022 Form 10-K) at 2–3; Ex. 20 (4/26/23 Press Release) at 2; Ex. 22 (5/4/23 Q1 2023 Press Release); Ex. 23 (5/4/23 Q1 2023 Form 10-Q) at 2–3; Ex. 25 (8/3/23 Q2 2023 Press Release); Ex. 26 (8/3/23 Q2 2023 Form 10-Q) at 2–3; Ex. 28 (11/2/23 Q3 2023 Press Release); Ex. 29 (11/2/23 Q3 2023 Form 10-Q) at 2–3.

[23] *See also* Ex. 2 (Risk Disclosure Chart).

[24] *See, e.g.*, *Homology Medicines*, 2024 WL 1436025, at *14 (D. Mass. Mar. 31, 2024) (risk disclosures that "successful development . . . may never occur if [drug] . . . were found to not be efficacious" and factors "could cause clinical trials to be delayed or terminated" were sufficient cautionary statements); *AVEO Pharms.*, 474 F. Supp. 3d at 479 (statements that clinical trials results were "inherently uncertain as to outcome" and company could not "guarantee that any clinical trials will be conducted as planned or completed on schedule, if at all" "fit squarely within the safe harbor"); *In re Praecis Pharms., Inc. Sec. Litig.*, 2007 WL 951695, at *7–8 (D. Mass. Mar. 28, 2007) (risk disclosures warning that defendant "[m]any factors may affect the market acceptance and commercial success for [drug] . . . including . . . "the effectiveness of [drug]"); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 404 (S.D.N.Y. 2018) (cautionary language that "(1) [defendant]'s clinical trials might fail to demonstrate efficacy, [and] (2) the previous clinical trials might not predict future results"), *aff'd*, 757 F. App'x 35 (2d Cir. 2018).

based on flawed and assumption-filled calculations. *See supra* pp. 9–13; *Praecis*, 2007 WL 951695, at \*9 (when pleading actual knowledge, "the PSLRA ratchets the bar even higher").

### 3.    The AC Challenges Inactionable Statements of Opinion.

Next, the AC challenges several statements of opinion without any cognizable basis. Statements of opinion are not actionable "unless Plaintiffs can allege that (1) the company's opinions were both objectively and subjectively false, *i.e.*, that the person holding the opinion did not subjectively believe in it, (2) self-embedded facts within the opinion are untrue, or (3) material facts about the opinion holder's inquiry into or knowledge concerning a statement of opinion were omitted." *Corban v. Sarepta Therapeutics, Inc.*, 2015 WL 1505693, at \*6 (D. Mass. Mar. 31, 2015) (citing *Omnicare, Inc. v. Laborers Dist. Counsel Constr. Indus. Pension Fund*, 575 U.S. 175 (2015)), *aff'd*, 868 F.3d 31 (1st Cir. 2017). "Without specific allegations of falsity, opinions interpreting the results of a clinical study are not actionable." *Leavitt v. Alnylam Pharms., Inc.*, 451 F. Supp. 3d 176, 184 (D. Mass. 2020).

Many of the alleged misstatements in the AC are statements of opinion. For example, in September 2023, Dr. Brainard said: "I think that we have a good batting average in terms of having successfully done this with our other trials." AC ¶ 147 (quoting 9/11/23 Morgan Stanley Conference); *see also, e.g.*, AC ¶ 111 (quoting 1/10/23 J.P. Morgan Healthcare Conference) ("we feel there is a reason to believe we're well situated for a positive outcome there").[25] Such "subjective statements that reflect judgments as to values that are not objectively determinable" are opinions. *In re Aratana Therapeutics Sec. Litig.*, 315 F. Supp. 3d 737, 758 (S.D.N.Y. 2018).

