# Exhibit 18

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2022**

**OR**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934 FOR THE TRANSITION PERIOD FROM TO**

**Commission File Number 001-39409**

# ALLOVIR, INC.
**(Exact name of Registrant as specified in its Charter)**

| | |
|---|---|
| **Delaware** | **83-1971007** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |
| **1100 Winter Street** | |
| **Waltham, MA** | **02451** |
| **(Address of principal executive offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code: (617) 433-2605**

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.0001 per share | ALVR | The Nasdaq Global Select Market |

Securities registered pursuant to Section 12(g) of the Act: **None**

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. YES ☐ NO ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. YES ☐ NO ☒

Indicate by check mark whether the Registrant: (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. YES ☒ NO ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files). YES ☒ NO ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the @Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the Registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). YES ☐ NO ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates of the Registrant was $143.5 million based on the closing price of the shares of common stock on The Nasdaq Global Select Market on June 30, 2022, the last business day of the registrant's most recently completed second quarter. In determining the market value of non-affiliate common stock, shares of the Registrant's common stock beneficially owned by officers, directors and affiliates have been excluded. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

The number of shares of Registrant's Common Stock, par value $0.0001 per share, outstanding as of February 9, 2023 was 93,463,200.

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Proxy Statement for the registrant's 2023 Annual Meeting of Stockholders, or the Proxy Statement, which the Registrant intends to file pursuant to Regulation 14A with the Securities and Exchange Commission not later than 120 days after the Registrant's fiscal year end of December 31, 2022, are incorporated by reference into Part III of this Annual Report on Form 10-K.

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

This Annual Report on Form 10-K contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995. All statements other than statements of historical facts contained in this Annual Report on Form 10-K are forward-looking statements, including but not limited to, statements about:

- the success, cost, timing and potential indications of our product development activities and clinical trials, including the ongoing and future clinical trials of posoleucel and ALVR106;

- the timing of our planned Investigational New Drug, or IND, submissions to the FDA for our product candidates, including ALVR107;

- the timing of the initiation, enrollment and completion of planned clinical trials;

- our plans to research, develop and commercialize our product candidates, including posoleucel, ALVR106, and ALVR107;

- the timing of the initiation, completion and outcomes of our preclinical studies;

- the costs of development of any of our product candidates or clinical development programs and our ability to obtain funding for our operations, including funding necessary to complete the clinical trials of any of our product candidates;

- our ability to successfully manufacture and distribute posoleucel, ALVR106 or any other future product or product candidate;

- the potential benefits of and our ability to maintain our collaboration with our existing collaborators, including BCM, and establish or maintain future collaborations or strategic relationships or obtain additional funding;

- the ability to maintain our existing license agreements, including Baylor College of Medicine, or BCM, and to license additional intellectual property relating to any future product candidates and to comply with our existing license agreements;

- our ability to attract and retain collaborators with development, regulatory and commercialization expertise;

- risks associated with the COVID-19 pandemic, including the emergence of new variants, which may adversely impact our business and clinical trials;

- the size of the markets for our VST product candidates, and our ability to serve those markets;

- whether the results of our clinical trials will be sufficient to support domestic or foreign regulatory approvals for any of our product candidates;

- our ability to successfully commercialize our product candidates, including posoleucel and ALVR106;

- the rate and degree of market acceptance of our product candidates, including posoleucel and ALVR106;

- our ability to obtain and maintain regulatory approval of our product candidates in any of the indications for which we plan to develop them, and any related restrictions, limitations or warnings in the label of any approved product we develop;

- our ability to develop and maintain sales and marketing capabilities, whether alone or with potential future collaborators;

- regulatory developments in the United States and foreign countries with respect to our product candidates or our competitors' products and product candidates;

- our reliance on third-party contract manufacturers and the performance of our third-party suppliers and manufacturers to manufacture and supply our product candidates for us;

- the success of competing therapies that are or become available;

- our ability to attract and retain key scientific or management personnel;

- our expectation about the period of time over which our existing capital resources will be sufficient to fund our operating expenses and capital expenditures;

- our expectations regarding the time during which we will be an emerging growth company under the JOBS Act;

- our financial performance;

- the impact of laws and regulations;

- developments and projections relating to our competitors or our industry;

2

- the accuracy of our estimates regarding expenses, future revenues, capital requirements and needs for additional financing; and

- our expectations regarding our ability to obtain and maintain intellectual property protection for our product candidates and our ability to operate our business without infringing on the intellectual property rights of others.

In some cases, you can identify forward-looking statements by the words "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "might," "objective," "ongoing," "plan," "predict," "project," "potential," "should," "will," or "would," or the negative of these terms, or other comparable terminology intended to identify statements about the future. These statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, levels of activity, performance or achievements to be materially different from the information expressed or implied by these forward-looking statements.

In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based upon information available to us as of the date of this report, and while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain, and investors are cautioned not to unduly rely upon these statements.

You should read the section titled "Risk Factors" set forth in Part I, Item 1A of this Annual Report on Form 10-K for a discussion of important factors that may cause our actual results to differ materially from those expressed or implied by our forward-looking statements. Moreover, we operate in an evolving environment. New risk factors and uncertainties may emerge from time to time, and it is not possible for management to predict all risk factors and uncertainties. As a result of these factors, we cannot assure you that the forward-looking statements in this Annual Report on Form 10-K will prove to be accurate. Except as required by applicable law, we do not plan to publicly update or revise any forward-looking statements contained herein, whether as a result of any new information, future events, changed circumstances or otherwise.

You should read this Annual Report on Form 10-K, completely and with the understanding that our actual future results may be materially different from what we expect. We qualify all of our forward-looking statements by these cautionary statements.

**PART I**

**Item 1. Business.**

**Overview**

We are a leading late clinical-stage cell therapy company developing highly innovative allogeneic T cell therapies to treat and prevent devastating viral diseases. Our innovative and proprietary virus-specific T cell, or VST, therapy platform allows us to generate off-the-shelf VSTs designed to restore immunity in patients with T cell deficiencies who are at risk from the life-threatening consequences of viral diseases. There is an urgent medical need for therapies to treat a large number of patients suffering from viral diseases who currently have limited or no treatment options. We are developing three innovative, allogeneic, off-the-shelf VST therapy candidates targeting 11 different devastating viruses. The most advanced is posoleucel, a multi-VST therapy that targets six viruses: adenovirus, or AdV, BK virus, or BKV, cytomegalovirus, or CMV, Epstein-Barr virus, or EBV, human herpesvirus 6, or HHV-6, and JC virus, or JCV. Posoleucel has the potential to fundamentally transform the treatment landscape for transplant patients by substantially reducing or preventing disease morbidity and mortality, thereby dramatically improving patient outcomes.

Posoleucel is being studied in three ongoing Phase 3 registrational trials for 3 distinct indications - the prevention of clinically significant infections from multiple viruses, the treatment of virus-associated hemorrhagic cystitis, or HC, and the treatment of AdV infections – all in allogeneic hematopoietic cell transplant, or HCT, patients who are at high risk for life-threatening viral infections from the six viruses targeted by posoleucel. We have successfully accelerated the multi-prevention study in recognition of the fact that prevention best addresses patients' unmet medical needs. The three Phase 3 studies are expected to complete enrollment by the end of 2023, enabling potential data readouts from all three trials in 2024.

The three registrational trials were informed by the positive results of proof-of-concept studies with posoleucel for both treatment and prevention. In the CHARMS Phase 2 treatment trial, 95% of allogeneic HCT patients with one or more treatment-refractory infections achieved a clinical response with posoleucel. In the Phase 2 multi-virus prevention trial, posoleucel demonstrated a substantial reduction in the expected rate of clinically significant viral infections or diseases, with 88% of patients remaining free of clinically significant infections caused by any of the six viruses that posoleucel targets through the Week 14 primary endpoint.