The AC does not adequately allege that these statements of opinion are actionable. First, the AC provides no well-pleaded facts suggesting that Defendants did not honestly hold their stated

---

[25] *See also* AC ¶¶ 103, 105, 107, 109, 111, 113, 115, 118, 120, 122, 125, 130, 132, 135, 138, 140, 145, 147, 150.

beliefs. *See supra* p. 22–23. Second, the AC does not allege that any embedded statement of fact was untrue. Third, the AC does not adequately allege any omissions. The AC's speculation that Defendants knew of the DSMBs' recommendations when they made the opinion statements is unsupported by particularized allegations. *Supra* pp. 9–13. Opinion statements cannot be challenged based on speculation. *See, e.g.*, *Tetraphase Pharms.*, 2017 WL 1946305, at *6 (holding that challenges to a defendant's opinion cannot "rest[] . . . on assumptions with no basis in the alleged facts or on mere speculation"); *Endocyte*, 2016 WL 51260, at *15 (rejecting claim that defendants "did not have a reasonable basis" for their opinion statements about drug trials, where defendants' alleged knowledge of "futility of the Phase 3 study" was not supported by "sufficient facts").

### 4.      The AC Challenges Inactionable Puffery.

In addition, many of the alleged misstatements are inactionable corporate puffery. It is well established that puffing statements of "loose optimism about both a company's current state of affairs and its future prospects" are immaterial as a matter of law. *In re Biogen Inc., Sec. Litig.*, 193 F. Supp. 3d 5, 41 (D. Mass. 2016), *aff'd* 857 F.3d 34 (1st Cir. 2017).

Many of the statements challenged by the AC consist of just such "loose optimism." For example, in January 2023, Dr. Brainard said she had "a lot of excitement and confidence, which we also feel is shared by the community given the pace of enrollment of the Phase III trial." *E.g.*, AC ¶ 109 (citing J.P. Morgan Healthcare Conference); *see also* AC ¶ 113 (citing FY 2022 Press Release) ("the posoleucel franchise is positioned for potentially significant value creation over the next 12-24 months"); AC ¶ 138 (citing Q2 2023 Press Release) ("We are very pleased with our progress to date and are on track to report data from all three studies in the second half of 2024").[26]

---

[26] *See also* AC ¶¶ 103, 105, 107, 109, 111, 113, 115, 118, 120, 130, 135, 138, 140, 145, 147, 150.

24

Such statements are classic puffery that cannot support a securities fraud claim. *See Biogen*, 193 F. Supp. 3d at 42 (descriptions of drug as "a compelling treatment option for MS patients" and "a terrific product that is going to perform very well in the market" were "immaterial expressions of corporate optimism or puffery").

### 5.   The AC Does Not Allege Any Misstatements by Mr. Sinha.

The AC does not allege that Mr. Sinha made any of the challenged statements. *See* AC ¶¶ 102–155. Thus, the Section 10(b) claim against him should be dismissed for this independent reason. *See, e.g.*, *In re Textron, Inc.*, 811 F. Supp. 2d 564, 574 (D.R.I. 2011) (dismissing claims against individual defendants where plaintiff did not allege they made any misstatements).

## II.   The Section 20(a) Claim Should Be Dismissed.

Because the AC fails to plead a primary Section 10(b) violation, the Section 20(a) claim against the Individual Defendants should be dismissed. *See ACA Financial Guaranty Corp. v. Advest Inc.*, 512 F.3d 46, 67–68 (1st Cir. 2008) ("The plain terms of section 20(a) indicate that it only creates liability derivative of an underlying securities violation. . . . Here, there was no underlying 10b-5 violation. The section 20(a) claim must fail.").

### CONCLUSION

Defendants respectfully request that the Court dismiss the AC with prejudice.

Dated:  August 16, 2024

Respectfully submitted,

ALLOVIR, INC., DIANA BRAINARD, and VIKAS SINHA

By their attorneys,

/s/ *Caroline H. Bullerjahn*
Caroline H. Bullerjahn (BBO No. 657241)
Justin D. Ward (BBO No. 711928)
Brendan Blake (BBO No. 710755)
Laura Noerdlinger (BBO No. 711482)
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
Tel.: 617-570-1000
Fax: 617-523-1231
cbullerjahn@goodwinlaw.com
jward@goodwinlaw.com
bblake@goodwinlaw.com
lnoerdlinger@goodwinlaw.com

*Counsel for Defendants*

26