In addition to the ongoing Phase 3 registrational studies, posoleucel has been studied in a Phase 2 proof-of-concept study for the treatment of BK viremia in kidney transplant patients. Positive topline results of this study were reported in February 2023, showing balanced safety across posoleucel and placebo groups and clinically meaningful greater viral load declines with posoleucel versus placebo. This is the first study of posoleucel in SOT patients, and the results of this trial will inform next steps for this potential indication as well as the company's broader SOT strategy.

Based on the strength of the posoleucel Phase 2 data for both treatment and prevention, the FDA has granted posoleucel Regenerative Medicine Advanced Therapy (RMAT) designation for each of the three indications being evaluated in Phase 3 clinical trials – for the treatment of HC caused by BKV, for the treatment of AdV infection in adults and children following allo-HCT, and for the prevention of clinically significant infections and disease caused by posoleucel's six target viruses. Similarly, based on data generated from the Phase 2 POC treatment trial and the critical medical need, the European Medicines Agency (EMA) has granted posoleucel PRIority MEdicines (PRIME) designation for the treatment of serious infections with AdV, BKV, CMV, EBV and HHV-6. Posoleucel was one of the first seven investigational therapies to receive both PRIME and RMAT designations and, to our knowledge, is the only investigational therapy to receive three RMAT designations. While these designations may not lead to a faster development process and do not increase the likelihood that a product candidate will receive approval from the FDA or EMA, we expect that PRIME and RMAT designations will result in increased EMA and FDA interactions to support our development efforts and may enable an expedited regulatory review process. In addition, the FDA also granted posoleucel Orphan Drug Designation for the treatment of virus-associated HC, and the EMA granted Orphan Medicinal Product designation to posoleucel for its targeted viruses in HCT patients, including for the potential prevention of infections or disease by these viruses.

In clinical trials conducted to date, we have treated more than 300 transplant patients with either single or multi-virus targeted allogeneic VSTs, and our product candidates have been generally well-tolerated and have been associated with clinical benefit. We believe that our allogeneic, off-the-shelf VSTs can benefit patients with other conditions characterized by T-cell deficiencies who are at high risk for life-threatening viral diseases, including immunocompromised cancer patients, the elderly and young children with immature immune systems. We are advancing a pipeline of VST therapies for delivery to individuals with compromised immune systems and those who are at high risk, or suffering from, the life-threatening consequences of viral diseases.

Our proprietary VST manufacturing platform enables the rapid, robust and reproducible generation of single-virus and multi-virus specific cell therapeutic candidates for clinical use. Our VST production process selectively expands polyclonal (CD4+ helper and CD8+ cytotoxic) virus-targeted T-cell populations. The critical components of our off-the-shelf VST platform, for which patents are issued and/or pending, include:

- Methods of identifying immunodominant viral antigens in target viruses;

4

We believe our data provide preliminary evidence demonstrating that posoleucel has the potential to meet unmet medical needs in allogeneic HCT patients with virus-associated HC.

### Clinical Development Plan

We have initiated our Phase 3 virus-associated-HC registrational trial. This Phase 3, multicenter, randomized, double-blind, placebo-controlled trial is designed to assess the safety and efficacy of posoleucel therapy compared to placebo for the treatment of patients with virus-associated HC following allogeneic HCT. The primary endpoint is the time to resolution of macroscopic hematuria. As these HCT patients often experience multiple viral infections, secondary endpoints include the reduction in viral load for AdV, CMV, EBV, HHV-6 and JCV.



## Virus-Associated Hemorrhagic Cystitis Pivotal Trial Design

- Phase 3, multicenter, double-blind, placebo-controlled
- Key eligibility criteria: patients with vHC following allogeneic HCT
  - Macroscopic hematuria (Grade ≥3)
  - Viruria
  - Dysuria, lower abdominal pain and/or pain associated with spasm
- Primary endpoint: time to resolution of macroscopic hematuria through Week 24

ClinicalTrials.gov NCT04390113

*Figure 13. Phase 3, multicenter, randomized, double-blind, placebo-controlled virus-associated HC trial design*

In addition to the PRIME and orphan drug designations granted by the EMA, posoleucel has received an RMAT designation from the FDA for the treatment of HC caused by BKV in adults and children following an allogeneic HCT. We expect that RMAT designation will result in increased FDA interactions to support our development efforts and may enable an expedited regulatory review process for product approval.

### Treatment of Adenovirus Infections

AdV viremia occurs in 32% of pediatric allogeneic HCT patients and 6% of adult allogeneic HCT patients. In the HCT setting, patients can present with AdV disease due either to reactivation or de novo exposure. Infection usually occurs between two and three months post-transplant and is a significant cause of morbidity and mortality. The spectrum of AdV-associated disease in HCT patients ranges from mild gastroenteric or respiratory symptoms to severe hemorrhagic enteritis, hemorrhagic cystitis, nephritis, hepatitis, pneumonia, encephalitis, myocarditis, and potentially lethal multiple organ involvement, frequently associated with hepatic failure. Off-label use of cidofovir has been established as the current standard of care treatment to control the replication of virus and prevent disseminated viremia. However, it has limited efficacy irrespective of dose and its use is limited due to toxicity to the kidneys and poor bioavailability. To date, no adequately powered, randomized well-controlled trials demonstrating significant efficacy of cidofovir use for adenoviral disease versus control have been performed.

23

*Posoleucel Clinical Data—AdV*

In our CHARMS trial, 83% of patients with AdV infection achieved a response by six weeks post-infusion.

*Clinical Development Plan*

We initiated our Phase 3 AdV trial at the end of 2021. The Phase 3 trial is a multicenter, randomized, double-blind, placebo-controlled trial designed to assess the safety and efficacy of posoleucel therapy for the treatment of pediatric and adult allogeneic HCT patients with AdV infection.



**Adenovirus Pivotal Trial Design**

- Phase 3, randomized, double-blind, placebo-controlled
- Key eligibility criteria: patients with adenovirus reactivation following allogeneic HCT
  - AdV viremia ≥10,000 copies/mL, OR
  - 2 consecutive, rising AdV viremia ≥1,000 copies/mL and lymphopenia or T-cell depletion
- Primary endpoint: proportion of patients with undetectable viremia at Day 29
- Patients with disease progression can enter optional 24-week cross-over period after Week 4

ClinicalTrials.gov NCT05179057.

*Figure 14. Phase 3, randomized, double-blind, placebo-controlled adenovirus treatment trial design*

*Prevention of Multi-Virus Infection and Associated Disease in HCT Patients*

Approximately 90% of all allogeneic HCT patients experience at least one infection associated with BKV, CMV, AdV, EBV or HHV-6 and more than 60% of patients experience infections caused by two or more of these five viruses within 100 days post-allogeneic HCT. Because of the increased morbidity and mortality associated with viral infections in transplant patients, prevention of viral disease is important for the overall health and survival of patients. Prophylactic therapy, which is a treatment administered to patients at risk for developing viral disease, and preemptive therapy, a treatment of patients with evidence of virus replication in blood, are the two major strategies used for disease prevention. Clinical guidelines recommend that allogeneic HCT patients infected with CMV or AdV should be monitored weekly for virus replication with a sensitive diagnostic technique for at least the first three months after HCT. There are currently no FDA- or EMA-approved antiviral therapies for prevention of multiple viral diseases or infections in transplant patients with one single therapy. For CMV alone, letermovir is approved for CMV in seropositive patients. However, drug resistant CMV has emerged with the use of letermovir, which may limit or restrict its utility.

*Posoleucel Clinical Data—Multi-Virus Prevention in HCT Patients*

Out of 26 high-risk allo-HCT patients who received posoleucel in this open-label study, 22 (85%) patients experienced reactivation of at least one of posoleucel's target viruses. Despite these expected high rates of viral reactivation, only three clinically significant infections were observed through Week 14. These results represent a substantial reduction in the expected rate of clinically significant viral infections or diseases in this high-risk patient population. Biomarker analyses demonstrated that viral control was associated with expansion of functional VSTs, and the presence of posoleucel was confirmed both during the infusion period and up to 14 weeks after

24

the last infusion.

Treatment with up to seven doses of posoleucel over 12 weeks was generally well tolerated with no unanticipated safety signals. Rates of GVHD were similar in frequency and severity to those expected in this high-risk allo-HCT population. Three (12%) treatment-related serious adverse events were reported. No episodes of cytokine release syndrome were reported.

***Clinical Development Plan***

Based on preliminary data from the open-label, Phase 2 POC study for multi-virus prevention, we initiated a global, registrational Phase 3 multicenter, randomized, double-blind, placebo-controlled clinical trial of posoleucel for multi-virus prevention. The study is enrolling patients in North America, Europe, Asia and Australia.



## Multi-Virus Prevention Pivotal Trial Design

- Phase 3, multicenter, randomized, double-blind, placebo-controlled
- Key eligibility criteria: high-risk* allo-HCT recipients, including matched unrelated donor
  - Age ≥1 year
  - Aviremic or viremic without clinically significant disease
- Primary endpoint: reduction in clinically significant viral infection and disease

*High-risk allo-HCT defined as haploidentical donor, umbilical cord blood, mismatched unrelated donor, matched unrelated donor, mismatched related donor, recipient of T cell depletion.
ClinicalTrials.gov NCT05305048.

*Figure 15. Phase 3, randomized, double-blind, placebo-controlled multi-virus prevention trial design*

***Treatment of BKV Infections in Kidney Transplant Patients***

BK virus reactivation in KT patients is due to T-cell immune deficiencies caused by intensive immunosuppressive induction therapy followed by maintenance immunosuppressive treatment. BKV reactivation causes interstitial nephritis and progressive allograft injury. Routine screening for BKV reactivation after transplantation has been widely recommended and is performed at most transplant centers. The goal of diagnosing and managing BK viremia early in the course of active infection is to prevent allograft failure that is associated with BKV-associated nephropathy. BK viremia is detected in up to 20% of KT patients and up to 50% of patients with BK viremia progresses to BK nephropathy, resulting in decreased graft function and graft survival. Nearly half of all patients who develop BK nephropathy experience allograft failure. Because KT patients remain on immunosuppression for life, BK viremia and BK nephropathy onset is not restricted to the first year post-transplant. There are currently no FDA- or EMA-approved therapies for the treatment of BK viremia or BK nephropathy in KT patients. Treatment primarily involves reduction of immunosuppression. However, this results in patients being at increased risk of immune mediated acute allograft rejection.

**Risks Related to the Clinical Development, Regulatory Review and Approval of Our Product Candidates**

Risks Related to Clinical Development

*We are early in our development efforts and have only a small number of product candidates in clinical development. All of our other product candidates are still in preclinical development. If we or our collaborators are unable to successfully develop and commercialize product candidates or experience significant delays in doing so, our business may be materially harmed.*

We are early in our development efforts, and only a small number of our product candidates are in or are entering into clinical development. The majority of our product candidates are currently in preclinical development. We have invested substantial resources in identifying and developing potential product candidates, conducting preclinical studies and clinical trials and developing an efficient and scalable manufacturing process for our product candidates. Our ability to generate revenues, which we do not expect will occur for several years, if ever, will depend heavily on the successful development and eventual commercialization of our product candidates. The success of our product candidates and our ability to generate revenues and achieve profitability will depend on many factors, including the following:

- completion of preclinical studies and clinical trials with positive results;

- receipt of regulatory approvals from applicable authorities and successful completion of any post-marketing requirements or commitments;

- protecting our rights in our intellectual property portfolio, including by obtaining and maintaining patent and trade secret protection and regulatory exclusivity for our product candidates;

- establishing and maintaining adequate supply of our product candidates, including third-party donor starting material for global clinical trials, raw materials used in the manufacturing process, manufacturing capacity and release testing capacity;

- establishing and qualifying redundant supplies for critical starting materials including third-party donor material, cell culture media, peptides, cytokines, human AB serum and drug product final formulation buffer;

- establishing or making arrangements with third-party manufacturers or completing our own manufacturing facility for clinical and commercial manufacturing purposes;

- developing manufacturing and distribution processes for our multi-VST cell therapy product candidates;

- manufacturing our product candidates at an acceptable cost;

- attracting, hiring and retaining qualified personnel;

- launching commercial sales of our products, if approved by applicable regulatory authorities, whether alone or in collaboration with others;

- acceptance of our products, if approved by applicable regulatory authorities, by patients and the medical community;

- obtaining and maintaining coverage and adequate reimbursement by third-party payors, including government payors, for our products, if approved by applicable regulatory authorities;

- effectively competing with other therapies;

- protecting our rights in our intellectual property portfolio;

- maintaining a continued acceptable benefit/risk profile of the products following approval; and

- maintaining and growing an organization of scientists and functional experts who can develop and commercialize our products and technology.

62

If we do not achieve one or more of these factors in a timely manner or at all, we could experience significant delays or an inability to successfully develop and commercialize our product candidates, which could materially harm our business. Our revenues for any of our product candidates for which regulatory approval is obtained will be dependent, in part, upon the size of the markets in the territories for which we gain regulatory approval, the accepted price for the product, the ability to obtain reimbursement at any price, and whether we own the commercial rights for such territory. If the addressable patient population in such territory is not as significant as we estimate, the indication approved by regulatory authorities is narrower than we expect, or the reasonably accepted population for treatment is narrowed by competition, physician choice or treatment guidelines, we may not generate significant revenues from sales of our products, even if approved. In addition, we anticipate incurring significant costs associated with commercializing any approved product candidate. As a result, even if we generate revenues, we may not become profitable and may need to obtain additional funding to continue operations. If we fail to become profitable or are unable to sustain profitability on a continuing basis, then we may be unable to continue our operations as planned and may be forced to reduce or discontinue our operations. In addition, regulators may determine that our financial relationships with our principal investigators, some of whom receive compensation as consultants, in a perceived or actual conflict of interest, may have affected the interpretation of a study, the integrity of the data generated at the applicable clinical trial site or the utility of the clinical trial.

***Our future success is dependent on the regulatory approval of our product candidates. The regulatory approval processes of the FDA and comparable foreign authorities are lengthy, time consuming and inherently unpredictable, and if we are ultimately unable to obtain regulatory approval for our product candidates, our business will be substantially harmed.***

We have not obtained regulatory approval for any of our product candidates, including our clinical-stage product candidates, posoleucel and, ALVR106. Our business is substantially dependent on our ability to obtain regulatory approval for, and, if approved, to successfully commercialize our product candidates in a timely manner.

We cannot commercialize product candidates in the United States without first obtaining regulatory approval from the FDA; similarly, we cannot commercialize product candidates outside of the United States without obtaining regulatory approval from comparable foreign regulatory authorities. Before obtaining regulatory approvals for the commercial sale of any product candidate for a target indication, we must demonstrate with substantial evidence gathered in preclinical studies and clinical trials, that the product candidate is safe and effective for use for that target indication and that the manufacturing facilities, processes and controls are adequate with respect to such product candidate to assure safety, purity and potency.

The time required to obtain approval by the FDA and comparable foreign regulatory authorities is unpredictable but typically takes many years following the commencement of preclinical studies and clinical trials and depends upon numerous factors, including the study designs and substantial discretion of the regulatory authorities. In addition, approval policies, regulations, or the type and amount of clinical data necessary to gain approval may change during the course of a product candidate's clinical development and may vary among jurisdictions. We have not obtained regulatory approval for any product candidate and it is possible that none of our existing product candidates or any future product candidates will ever obtain regulatory approval.

Our product candidates could fail to receive regulatory approval from the FDA or a comparable foreign regulatory authority for many reasons, including:

- disagreement with the design or conduct of our clinical trials;
- failure to demonstrate to the satisfaction of regulatory agencies that our product candidates are safe and effective, or have a positive benefit/risk profile for its proposed indication;
- failure of clinical trials to meet the level of statistical significance required for approval;
- disagreement with our interpretation of data from preclinical studies or clinical trials;
- the insufficiency of data collected from clinical trials of our product candidates to support the submission and filing of a Biologics License Application, or BLA, or other submission or to obtain regulatory approval;
- failure to obtain approval of our manufacturing processes or facilities of third-party manufacturers with whom we contract for clinical and commercial supplies or our own manufacturing facility;
- changes in the approval policies or regulations that render our preclinical and clinical data insufficient for approval; or
- our failure to obtain and retain accurate data in our clinical trials.

This lengthy approval process as well as the unpredictability of future clinical trial results may result in our failing to obtain regulatory approval to market our product candidates, which would significantly harm our business, results of operations and prospects. The FDA or a comparable foreign regulatory authority may require more information, including additional preclinical or clinical data to support approval, which may delay or prevent approval and our commercialization plans, or we may decide to abandon the development program. If we were to obtain approval, regulatory authorities may approve any of our product candidates for fewer or more limited

indications than we request (including failing to approve the most commercially promising indications), may grant approval contingent on the performance of costly post-marketing clinical studies, or may approve a product candidate with a label that does not include the labeling claims necessary or desirable for the successful commercialization of that product candidate.

In addition, the clinical trial requirements of the FDA, the European Medicines Agency, or the EMA, and other regulatory agencies and the criteria these regulators use to determine the safety and efficacy of a product candidate are determined according to the type, complexity, novelty and intended use and market of the potential products. The regulatory approval process for novel product candidates, such as our novel multi-VST-cell therapy, can be more complex and consequently more expensive and take longer than for other, better known or extensively studied pharmaceutical or other product candidates. There are currently no FDA approved cell-based therapies for the treatment of viral diseases, including those that our product candidates are designed to target. Moreover, our product candidates may not perform successfully in clinical trials or may be associated with adverse events.

Risks Related to the Industry

***Disruptions at the FDA and other government agencies caused by funding shortages or global health concerns could hinder their ability to hire, retain or deploy key leadership and other personnel, or otherwise prevent new or modified products from being developed, approved, or commercialized in a timely manner or at all, which could negatively impact our business.***

The ability of the FDA to review and approve new products can be affected by a variety of factors, including government budget and funding levels, statutory, regulatory, and policy changes, the FDA's ability to hire and retain key personnel and accept the payment of user fees, and other events that may otherwise affect the FDA's ability to perform routine functions. Average review times at the agency have fluctuated in recent years as a result. In addition, government funding of the SEC and other government agencies on which our operations may rely, including those that fund research and development activities is subject to the political process, which is inherently fluid and unpredictable. Disruptions at the FDA and other agencies may also slow the time necessary for biological products, or biologics, or modifications to approved biologics to be reviewed and/or approved by necessary government agencies, which would adversely affect our business. If a prolonged government shutdown occurs, it could significantly impact the ability of the FDA to timely review and process our regulatory submissions, which could have a material adverse effect on our business. Further, future government shutdowns could impact our ability to access the public markets and obtain necessary capital in order to properly capitalize and continue our operations. For example, over the last several years, including for 35 days beginning on December 22, 2018, the U.S. government has shut down several times and certain regulatory agencies, such as the FDA, have had to furlough critical FDA employees and stop critical activities.

Since March 2020 when foreign and domestic inspections of facilities were largely placed on hold, the FDA has been working to resume routine surveillance, bioresearch monitoring and pre-approval inspections on a prioritized basis. Should the FDA determine that an inspection is necessary for approval and an inspection cannot be completed during the review cycle due to restrictions on travel, and the FDA does not determine a remote interactive evaluation to be adequate, the agency has stated that it generally intends to issue, depending on the circumstances, a complete response letter or defer action on the application until an inspection can be completed. During the COVID-19 public health emergency, a number of companies announced receipt of complete response letters due to the FDA's inability to complete required inspections for their applications. Regulatory authorities outside the U.S. may adopt similar restrictions or other policy measures in response to the ongoing COVID-19 pandemic and may experience delays in their regulatory activities.

***The regulatory landscape that applies to gene and cell therapy product candidates is rigorous, complex, uncertain and subject to change. Our single- and multi-VST cell therapy product candidates represent new therapeutic approaches that could result in heightened regulatory scrutiny, delays in clinical development or delays in or our ability to achieve regulatory approval, if at all, and commercialization or payor coverage and reimbursement of our product candidates, if approved.***

Our future success is dependent on our single- and multi-VST cell therapy approach. Because these programs, particularly our pipeline of allogeneic T cell product candidates that are bioengineered from donors, represent a unique approach to immunotherapy for the treatment of virus-infected cells in order to restore T cell immunity, developing and commercializing our product candidates subjects us to a number of challenges, including:

- obtaining regulatory approval from the FDA and other regulatory authorities, which have limited experience with regulating the development and commercialization of T cell immunotherapies;

- developing and deploying consistent and reliable processes for procuring blood from consenting third-party donors, isolating T cells from the blood of such donors, activating the isolated T cells against specific antigens, characterizing and storing the resulting activated T cells for future therapeutic use, selecting and delivering a sufficient supply and breadth of appropriate partially HLA-matched cell line from among the available T cell lines, and finally infusing these activated T cells into patients to enable the VSTs to recognize and eliminate virus-infected cells in the patient and induce antiviral benefit;

subscribe to the novel treatment mechanics. The FDA or other applicable regulatory authorities may ask for specific post-market requirements, such as establishment of a Risk Evaluation and Mitigation Strategy, or REMS, and additional information informing benefits or risks of our products may emerge at any time prior to or after regulatory approval.

Physicians, hospitals and third-party payors are often slow to adopt new products, technologies and treatment practices that require additional upfront costs and training. Based on these and other factors, hospitals and payors may decide that the benefits of this new therapy do not or will not outweigh its costs.

***Clinical drug development involves a lengthy and expensive process with an uncertain outcome, and the inability to successfully and timely conduct clinical trials and obtain regulatory approval for our product candidates would substantially harm our business.***

Clinical testing is expensive and can take many years to complete, and its outcome is inherently uncertain. Failure can occur at any time during the clinical trial process. Product candidates in later stages of clinical trials may fail to show the desired safety and efficacy traits despite having progressed through preclinical studies and clinical trials.

We may experience delays in our ongoing or future clinical trials and we do not know whether clinical trials will begin or enroll subjects on time, will need to be redesigned or will be completed on schedule, if at all, such as on account of the COVID-19 pandemic and its impact at clinical trials sites or on the third-party service providers on whom we rely. In July 2020, the Investigational New Drug, or IND that Baylor College of Medicine, or BCM, submitted for ALVR109 was placed on clinical hold for safety concerns related to the quality of ancillary reagents unique to ALVR109. The FDA subsequently lifted this clinical hold and cleared the IND for ALVR109 but there can be no assurance that the FDA or comparable foreign regulatory authorities will not put clinical trials of any of our product candidates on clinical hold in the future. Any inability to commence or complete our planned clinical trials of our product candidates as a result of a clinical hold or otherwise, will delay or terminate our clinical development plans for our product candidates, may require us to incur additional clinical development costs and could impair our ability to ultimately obtain FDA approval for our product candidates. Clinical trials may be delayed, suspended or prematurely terminated for a variety of other reasons, such as:

- delay or failure in reaching agreement with the FDA or a comparable foreign regulatory authority on the design and implementation of clinical trials;

- delay or failure in obtaining authorization to commence a trial, including the delay or ability to generate sufficient preclinical data to support initiation of clinical trials, or inability to comply with conditions imposed by a regulatory authority regarding the scope or design of a trial;

- delay or failure in reaching agreement on acceptable terms with prospective CROs and clinical trial sites, the terms of which can be subject to extensive negotiation and may vary significantly among different CROs and trial sites;

- the inability of CROs to perform under these agreements, including due to impacts from the COVID-19 pandemic on their workforce;

- delay or failure in obtaining IRB approval or the approval of other reviewing entities, including comparable foreign regulatory authorities, to conduct a clinical trial at each site;

- withdrawal of clinical trial sites from our clinical trials or the ineligibility of a site to participate in our clinical trials;

- delay or failure in recruiting and enrolling suitable subjects to participate in a trial;

- delay or failure in subjects completing a study or returning for post-treatment follow-up;

- clinical sites and investigators deviating from study protocol, failing to conduct the study in accordance with regulatory requirements, or dropping out of a study;

- inability to identify and maintain a sufficient number of trial sites, including because potential trial sites may already be engaged in competing clinical trial programs for the same indication that we are treating;

- failure of our third-party clinical trial managers to satisfy their contractual duties, meet expected deadlines or return trustworthy data;

- delay or failure in adding new trial sites, including due to changes in policies of the clinical research sites or local IRBs;

- interim results or data that are ambiguous or negative or are inconsistent with earlier results or data;

- feedback from the FDA, the IRB, data safety monitoring boards or comparable foreign authorities, or results from earlier stage or concurrent preclinical studies and clinical trials, that might require modification to the protocol for a study;

66

- a decision by the FDA, the IRB, comparable foreign authorities, or us, or a recommendation by a data safety monitoring board or comparable foreign authority, to suspend or terminate clinical trials at any time for safety issues or for any other reason;

- unacceptable benefit/risk profile, unforeseen safety issues or adverse side effects;

- failure to demonstrate a benefit from using a product candidate;

- difficulties in finding subjects from whom to obtain cell lines, including on account of the COVID-19 pandemic;

- difficulties in locating cell lines for which it is difficult to find a match;

- difficulties in manufacturing or obtaining from third parties sufficient quantities and breadth of appropriate partially HLA matched cell lines from among the available T cell lines to start or to use in clinical trials;

- lack of adequate funding to continue a study, including the incurrence of unforeseen costs due to enrollment delays, requirements to conduct additional studies or increased expenses associated with the services of our CROs and other third parties; or

- changes in governmental regulations or administrative actions, failure by us or third parties to comply with regulatory requirements, or lack of adequate funding to continue a clinical trial.

- Patient enrollment, a significant factor in the timing of clinical trials, is affected by many factors including:

- the size and nature of the patient population;

- the possibility that the viral diseases that many of our product candidates address are under-diagnosed;

- changing medical practice patterns or guidelines related to the indications we are investigating;

- the severity of the disease under investigation, our ability to open clinical trial sites;

- the proximity of subjects to clinical sites;

- travel restrictions and other potential limitations by federal, state, or local governments affecting the workforce or affecting clinical research site policies implemented in response to the COVID-19 pandemic;

- delays in or temporary suspension of the enrollment of patients in our ongoing and planned clinical trials due to the COVID-19 pandemic;

- the patient referral practices of physicians;

- the design and eligibility criteria of the clinical trial;

- ability to obtain and maintain patient consents;

- risk that enrolled subjects will drop out or die before completion;

- competition for patients from other clinical trials;

- our ability to manufacture the requisite materials for a trial;

- risk that we do not have appropriately matched HLA cell lines; and

- clinicians' and patients' perceptions as to the potential advantages and risks of the product candidate being studied in relation to other available therapies, including any new product candidates that may be approved for the indications we are investigating.

In addition, disruptions caused by the COVID-19 pandemic may increase the likelihood that we encounter such difficulties or delays in initiating, enrolling, conducting or completing our planned and ongoing clinical trials. We could also encounter delays if a clinical trial is suspended or terminated by us, by the IRBs of the institutions in which such trials are being conducted, by a Data Safety Monitoring Board for such trial or by the FDA or comparable foreign regulatory authorities. Such authorities may impose such a suspension or termination due to a number of factors, including failure to conduct the clinical trial in accordance with regulatory requirements or our clinical protocols, inspection of the clinical trial operations or trial site by the FDA or comparable foreign regulatory authorities resulting in the imposition of a clinical hold, unforeseen safety issues or adverse side effects, failure to demonstrate a benefit from using a drug, changes in governmental regulations or administrative actions or lack of adequate funding to continue the clinical trial. In addition, changes in regulatory requirements and policies may occur, and we may need to amend clinical trial protocols to comply with these changes. Amendments may require us to resubmit our clinical trial protocols to IRBs for reexamination, which may impact the costs, timing or successful completion of a clinical trial.

***The results of preclinical studies or earlier clinical trials are not necessarily predictive of future results. Our existing product candidates in clinical trials, and any other product candidate we advance into clinical trials, may not have favorable results in later clinical trials or receive regulatory approval.***

Success in preclinical studies and early clinical trials does not ensure that later clinical trials, including our Phase 3 pivotal and Phase 2 proof-of-concept clinical trials of posoleucel, will generate adequate data to demonstrate the efficacy and safety of any of our product candidates. Likewise, a number of companies in the pharmaceutical and biotechnology industries, including those with greater resources and experience than us, have suffered significant setbacks in clinical trials, even after seeing promising results in earlier preclinical studies or clinical trials. Despite the results reported in earlier preclinical studies or clinical trials for our product candidates, to date, results may not be replicated in subsequent trials, and we do not know whether the clinical trials we may conduct will demonstrate adequate efficacy and safety to result in regulatory approval to market posoleucel, ALVR106, ALVR109 or any future product candidates we develop from our allogeneic T cell immunotherapy platform. Additionally, certain of our clinical trial endpoints also may not be adequately powered in a particular subpopulation of our trial population. Additionally, all of our clinical trials to date have been open-label trials. An "open-label" clinical trial is one where both the patient and investigator know whether the patient is receiving the investigational product candidate or either an existing approved drug or placebo. Most typically, open-label clinical trials test only the investigational product candidate and sometimes may do so at different dose levels. Open-label clinical trials are subject to various limitations that may exaggerate any therapeutic effect as patients in open-label clinical trials are aware when they are receiving treatment. Open-label clinical trials may be subject to a "patient bias" where patients perceive their symptoms to have improved merely due to their awareness of receiving an experimental treatment. In addition, open-label clinical trials may be subject to an "investigator bias" where those assessing and reviewing the physiological outcomes of the clinical trials are aware of which patients have received treatment and may interpret the information of the treated group more favorably given this knowledge. The results from an open-label trial may not be predictive of future clinical trial results with any of our product candidates for which we include an open-label clinical trial when studied in a controlled environment with a placebo or active control.

Efficacy data from prospectively designed trial may differ significantly from those obtained from retrospective subgroup analyses. In addition, clinical data obtained from a clinical trial with an allogeneic product candidate such as posoleucel may not yield the same or better results as compared to an autologous product candidate. Moreover, preclinical and clinical data are often susceptible to varying interpretations and analyses, and many companies that believed their product candidates performed satisfactorily in such studies nonetheless failed to obtain FDA, EMA or other necessary regulatory agency approval.

If later-stage clinical trials do not produce favorable results, our ability to achieve regulatory approval for any of our product candidates will be adversely impacted. Even if we believe that we have adequate data to support an application for regulatory approval to market any of our product candidates, no cell-based therapies for the treatment of viral diseases have been approved to date, and the FDA or other regulatory authorities may not agree and may require that we conduct additional clinical trials to support the regulatory approval of our product candidates. If we fail to obtain results in our planned and future preclinical and clinical activities and studies sufficient to meet the requirements of the relevant regulatory agencies, the development timeline and regulatory approval and commercialization prospects for any potential product candidate, and, correspondingly, our business and financial prospects, would be materially adversely affected.

***Interim, "topline" or preliminary data from our clinical trials that we may announce or share with regulatory authorities from time to time may change as more patient data become available and are subject to audit and verification procedures that could result in material changes in the final data.***

From time to time, we may announce or share with regulatory authorities interim "topline" or preliminary data from our clinical trials, such as the June 2022 announcement of preliminary results for our Phase 2 posoleucel study for the treatment of BK virus, or BKV, in adult kidney transplant recipients, which is based on a preliminary analysis of then-available data, and the results and related findings and conclusions are subject to change following a more comprehensive review of the data related to the particular study or trial. We also make assumptions, estimations, calculations and conclusions as part of our analyses of data, and we may not have received or had the opportunity to fully and carefully evaluate all data. As a result, the topline or preliminary results that we report may differ from future results of the same studies, or different conclusions or considerations may qualify such results, once additional data have been received and fully evaluated. Interim data from clinical trials that we may complete are subject to the risk that one or more of the clinical outcomes may materially change as patient enrollment continues and more patient data become available. We also make assumptions, estimations, calculations and conclusions as part of our analyses of data, and we may not have received or had the opportunity to fully and carefully evaluate all data. Preliminary or "topline" data also remain subject to audit and verification procedures that may result in the final data being materially different from the preliminary data we previously announced. As a result, interim, "topline," and preliminary data should be viewed with caution until the final data are available. Adverse differences between preliminary, "topline," or interim data and final data could impact the regulatory approval of, and significantly harm the prospects for any product candidate that is impacted by the applicable data.

Further, others, including regulatory agencies, may not accept or agree with our assumptions, estimates, calculations, conclusions or analyses or may interpret or weigh the importance of data differently, which could impact the value of the particular program, the approvability or commercialization of the particular product candidate or product and our business in general. In addition, the information we choose to publicly disclose regarding a particular study or clinical trial is based on what is typically extensive information, and you or others may not agree with what we determine is the material or otherwise appropriate information to include in our disclosure, and any information we determine not to disclose may ultimately be deemed significant with respect to future decisions, conclusions, views, activities or otherwise regarding a particular product candidate or our business. If the interim, "topline," or preliminary data that we report differ from actual results, or if others, including regulatory authorities, disagree with the conclusions reached, our ability to obtain approval for and commercialize our product candidates, our business, operating results, prospects or financial condition may be harmed.

***Our product candidates, the methods used to deliver them or their dosage levels may cause undesirable side effects or have other properties that could delay or prevent their regulatory approval, limit the commercial profile of an approved label or result in significant negative consequences following any regulatory approval.***

Undesirable side effects caused by our product candidates, their delivery methods or dosage levels could cause us or regulatory authorities to interrupt, delay or halt clinical trials and could result in a more restrictive label or the delay or denial of regulatory approval by the FDA or other comparable foreign regulatory authority. As a result of safety or toxicity issues that we may experience in our clinical trials, we may not receive approval to market any product candidates, which could prevent us from ever generating revenues or achieving profitability. Results of our trials could reveal an unacceptably high severity and incidence of side effects, or side effects outweighing the benefits of our product candidates. In such an event, our studies could be delayed, suspended or terminated and the FDA or comparable foreign regulatory authorities could order us to cease further development of or deny approval of our product candidates for any or all targeted indications. The drug-related side effects could affect patient recruitment or the ability of enrolled subjects to complete the trial or result in potential product liability claims. In addition, while we note the summary of safety findings we have gathered, to date, certain populations of patients receiving our product candidates may experience side effects in greater frequency or severity than others who may receive our product candidates and additional clinical research is planned to more fully understand the safety profile of our product candidates in our patient populations and indications of focus.

Additionally, if any of our product candidates receives regulatory approval, and we or others later identify undesirable side effects caused by such product, a number of potentially significant negative consequences could result. For example, the FDA could require us to adopt a REMS to ensure that the benefits of treatment with such product candidate outweigh the risks for each potential patient, which may include, among other things, a communication plan to health care practitioners, patient education, extensive patient monitoring or distribution systems and processes that are highly controlled, restrictive and more costly than what is typical for the industry. We or our collaborators may also be required to adopt a REMS or engage in similar actions, such as patient education, certification of health care professionals or specific monitoring, if we or others later identify undesirable side effects caused by any product that we develop alone or with collaborators. Other potentially significant negative consequences include that:

- we may be forced to suspend marketing of that product, or decide to remove the product form the marketplace;

- regulatory authorities may withdraw or change their approvals of that product;

- regulatory authorities may require additional warnings on the label or limit access of that product to selective specialized centers with additional safety reporting and with requirements that patients be geographically close to these centers for all or part of their treatment;

- we may be required to create a medication guide outlining the risks of the product for patients, or to conduct post-marketing studies;

- we may be required to change the way the product is administered;

- we could be subject to fines, injunctions, or the imposition of criminal or civil penalties, or to sued and held liable for harm caused to subjects or patients; and

- the product may become less competitive, and our reputation may suffer.

Any of these events could diminish the usage or otherwise limit the commercial success of our product candidates and prevent us from achieving or maintaining market acceptance of the affected product candidate, if approved by applicable regulatory authorities.

70

The FDA and other regulatory authorities' policies may change and additional government regulations may be enacted that could prevent, limit or delay regulatory approval of any current or future product candidate. We cannot predict the likelihood, nature or extent of government regulation that may arise from future legislation or administrative action, either in the United States or abroad. If we are slow or unable to adapt to changes in existing requirements or to the adoption of new requirements or policies, or if we are not able to maintain regulatory compliance, we may lose any marketing approval that we may have obtained. Non-compliance by us or any future collaborator with regulatory requirements, including safety monitoring or pharmacovigilance, and with requirements related to the development of products for the pediatric population can also result in significant financial penalties.

***Regulations, guidelines and recommendations published by various government agencies and organizations may affect the use of our product candidates.***

Changes to regulations, recommendations or other guidelines advocating alternative therapies for the indications we treat could result in decreased use of our products, if approved.

Risks Related to Business Development and Commercialization

***We may not successfully identify, acquire, develop or commercialize new potential product candidates.***

Part of our business strategy is to expand our product candidate pipeline by identifying and validating new product candidates, which we may develop ourselves, in-license or otherwise acquire from others. In addition, in the event that our existing product candidates do not receive regulatory approval or are not successfully commercialized, then the success of our business will depend on our ability to expand our product pipeline through in-licensing or other acquisitions. We may be unable to identify relevant product candidates. If we do identify such product candidates, we may be unable to reach acceptable terms with any third party from which we desire to in-license or acquire them.

***Our commercial success depends upon attaining significant market acceptance of our product candidates, if approved, among physicians, patients, healthcare payors and the medical community, including hospitals and outpatient clinics.***

Even if we obtain regulatory approval for any of our product candidates that we may develop or acquire in the future, the product may not gain market acceptance among physicians, healthcare payors, patients or the medical community that supports our product development efforts, including hospitals and outpatient clinics. Market acceptance of any of our product candidates for which we receive approval depends on a number of factors, including:

- the efficacy and safety of the product candidates as demonstrated in clinical trials;
- the clinical indications and patient populations for which the product candidate is approved;
- acceptance by physicians and patients of the drug as a safe and effective treatment;
- the administrative and logistical burden of treating patients, including the availability and accessibility of healthcare provider sites for administering infusions to patients;
- the adoption of novel cellular therapies by physicians, hospitals and third-party payors;
- the potential and perceived advantages of product candidates over alternative treatments;
- the safety of product candidates seen in a broader patient group, including its use outside the approved indications;
- any restrictions on use together with other medications;
- the prevalence and severity of any side effects;
- product labeling or product insert requirements of the FDA or other regulatory authorities;
- the timing of market introduction of our products as well as competitive products;
- the development of manufacturing and distribution processes for our product candidates;
- the cost of treatment in relation to alternative treatments;
- the availability of coverage and adequate reimbursement from, and our ability to negotiate pricing with, third-party payors, providers and government authorities;
- relative convenience and ease of administration; and
- the effectiveness of our sales and marketing efforts and those of our collaborators.

***Even if we are able to commercialize our product candidates, the products may not receive coverage and adequate reimbursement from third-party payors in the United States and in other countries in which we seek to commercialize our products, which could harm our business.***

In the United States and markets in other countries, patients generally rely on third-party payors to reimburse all or part of the costs associated with their treatment. Adequate coverage and reimbursement from governmental healthcare programs, such as Medicare and Medicaid, and commercial payors is critical to new product acceptance. Our ability to commercialize any product successfully will depend, in part, on the extent to which coverage and adequate reimbursement for these products and related treatments will be available from government health administration authorities, private health insurers and other organizations. Even if coverage is provided, the approved reimbursement amount may not be high enough to allow us to establish or maintain pricing sufficient to realize a sufficient return on our investment. Government authorities and third-party payors, such as private health insurers and health maintenance organizations, decide which medications they will pay for and establish reimbursement levels. For more information regarding the risks related to insurance coverage and reimbursement please see "*Business – Government Regulation – Coverage and Reimbursement.*"

There is also significant uncertainty related to the insurance coverage and reimbursement of newly approved products and coverage may be more limited than the purposes for which the medicine is approved by the FDA or comparable foreign regulatory authorities. Government authorities and other third-party payors, such as private health insurers and health maintenance organizations, determine which medications they will cover and establish reimbursement levels. A primary trend in the healthcare industry is cost containment. Government authorities and third-party payors have attempted to control costs by limiting coverage and the amount of reimbursement for particular medications. Increasingly, third-party payors are requiring that drug companies provide them with predetermined discounts from list prices and are challenging the prices charged for medical products. Third-party payors may also seek additional clinical evidence, beyond the data required to obtain regulatory approval, demonstrating clinical benefits and value in specific patient populations before covering our products for those patients. We cannot be sure that coverage and adequate reimbursement will be available for any product that we commercialize and, if reimbursement is available, what the level of reimbursement will be. Coverage and reimbursement may impact the demand for, or the price of, any product candidate for which we obtain regulatory approval, and ultimately our ability to successfully commercialize any product candidate for which we obtain regulatory approval.

There may be significant delays in obtaining coverage and reimbursement for newly approved drugs, and coverage may be more limited than the purposes for which the drug is approved by the FDA or comparable foreign regulatory authorities. Moreover, eligibility for coverage and reimbursement does not imply that any drug will be paid for in all cases or at a rate that covers our costs, including research, development, manufacture, sale and distribution. Interim reimbursement levels for new drugs, if applicable, may also not be sufficient to cover our costs and may only be temporary. Reimbursement rates may vary according to the use of the drug and the clinical setting in which it is used, may be based on reimbursement levels already set for lower cost drugs and may be incorporated into existing payments for other services. For products administered under the supervision of a physician, obtaining coverage and adequate reimbursement may be particularly difficult because of the higher prices often associated with such drugs. Additionally, separate reimbursement for the product itself or the treatment or procedure in which the product is used may not be available, which may impact physician utilization. Net prices for drugs may be reduced by mandatory discounts or rebates required by government healthcare programs or private payors and by any future relaxation of laws that presently restrict imports of drugs from countries where they may be sold at lower prices than in the U.S. Third-party payors in the U.S. often rely upon Medicare coverage policy and payment limitations in setting their own reimbursement policies. Our inability to promptly obtain coverage and profitable reimbursement rates from both government-funded and private payors for any approved products that we develop could have a material adverse effect on our operating results, our ability to raise capital needed to commercialize products and our overall financial condition.

***Our business is highly dependent on our lead product candidate, posoleucel, and we must complete clinical testing before we can seek regulatory approval and begin commercialization of any of our product candidates.***

There is no guarantee that any of our product candidates will proceed in preclinical or clinical development or achieve regulatory approval. The process for obtaining marketing approval for any product candidate is very long and risky and there will be significant challenges for us to address in order to obtain marketing approval as planned or, if at all.

There is no guarantee that the results obtained in current clinical studies or planned Phase 3 clinical trials of posoleucel will be sufficient to obtain regulatory approval or marketing authorization for HC, AdV, prevention or any other indication. Negative results in the development of our lead product candidates may also impact our ability to obtain regulatory approval for our other product candidates, either at all or within anticipated timeframes because, although other product candidates may target different indications, the underlying technology platform, manufacturing process and development process is the same for all of our product candidates. Accordingly, a failure in any one program may affect the ability to obtain regulatory approval to continue or conduct clinical programs for other product candidates.

76

In addition, because we have limited financial and personnel resources and are placing significant focus on the development of our lead product candidates, we may forgo or delay pursuit of opportunities with other future product candidates that later prove to have greater commercial potential. Our resource allocation decisions may cause us to fail to capitalize on viable commercial products or profitable market opportunities. Our spending on current and future research and development programs and other future product candidates for specific indications may not yield any commercially viable future product candidates. If we do not accurately evaluate the commercial potential or target market for a particular future product candidate, we may relinquish valuable rights to those future product candidates through collaboration, licensing or other royalty arrangements in cases in which it would have been more advantageous for us to retain sole development and commercialization rights to such future product candidates.

***Current and future legislation, including potentially unfavorable pricing regulations or other healthcare reform initiatives, may increase the difficulty and cost for us to obtain regulatory approval of and commercialize our product candidates and affect the prices we may obtain.***

The regulations that govern, among other things, regulatory approvals, coverage, pricing and reimbursement for new drug products vary widely from country to country. In the United States and some foreign jurisdictions, there have been a number of legislative and regulatory changes and proposed changes regarding the healthcare system that could prevent or delay regulatory approval of our product candidates, restrict or regulate post-approval activities and affect our ability to successfully sell any product candidates for which we obtain regulatory approval. The U.S. government, state legislatures and foreign governments also have shown significant interest in implementing cost-containment programs to limit the growth of government-paid healthcare costs, including price controls, restrictions on reimbursement and requirements for substitution of generic products for branded prescription drugs. Additional changes that may affect our business include those governing enrollment in federal healthcare programs, reimbursement changes, rules regarding prescription drug benefits under the health insurance exchanges and fraud and abuse and enforcement. Continued implementation of the Affordable Care Act, or ACA, and the passage of additional laws and regulations may result in the expansion of new programs, such as Medicare payment for performance initiatives, and may impact existing government healthcare programs, such as by improving the physician quality reporting system and feedback program. For more information regarding the risks related to recently enacted and future legislation please see "*Business – Government Regulation – Healthcare Reform.*"

We expect that additional U.S. federal healthcare reform measures will be adopted in the future, any of which could limit the amounts that the U.S. federal government will pay for healthcare drugs and services, which could result in reduced demand for our drug candidates or additional pricing pressures. Individual states in the U.S. have also become increasingly active in passing legislation and implementing regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain drug access and marketing cost disclosure and transparency measures, and designed to encourage importation from other countries and bulk purchasing. Legally mandated price controls on payment amounts by third-party payors or other restrictions could harm our business, financial condition, results of operations and prospects. In addition, regional healthcare authorities and individual hospitals are increasingly using bidding procedures to determine what pharmaceutical products and which suppliers will be included in their prescription drug and other healthcare programs. This could reduce the ultimate demand for our drugs or put pressure on our drug pricing, which could negatively affect our business, financial condition, results of operations and prospects.

***Price controls may be imposed in foreign markets, which may adversely affect our future profitability.***

In some countries, particularly member states of the European Union, the pricing of prescription drugs is subject to governmental control. In these countries, pricing negotiations with governmental authorities can take considerable time after receipt of regulatory approval for a product. In addition, there can be considerable pressure by governments and other stakeholders on prices and reimbursement levels, including as part of cost containment measures. Political, economic and regulatory developments may further complicate pricing negotiations, and pricing negotiations may continue after reimbursement has been obtained. Reference pricing used by various European Union member states and parallel distribution, or arbitrage between low-priced and high-priced member states, can further reduce prices. In some countries, we, or our collaborators, may be required to conduct a clinical trial or other studies that compare the cost-effectiveness of our product candidates to other available therapies in order to obtain or maintain reimbursement or pricing approval. Publication of discounts by third-party payors or authorities may lead to further pressure on the prices or reimbursement levels within the country of publication and other countries. If reimbursement of our products is unavailable or limited in scope or amount, or if pricing is set at unsatisfactory levels, our business could be adversely affected.

***We expect the product candidates we develop will be regulated biologics and therefore they may be subject to competition sooner than anticipated.***

The Biologics Price Competition and Innovation Act of 2009, or BPCIA, was enacted as part of the Affordable Care Act to establish an abbreviated pathway for the approval of biosimilar and interchangeable biological products. The regulatory pathway establishes legal authority for the FDA to review and approve biosimilar biologics, including the possible designation of a biosimilar as "interchangeable" based on its similarity to an approved biologic. Under the BPCIA, an application for a biosimilar product cannot be approved by the

intellectual property rights, require us or our partners to cease using the related technology and commercializing our product candidates, or require us to license rights to it from the prevailing party. Our business could be harmed if the prevailing party does not offer us or our partners a license on commercially reasonable terms if any license is offered at all. Even if we or our licensors obtain a license, it may be non-exclusive, thereby giving our competitors access to the same technologies licensed to us or our partners. In addition, if the breadth or strength of protection provided by our patents and patent applications is threatened, it could dissuade companies from collaborating with us to license, develop or commercialize current or future product candidates.

Any intellectual property proceedings can be expensive and time-consuming. Our or our partners' adversaries in these proceedings may have the ability to dedicate substantially greater resources to prosecuting these legal actions than we or our partners can. Accordingly, despite our or our partners' efforts, we or our partners may not be able to prevent third parties from infringing upon or misappropriating our intellectual property rights, particularly in countries where the laws may not protect our rights as fully as in the U.S. Even if we are successful in the relevant proceedings, we may incur substantial costs and the time and attention of our management and scientific personnel could be diverted from other activities. In addition, in an infringement proceeding, a court may decide that one or more of our patents is invalid or unenforceable, in whole or in part, or may refuse to stop the other party from using the technology at issue on the grounds that our patents do not cover the technology in question. An adverse result in any litigation proceeding could put one or more of our patents at risk of being invalidated, held unenforceable or interpreted narrowly.

Furthermore, because of the substantial amount of discovery required in connection with intellectual property litigation, there is a risk that some of our confidential information could be compromised by disclosure during this type of litigation. In addition, there could be public announcements of the results of hearings, motions or other interim proceedings or developments, and if securities analysts or investors view these announcements in a negative light, the price of our common stock could be adversely affected.

***We may be subject to claims that our employees, consultants or independent contractors have wrongfully used or disclosed confidential information of third parties or that our employees have wrongfully used or disclosed alleged trade secrets of their former employers.***

As is common in the biotechnology and pharmaceutical industry, we employ individuals who were previously employed at universities or other biotechnology or pharmaceutical companies, including our competitors or potential competitors. Although we try to ensure that our employees, consultants and independent contractors do not use the proprietary information or know-how of others in their work for us, we may be subject to claims that we or our employees, consultants or independent contractors have inadvertently or otherwise used or disclosed intellectual property, including trade secrets or other proprietary information, of any of our employee's former employer or other third parties. Litigation may be necessary to defend against these claims. If we fail in defending any such claims, in addition to paying monetary damages, we may lose valuable intellectual property rights or personnel, which could adversely impact our business. Even if we are successful in defending against such claims, litigation could result in substantial costs and be a distraction to management and other employees.

### Risks Related to Our Financial Condition, Capital Needs and Ownership of Our Common Stock

Risks Related to Financial Condition

***We are a late clinical-stage cell therapy company and we have incurred net losses since our inception. We anticipate that we will continue to incur significant losses for the foreseeable future, and may never achieve or maintain profitability.***

Investment in biopharmaceutical product development is highly speculative because it entails substantial upfront capital expenditures and significant risk that any potential product candidate will fail to demonstrate adequate effect or an acceptable safety profile, gain regulatory approval and become commercially viable. We have no products approved for commercial sale and have not generated any revenue from product sales to date, and we will continue to incur significant research and development and other expenses related to our clinical development and ongoing operations. As a result, we are not profitable and have incurred losses in each period since our inception. Since our inception, we have devoted substantially all of our financial resources and efforts to research and development, including preclinical studies and our clinical trials. Our financial condition and operating results, including net losses, may fluctuate significantly from quarter to quarter and year to year. Accordingly, you should not rely upon the results of any quarterly or annual periods as indications of future operating performance. Additionally, net losses and negative cash flows have had, and will continue to have, an adverse effect on our stockholders' equity and working capital. Our net losses were $168.7 million and $172.0 million for the years ended December 31, 2022 and 2021, respectively. As of December 31, 2022, we had an accumulated deficit of $465.8 million. We expect to continue to incur significant losses for the foreseeable future, and we expect these losses to increase as we continue our research and development of, and seek regulatory approvals for, our product candidates.

86

We anticipate that our expenses will increase substantially if and as we:

- continue to conduct clinical trials for our lead product candidate, posoleucel, for our initial and potential additional indications;

- initiate and continue research, preclinical and clinical development efforts for our additional product candidates, including ALVR106 and ALVR107 and any future product candidates we may develop;

- seek to identify additional product candidates;

- seek regulatory approvals for posoleucel or any other product candidates that successfully complete clinical development;

- add operational, financial and management information systems and personnel, including personnel to help us comply with our obligations as a public company;

- hire and retain additional personnel, such as clinical, quality control, scientific, commercial and administrative personnel, to support our product candidate development;

- maintain, expand and protect our intellectual property portfolio;

- establish sales, marketing, distribution, manufacturing, supply chain and other commercial infrastructure in the future to commercialize any product candidates for which we may obtain regulatory approval;

- add equipment and physical infrastructure to support our research and development; and

- acquire or in-license other product candidates and technologies.

Our expenses could increase beyond our expectations if we are required by the U.S. Food and Drug Administration, or FDA, or other regulatory authorities to perform clinical trials in addition to those that we currently expect, if there are any delays in establishing appropriate manufacturing arrangements for our product candidates, or if we experience delays in the completion of our clinical trials or the development of any of our product candidates for any reason, including as a result of the COVID-19 pandemic.

*We have a limited operating history, which may make it difficult to evaluate the success of our business to date and to assess our future viability.*

Our company was formed in August 2013. Since inception, we have devoted substantially all of our resources on raising capital, organizing and staffing our company, business planning, conducting discovery and research activities, acquiring or discovering product candidates, establishing and protecting our intellectual property portfolio, developing and progressing posoleucel, ALVR106, and other product candidates and preparing for clinical trials and establishing arrangements with third parties for the manufacture of initial quantities of our product candidates and component materials. We have financed our operations primarily through private placements of our preferred stock, our initial public offering, or IPO, in August 2020 and our registered direct offering in July 2022. We have not yet demonstrated our ability to successfully complete any Phase 3 clinical trials, obtain regulatory approval, consistently manufacture a commercial scale product or arrange for a third party to do so on our behalf, or conduct sales and marketing activities necessary for the successful commercialization of any of our product candidates. In addition, the allogeneic, off-the-shelf, multi-virus specific T approach of our cell therapies is new and largely unproven. Any predictions about our future success, performance or viability, particularly in view of the rapidly evolving immunotherapy field, may not be accurate given our limited operating history and lack of approved products.

In addition, given our limited operating history, we may encounter unforeseen expenses, difficulties, complications, delays and other known and unknown factors. We will need to transition from a company with a research and development focus to a company capable of supporting commercial activities and may not be successful in such a transition. We expect our financial condition and operating results to continue to fluctuate significantly from quarter to quarter and year to year due to a variety of factors, many of which are beyond our control. Accordingly, our financial results for any quarterly or annual periods may not be indicative of future operating performance.

Risks Related to Capital Needs

*We will need substantial additional funding, and if we are unable to raise capital when needed, we could be forced to delay, reduce or eliminate our product discovery and development programs or commercialization efforts.*

Developing pharmaceutical products, including conducting preclinical studies and clinical trials, is a very time-consuming, expensive and uncertain process that takes years to complete. We expect to continue to spend substantial amounts of capital to continue the preclinical and clinical development of our current and future programs. If we are able to gain marketing approval for any product candidate we develop, including for any indication for which we are developing or may develop posoleucel, we will require substantial additional funding in order to launch and commercialize such product candidates, to the extent that such launch and commercialization