**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JENNIFER ZERBATO, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ALLOVIR, INC., DIANA M. BRAINARD, and VIKAS SINHA,<br><br>Defendants. | Civil Action No. 1:24-cv-10152-DJC |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ......................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 2

ARGUMENT .................................................................................................................. 5

I.      LEGAL STANDARDS ........................................................................................ 5

II.     PLAINTIFFS ADEQUATELY PLED A STRONG INFERENCE OF SCIENTER ......... 6

        A.      Defendants' FDA Filings Show Defendants Knew the Trials Were
                Futile during the Class Period ............................................................... 7

                1.      Defendants' FDA Filings Show Defendants Knew the Trials
                        Were Futile While Issuing the Misleading Statements .............................. 7

                2.      Defendants' FDA Filings Show That the DSMBs Were Required
                        to Disclose Futility Findings to AlloVir during the Trials ........................ 9

        B.      The Core Operations Doctrine Supports the Inference of Scienter ...................... 11

        C.      Defendants' Motive Bolsters the Strong Inference of Scienter Allegations ......... 12

        D.      The Strong Inference of Scienter Outweighs Any Nonfraudulent Inference ....... 14

III.    THE AC ALLEGES ACTIONABLE MISLEADING STATEMENTS AND
        OMISSIONS .................................................................................................... 17

        A.      Plaintiffs Allege Misrepresentations and Omissions with Particularity ............... 17

        B.      There Is No Safe Harbor for the Misleading Statements and
                Material Omissions ............................................................................... 19

        C.      Any Misleading Statements Couched as Opinions Are Actionable .................... 22

        D.      The Statements Are Not Immaterial Puffery ........................................... 24

        E.      The Claim Against Sinha Should Not Be Dismissed ............................................ 25

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

*Page(s)*

*Cases*

*ACA Fin. Guar. Corp. v. Advest, Inc.*,
    512 F.3d 46 (1st Cir. 2008) ................................................................................................ 6

*Aldridge v. A.T. Cross Corp.*,
    284 F.3d 72 (1st Cir. 2002) ......................................................................................... 12, 17

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988) ........................................................................................................ 24

*Bergeron v. Ridgewood Sec. Corp.*,
    610 F. Supp. 2d 113 (D. Mass. 2009) .............................................................................. 25

*Collier v. ModusLink Glob. Sols., Inc.*,
    9 F. Supp. 3d 61 (D. Mass. 2014) ....................................................................... 6, 16, 25

*Constr. Indus. & Laborers Joint Pension Trust v. Carbonite*,
    22 F.4th 1 (1st Cir. 2021) ......................................................................................... passim

*Crowell v. Ionics, Inc.*,
    343 F. Supp. 2d 1 (D. Mass. 2004) .................................................................................. 11

*Dahan v. OvaScience, Inc.*,
    321 F. Supp. 3d 247 (D. Mass. 2018) .................................................................. 11, 19, 21

*Fire & Police Pension Ass'n of Colo. v. Abiomed*,
    778 F.3d 228 (1st Cir. 2015) ........................................................................................... 17

*Ganem v. InVivo Therapeutics*,
    845 F.3d 447 (1st Cir. 2017) ........................................................................................... 18

*Gerneth v. Chiasma, Inc.*,
    2018 WL 935418 (D. Mass. Feb. 15, 2018) .................................................................... 19

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) ........................................................................................... 21

*Gregory v. ProNAi Therapeutics*,
    297 F. Supp. 3d 372 (S.D.N.Y. 2018) ............................................................................. 22

*Gruber v. Gilbertson*,
    2021 WL 2482109, at n.3 (S.D.N.Y. June 17, 2021) ....................................................... 16

*Hackel v. AVEO Pharms., Inc.*,
   474 F. Supp. 3d 468 (D. Mass. 2020) ................................................................................... 20

*Harrington v. Tetraphase Pharms. Inc.*,
   2017 WL 1946305 (D. Mass. May 9, 2017) ............................................................. 15, 20, 23

*Huddleston v. Herman & MacLean*,
   640 F.2d 534 (5th Cir. 1981), *aff'd in part and rev'd in part on other grounds*,
   459 U.S. 375 (1983) ............................................................................................................... 21

*In re Biogen Inc. Sec. Litig.*,
   857 F.3d 34 (1st Cir. 2017) ................................................................................................... 17

*In re Biogen Inc., Sec. Litig.*,
   193 F. Supp. 3d 5 (D. Mass. 2016), *aff'd* 857 F.3d 34 (1st Cir. 2017) ................................... 25

*In re Cabletron Sys., Inc.*,
   311 F.3d 11 (1st Cir. 2002) .............................................................................................. 17, 25

*In re iRobot Corp. Sec. Litig.*,
   2021 WL 950675 (D. Mass. Mar. 12, 2021) ..................................................................... 11, 16

*In re N. Telecom Ltd. Sec. Litig.*,
   116 F. Supp. 2d 446 (S.D.N.Y. 2000) .................................................................................... 16

*In re Praecis Pharms., Inc. Sec. Litig.*,
   2007 WL 951695 (D. Mass. Mar. 28, 2007) .......................................................................... 22

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018) ........................................................................ 22

*In re Stone & Webster, Inc., Sec. Litig.*,
   414 F.3d 187 (1st Cir. 2005) ................................................................................................. 19

*In re Transkaryotic Therapies, Inc. Sec. Litig.*,
   319 F. Supp. 2d 152 (D. Mass. 2004) .................................................................................... 23

*In re WEBMD Health Corp. Sec. Litig.*,
   2013 WL 64511 (S.D.N.Y. Jan. 2, 2013) ............................................................................... 16

*Kader v. Sarepta Therapeutics, Inc.*,
   2016 WL 1337256 (D. Mass. Apr. 5, 2016) ........................................................................... 18

*Leavitt v. Alnylam Pharms., Inc.*,
   525 F. Supp. 3d 259 (D. Mass. 2021) .................................................................................... 11

*Lerner v. Nw. Biotherapeutics*,
   273 F. Supp. 3d 573 (D. Md. 2017) ................................................................................ 9

*Local No. 8 IBEW Ret. Plan & Trust v. Vertex Pharms.*,
   838 F.3d 76 (1st Cir. 2016) ........................................................................................... 17

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
   716 F.3d 229 (1st Cir. 2013) ........................................................................................... 6

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ............................................................................................... 5, 6, 14

*Omnicare v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015) ...................................................................................................... 22

*Pizzuto v. Homology Medicines, Inc.*,
   2024 WL 1436025 (D. Mass. Mar. 31, 2024) ........................................................ 9, 18, 20, 22

*Rosen v. Textron, Inc.*,
   321 F. Supp. 2d 308 (D.R.I. 2004) ............................................................................. 14, 25

*Rosenbaum Cap. LLC v. Boston Commc'ns Grp., Inc.*,
   445 F. Supp. 2d 170 (D. Mass. 2006) ............................................................................ 24

*Sanders v. AVEO Pharm., Inc.*,
   2015 WL 1276824 (D. Mass. 2015) .............................................................................. 17

*Shash v. Biogen, Inc.*,
   84 F.4th 1 (1st Cir. 2023) ....................................................................................... 14, 18, 22

*Skiadas v. Acer Therapeutics Inc.*,
   2020 WL 3268495 (S.D.N.Y. June 16, 2020) ................................................................ 13

*Sousa v. Sonus Networks*,
   261 F. Supp. 3d 112 (D. Mass. 2017) ............................................................................ 16

*Swack v. Credit Suisse First Bos.*,
   383 F. Supp. 2d 223 (D. Mass. 2004) ............................................................................ 12

*Tellabs Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ............................................................................................... 6, 14, 16

*Terumo Americas Holding, Inc. v. Tureski*,
   2016 WL 5376300 (D. Mass. May 23, 2016) ................................................................... 8

*Tran v. XBiotech Inc.*,
   2016 WL 5408382 (W.D. Tex. Sept. 23, 2016) ................................................................ 8

*Vallabhaneni v. Endocyte, Inc.*,
    2016 WL 51260 (S.D. Ind. Jan. 4, 2016) ............................................................................. 15, 23

*Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
    28 F. Supp. 3d 93 (D. Mass. 2014) ................................................................................................ 6

**Statutes**

15 U.S.C. §78u-4(b)(1)(B) ........................................................................................................... 17

15 U.S.C. § 78u-4(b)(1) ............................................................................................................... 18

15 U.S.C. § 78u-5(c) .................................................................................................................... 19

## PRELIMINARY STATEMENT

AlloVir internally unblinded the posoleucel Trials[1] and learned that the preliminary results were so terrible that continuing was futile. By the first day of the Class Period, Defendants knew that the posoleucel MVP Phase 3 Trial had failed, but because posoleucel was in two other pending trials (ADV Phase 3 Trial and VHC Phase 3 Trial), Defendants kept investors in the dark. They promoted positive Phase 2 Data while knowing that MVP (multi-virus prevention), the largest potential commercial application for posoleucel, would never generate revenue. The remaining two trials for different applications of posoleucel also failed. Defendants internally unblinded those trials during the Class Period and ended them because development was futile. Months went by with Class members buying and AlloVir selling securities at inflated prices because Defendants led investors to believe all three Trials were progressing toward FDA approval. Finally, on December 22, 2023, Defendants disclosed that all three Trials would be terminated, effective immediately, because developing posoleucel was futile. Class members who purchased AlloVir stock during the Class Period then lost 67% of their investments in one day.

The AC specifically alleges this securities fraud under Sections 10(b) and 20(a) of the Exchange Act by using facts from documents provided by Defendants to the FDA. Those documents outline the Trials' structures, findings, enrollments, and futility tests for AlloVir's flagship drug posoleucel. The AC sets forth a particularized timeline based on Defendants' representations that establishes the dates by which Defendants learned the futility analysis results for each posoleucel Trial. Regardless, Defendants claim the timeline is speculation. This argument

---

[1] Unless otherwise defined or stated, all capitalized terms used herein have the meanings as provided in the Amended Complaint (the "AC") (ECF No. 51). Citations to "¶__" refer to the AC. Citations to "MTD_" refer to Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint (ECF No. 56). The Class Period is January 11, 2023 through December 21, 2023, inclusive. ¶1.

fails, however, because the timeline is based on publicly available facts that Defendants revealed through FDA filings that chronicled the Trials. This is exactly the type of fact-based analysis that the PSLRA permits a plaintiff to use to allege scienter and falsity.

Since the timeline for establishing Defendants' knowledge of when the Trials failed is adequately alleged, the remainder of Defendants' arguments fall apart. It is undisputed that AlloVir designed the Trials, discussed the Trials, and posoleucel was the core business of AlloVir. Accordingly, Defendants acted with scienter when touting materially misleading Phase 2 Data milestones on the road to commercial development, when at the same time, Defendants knew commercial development was futile. There is no safe harbor for Defendants' material omissions in this circumstance. Moreover, the competing claim that Defendants learned the truth about the three Trials failing at the same time it told the market is not only implausible, but completely inconsistent with the facts alleged as admitted by Defendants in their FDA filings.

Accordingly, because the AC adequately alleges that Defendants acted with scienter while making actionable, misleading statements, the motion to dismiss should be denied in full.

## STATEMENT OF FACTS

AlloVir, founded in 2013, has never commercialized an FDA approved product or generated revenue. ¶¶23, 24. Posoleucel was AlloVir's lead product prospect, which was intended to provide a "multi-VST therapy that targets six viruses." ¶4. Defendant Brainard emphasized the importance of posoleucel to the Company, stating that it "represent[ed] a blockbuster market opportunity of over $1 billion in peak sales annually." ¶172

Early on, posoleucel showed promise that it would be commercially viable because of positive results in Phase 2 studies (the "Phase 2 Data"). ¶¶38-41. Defendants repeatedly touted Phase 2 Data and used it to justify starting the Trials, which are effectively the last steps before gaining FDA approval to sell posoleucel commercially. ¶5.

2

During the Class Period, posoleucel was in three different Phase 3 trials for different applications. ¶29. One of the trials, the MVP Phase 3 Trial, related to posoleucel's efficacy for the prevention of the six target viruses. The other two trials, the ADV Phase 3 Trial and VHC Phase 3 Trial, related the posoleucel's efficacy for the treatment of those viruses. ¶6. The Trials began at different times (years apart), used different endpoints, and required a different number of patients enrolled before evaluating efficacy. ¶170.

AlloVir was responsible for the design of the Trials and detailed these designs in the study protocols (SPs) and statistical analysis plans (SAPs) for the Trials, which only became publicly available after the Class Period. ¶43. Unbeknownst to investors, AlloVir instituted a Data Safety Monitoring Board (DSMB) for each of the Trials. ¶45. AlloVir required each DSMB to routinely monitor the Trials, perform a futility analysis at early set points, and based on this analysis make recommendations to AlloVir regarding the Trials' continuation. *i.e.*, if at the early set point the probability of success for the entire trial was minuscule, the DSMBs were mandated to recommend AlloVir terminate the Trials. ¶¶44-46, 57-58, 75-76, 88-89.

AlloVir announced the initiation of the MVP Phase 3 Trial on March 22, 2022. ¶48. AlloVir required the DSMB to perform a futility analysis and make a recommendation to AlloVir on continuation when 121 patients reached week 14.  ¶¶57, 58. The results of the MVP Phase 3 Trial, which AlloVir only made public after the trial was terminated, state that 377 patients enrolled in the 89-week period from March 22, 2022 to December 6, 2023, amounting to 4-5 patients enrolled per week. ¶61. With a start date of March 22, 2022, and enrollment of 4-5 patients per week, the MVP Phase 3 Trial reached 121 patients enrolled by October 4, 2022. ¶62. These enrollees reached week 14 of trial by at least January 10, 2023, triggering the DSMB's futility

analysis and the communication of the results to AlloVir. *Id.* At that time, the DSMB's recommendation to AlloVir would have been to terminate the MVP Phase 3 Trial. *Id.*

The VHC Phase 3 Trial began on March 18, 2021. ¶65. AlloVir required the DSMB to perform a futility analysis and make a recommendation to AlloVir on continuation when 60 patients reached week 24. ¶76. The results of the VHC Phase 3 Trial, which AlloVir only made public after the trial was terminated, state that 97 patients enrolled in the 33-month period from March 18, 2021 to December 22, 2023, amounting to 2-3 patients enrolled per month. ¶78. With a start date of March 18, 2021, and enrollment of 2-3 patients per month, the VHC Phase 3 Trial reached 60 patients by March 18, 2023. ¶79. These enrollees reached week 24 of the trial by at least September 2, 2023, triggering the DSMB's futility analysis and the communication of the results to AlloVir. *Id.* At that time, the DSMB's recommendation to AlloVir would have been to terminate the VHC Phase 3 Trial. *Id.*

The ADV Phase 3 Trial began on May 11, 2022. ¶82. AlloVir required the DSMB to perform a futility analysis and make a recommendation to AlloVir on the trial's continuation when 40 patients reached day 29. ¶89. The results of the ADV Phase 3 Trial, which AlloVir only made public after the trial was terminated, state that 2-3 patients enrolled per month. ¶90. With a start date of May 11, 2022, and enrollment of 2-3 patients per month, the ADV Phase 3 Trial reached 40 patients by September 11, 2023. ¶91. These enrollees reached day 29 of the trial by at least October 10, 2023, triggering the DSMB's futility analysis and the communication of the results to AlloVir. *Id.* At that time, the DSMB's recommendation to AlloVir would have been to terminate the ADV Phase 3 Trial. *Id.*

In sum, through the futility analysis, by at least January 10, 2023, the first day of the Class Period, Defendants knew the MVP Phase 3 Trial was futile. ¶¶47-63. Later, during the Class

Period, by at least September 2, 2023, Defendants knew the ADV Phase 3 Trial was futile, and by at least October 10, 2023, Defendants knew the VHC Phase 3 Trial was futile. ¶¶64-80, 81-92. As a result, there was no viable path to commercialize posoleucel. ¶9.

Defendants concealed the futility of the Trials during the Class Period. Defendants assured investors that posoleucel was on track to complete the Trials and become a commercially viable product, with representations in SEC filings signed by Defendants, press releases, and during earnings calls with analysts stating that the Trials were ongoing, enrollment was robust, and repeatedly touting obsolete Phase 2 Data. ¶¶103-155. These statements misled investors because Defendants knowingly omitted the material fact that proceeding with the Trials was futile, and the Company would not use the outdated Phase 2 Data to proceed with FDA approval.

These material omissions caused AlloVir's stock price to remain artificially inflated while the Class purchased shares and the Company raised millions of dollars in a stock offering. ¶10.

Then, on December 22, 2023, Defendants shocked the market by finally revealing that the Trials were terminated because it would be futile for each of the Trials to proceed because preliminary analyses decisively showed that posoleucel was ineffective. ¶11. Analysts were shocked by the abrupt and supposedly simultaneous failure of the Trials, with one stating "we are doubly surprised in that it was never disclosed that these trials had planned futility analyses baked into their design, let alone the timing." ¶12. AlloVir's stock price plummeted by over 67%, causing millions of dollars in losses to Class members. ¶13.

## ARGUMENT

### I.    LEGAL STANDARDS

On a motion to dismiss, a plaintiff "need only allege 'enough facts to state a [plausible] claim.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011). The question is whether "allegations suffice to 'raise a reasonable expectation that discovery will reveal

5

evidence.'" *Id.* at 28. The Court must accept the AC's allegations as true and view it in its entirety. *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). To state a claim under § 10(b), a plaintiff must plead: (1) a material misrepresentation or omission; (2) scienter; (3) reliance; (4) damages; and (5) loss causation. *See Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 237 (1st Cir. 2013). Defendants only argue that Plaintiffs have not sufficiently alleged a strong inference of scienter or an actionable misstatement.[2] On both counts, Defendants are wrong.

## II.    PLAINTIFFS ADEQUATELY PLED A STRONG INFERENCE OF SCIENTER

The PSLRA requires a complaint to state with particularity facts that give rise to a strong inference of scienter. *Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 69 (D. Mass. 2014) (Casper, J.). When analyzing scienter, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs*, 551 U.S. at 310, 326. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. "[W]here there are equally strong inferences for and against scienter, *Tellabs* now awards the draw to the Plaintiff." *Collier*, 9 F. Supp. 3d at 69 (quoting *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 59 (1st Cir. 2008)). The court must also "accept well-pleaded factual allegations in the complaint as true and . . . view all reasonable inferences in plaintiff's favor." *Constr. Indus. & Laborers Joint Pension Trust v. Carbonite*, 22 F.4th 1, 6 (1st Cir. 2021).

Here, the AC alleges particularized facts demonstrating that Defendants knowingly misled investors by representing the Trials were ongoing, enrolling, posoleucel was on track to become

---

[2] Because Defendants only challenge those elements, the Court need not consider the others at this stage. *Washtenaw Cty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 103 (D. Mass. 2014).

6

commercially viable, and touting the meaningless Phase 2 Data, when current analyses showed the Trials were futile. ¶¶39-41, 103, 107, 109, 113, 118, 120, 122, 124, 135, 140, 145.

**A. Defendants' FDA Filings Show Defendants Knew the Trials Were Futile during the Class Period**

The AC alleges a particularized timeline based on Defendants' admissions in their own documents that sets forth the dates by which Defendants knew each of the Trials was futile from the unblinded DSMBs. Specifically, the AC details that Defendants knew:

- *The MVP Phase 3 Trial was futile by January 10, 2023.* ¶62; *see also supra* 3-5.
- *The VHC Phase 3 Trial was futile by September 2, 2023.* ¶79; *see also supra* 3-5.
- *The ADV Phase 3 Trial was futile by October 10, 2023.* ¶91; *see also supra* 3-5.

As such, the AC adequately alleges a strong inference of scienter through well pled allegations that Defendants knew of the Trials' futility by the start of and during the Class Period, while issuing misleading statements.

**1.    Defendants' FDA Filings Show Defendants Knew the Trials Were Futile While Issuing the Misleading Statements**

The timeline alleged in the AC and summarized above, sets forth the dates by which Defendants, through recommendations made by the unblinded DSMBs' based on their futility analyses, knew the Trials had failed. *See supra* 3-5. This timeline is supported by the SAPs and SPs that Defendants created and submitted to the FDA, which show the enrollment threshold triggering the DSMBs analyses was reached by the start of and during the Class Period. ¶¶55-56, 72-73, 86-87.[3]

---

[3] The only disputed issue is *when*, not *if*, Defendants knew of the DSMBs' futility analyses. Even if the Court accepts Defendants' arguments contesting the exact dates alleged in the AC, it does not change the fact that the FDA documents support that Defendants made actionable misstatements during the Class Period with scienter.

Specifically, AlloVir admitted that enrollment in the ADV Phase 3 Trial "is approximately 2-3 patients per month." ¶90. Applying Defendants' reported data, at an enrollment of 2-3 patients per month, the threshold triggering the DSMB analysis was reached by at least October 10, 2023. ¶91. Likewise, AlloVir admitted that the VHC Phase 3 Trial enrolled 97 patients in a 33-month period, amounting to 2.9 or approximately 2-3 patients per month. ¶¶78-79. Accordingly, applying Defendants' reported data, the enrollment threshold triggering the DSMB analysis was reached by at least September 2, 2023. *Id.* Similarly, AlloVir admitted that the MVP Phase 3 Trial enrolled 377 patients in an 89-week period, amounting to 4.2 or approximately 4-5 patients per week. ¶61. Accordingly, applying Defendants' reported data, the enrollment threshold triggering the DSMB analysis was reached by at least January 10, 2023. ¶62. Notably, Defendants reported that the MVP Phase 3 Trial actually over-enrolled, further supporting the AC's allegation that the futility analysis occurred by at least January 10, 2023. ¶52.

Defendants cannot now claim that the application of the data they reported is speculation. It is indisputable that enrollment in the ADV Phase 3 Trial was 2-3 patients per month, however, even if enrollment was not a constant rate (as Defendants suggest), Plaintiffs' timeline still stands because patients per-month is an average. Reaching the conclusion Defendants offer—that the results of the DSMBs' futility analyses for the three Trials all came down on December 22, 2023— requires making assumptions that directly contradict Defendants' representations to the FDA and investors.[4] *See, e.g.*, ¶103 (Defendant Brainard stating the MVP Phase 3 Trial was experiencing "robust enrollment"); ¶107 (Trials are "on track to complete enrollment this year"); ¶109 ("pace

---

[4] Defendants' citations to *Terumo Americas Holding, Inc. v. Tureski*, 2016 WL 5376300, at *3 (D. Mass. May 23, 2016) and *Tran v. XBiotech Inc.*, 2016 WL 5408382, at *4 (W.D. Tex. Sept. 23, 2016) (MTD at 10, n. 3) are out of context. The quotations Defendants cherry-pick are the courts' recitation of allegations in complaints, not analysis that trial enrollment is universally non-linear.

of enrollment" is cause of excitement). Accordingly, the AC's allegations detail facts showing when the DSMBs learned each Trial failed, which was required to be communicated to AlloVir.

### 2. Defendants' FDA Filings Show That the DSMBs Were Required to Disclose Futility Findings to AlloVir during the Trials

The AC alleges the preliminary trial data was analyzed by the DSMBs immediately and communicated to AlloVir. ¶¶167-168. The SPs and SAPs for each of the Trials were designed by AlloVir, and the Company instituted a DSMB for each of the Trials. ¶¶43-46. AlloVir directed the DSMB for each Trial to "routinely monitor" the Trials on an ongoing basis and "make recommendations on study continuation" to AlloVir. ¶¶59-60 (MVP SP calls for DSMB to meet throughout the study and make assessments "on an ongoing basis"); ¶77 (VHC SAP requires the DSMB to "routinely monitor" and "evaluate" whether to "stop the study early for futility"); ¶88-90 (same for ADV Phase 3 Trial). The AC alleges that the DSMBs followed AlloVir's mandate to perform the futility analyses and report findings. ¶¶166-167, 59-60, 77, 88-90. There is no merit to Defendants' speculation that there *could* have been months of delay. The futility analyses here were straightforward, binary tests of whether the initial data indicates a 5% or 10% chance of success in the Trial. ¶¶58, 75-76, 89. This was not a full-blown "complex data analysis" as Defendants contend.[5] The Trials' futility analyses, by design, had a low bar to quickly identify futility. ¶¶37, 46. Indeed, there are no facts showing the DSMBs ignored their directives, experienced delays, or concealed the Trials' over 90% or 95% likelihood of failure from AlloVir.[6]

---

[5] Defendants' reliance on *Pizzuto v. Homology Medicines, Inc.*, 2024 WL 1436025, at *10 (D. Mass. Mar. 31, 2024) to dispute the facts alleged is misguided because there the statement that "nothing fundamental had changed" made the same day that one patient's results were leaked was immaterial as a matter of law and the failure to timely disclose data from one patient could not reasonably mislead investors about the product's efficacy.

[6] *Lerner v. Nw. Biotherapeutics*, 273 F. Supp. 3d 573, 589–90 (D. Md. 2017) is inapposite for this reason. There, plaintiffs alleged that the DSMB had not followed its directive or had been told not

9

Defendants also assert that because the SAPs and SPs for two trials use the future tense as a trigger for the futility analysis, it necessarily means the DSMBs' analyses had not taken place at the time the documents were edited. MTD at 12. The words "will" and "would," however, support the AC's allegations because they show AlloVir's directives to the DSMBs were compulsory. ¶¶57-60, 74-76, 88-90. Additionally, even after the Class Period, after the DSMBs' analyses had indisputably occurred, the SAPs and SPs for two of the three Trials *still* use the future tense. *Id.* While Defendants latch on to the fact that after the Class Period the SAP for the ADV Phase 3 Trial was revised to state that the "study is terminated due to futility" (MTD at 12, n. 5), Defendants ignore that the same document *still* uses the words "will" and "would" to describe the DSMB's futility analysis in several other places. *See* ADV SAP (https://cdn.clinicaltrials.gov/large-docs/57/NCT05179057/SAP_001.pdf) at 6, 9, 14 ("futility analysis will be performed") ("(DSMB) will review data…"). As such, there is nothing to glean from the SAPs and SPs partial tense shift. At best, Defendants raise a question of fact as to why one SAP was changed in one place.

Defendants similarly argue that changing the enrollment criteria for the MVP Phase 3 Trial during the Class Period, means it was "impossible" for the enrollment threshold required for the DSMB analysis to have been reached by the date alleged in the AC. MTD at 12. Not so. There is nothing preventing Defendants from changing enrollment criteria after receiving the results of the

to perform the interim efficacy analysis. Additionally, there, the interim efficacy analysis was blinded. Here, even assuming that it took the DSMBs "a few weeks", as the expert report in *Lerner* stated, to analyze the data and communicate this to Defendants, Defendants would still know the Trials were futile when they made misleading statements with material omissions during the Class Period. Indeed, to conclude that the three DSMBs completed their analyses on December 22, 2023, requires the unrealistic assumptions that: the DSMB for the MVP Phase 3 Trial took over 11 months, that the DSMB for the VHC Phase 3 Trial took nearly 4 months, that the DSMB for the ADV Phase 3 Trial took nearly 3 months, and that all three DSMBs completed their analyses on the same exact day. The inclusion of an unblinded statistician also reviewing the preliminary data, does not change this analysis as Defendants contend. MTD at 11.

10

DSMB's futility analysis. Additionally, changing the enrollment criteria after receiving the results of the futility analysis, if anything, suggests that Defendants knew the trial as constructed was dead in the water.

### B.    The Core Operations Doctrine Supports the Inference of Scienter

Scienter is imputed to individual defendants where "[f]acts critical to a business's core operations … are so apparent that their knowledge may be attributed to the company and its officers." *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 19 (D. Mass. 2004). A product's "position as the core product tips towards a finding for a strong inference of scienter [even] in the absence of further allegations of Defendants' intent or recklessness or any "plus factor."" *In re iRobot Corp. Sec. Litig.*, 2021 WL 950675, at *9 (D. Mass. Mar. 12, 2021).

Here, posoleucel was not merely "critical to [AlloVir's] core operations," posoleucel *was* the core operation. Defendants do not contest this. Nor could they as Defendants repeatedly discussed the status of the posoleucel Trials on practically a monthly basis throughout the Class Period. ¶¶38-41, 122, 130, 135, 138, 172, 176-178. Additionally, Defendant Brainard explained that posoleucel represented a "blockbuster" $1 billion opportunity for the Company, the Company mandated the DSMBs to communicate the futility results to it, and the Trials were integral to any efforts to commercialize the drug.[7] *Id*; *see Dahan v. OvaScience*, *Inc.*, 321 F. Supp. 3d 247, 255 (D. Mass. 2018) ("The importance of [the product] supports the inference" of executives' knowledge); *Carbonite*, 22 F.4th at 9 (product's importance, coupled with statements, supports inference of defendants' knowledge).[8]

---

[7] Defendants' cases are inapposite as Plaintiffs do not contend that core operations allegations *alone* are sufficient to establish scienter. *See* MTD at 16.

[8] Individual Defendants' education and experience also supports scienter because they were the architects of the Trials and knew the significance of the futility analysis. ¶163. Defendants'

### C.  Defendants' Motive Bolsters the Strong Inference of Scienter Allegations

Scienter may be established by combining various facts and circumstances indicating fraudulent intent, including "motive and opportunity." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 82 (1st Cir. 2002). While alleging motive and opportunity is not required to adequately allege scienter, such allegations strengthen the inference. *Swack v. Credit Suisse First Bos.*, 383 F. Supp. 2d 223, 245 (D. Mass. 2004). Here, Plaintiffs' allegations of motive and opportunity bolster the already strong inference of scienter.

Defendants were principally motivated to keep up the appearance that the Company had a potentially commercially viable product because of the $1 billion opportunity that posoleucel represented. ¶¶172, 175. Indeed, since its inception, AlloVir has never earned any revenue, it has never developed a commercially viable product, nor has it ever even had another product candidate get to the Phase 3 stage. ¶¶3, 24, 175. The entirety of the Company was staked on obtaining positive results in at least one of the posoleucel Trials. Defendants were highly motivated to conceal and omit from their Class Period statements that one or more of the Trials was futile because that would effectively begin the winding down of the Company. This became evident after the Class Period when, following Defendants' disclosure that the Trials were terminated, AlloVir's stock fell below $1.00, it laid off 95% of employees, terminated its lease, and began exploring "strategic alternatives" *i.e.,* selling off assets. *Id*. With no viable path forward for posoleucel, AlloVir's very existence was jeopardized by the triple failure.

This motive alleged is far from boilerplate. Indeed, none of the cases cited by Defendants involve allegations comparable to this case where a company had never earned any revenue, had

---

reliance on *Leavitt v. Alnylam Pharms., Inc.*, 525 F. Supp. 3d 259 (D. Mass. 2021) is misplaced because there plaintiffs largely relied on defendants' positions as indicia of scienter.

no marketable products, and Defendants concealed information that if/when disclosed would effectively wipe out the Company. MTD at 14-15.

Defendants stood to benefit from their misrepresentations that posoleucel was proceeding through the FDA approval process. Had Defendants promptly disclosed that the MVP Phase 3 Trial was futile in January 2023, investors and analysts never would have believed Defendants' Class Period representations that posoleucel was still showing promise in light of the over 90% failure rate in the MVP Phase 3 Trial. Defendants' gamble after learning the MVP Phase 3 Trial was futile by the start of the Class Period was: conceal the trial's futility results because they still have two chances (the ADV and VHC trials), and if one of the two trials still pending is ultimately determined not to be futile, Defendants could temper the announcement of bad news by disclosing it alongside positive news. Put another way, why tell the market that one trial is futile immediately when there is still a chance, no matter how remote, that they can bury the lede by disclosing it with positive news. *See Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11 (S.D.N.Y. June 16, 2020) ("executive has a stronger incentive to bet the farm in a reckless gamble because the alternative is certain failure"). As such, Defendants had a strong motive to conceal the abysmal results of the DSMBs' futility analyses.[9]

Defendants mischaracterize the allegations as merely a motive to keep the stock high and argue this is too "generalized." MTD at 15. This puts the cart before the horse. The motive is to keep the Company going and support its cash burn. With the stock inflated, Defendants raised millions while knowing their statements to investors were contradicted by the DSMBs' futility analyses. ¶173. It seems those funds floated the Company until the remainder could be used as

---

[9] Contrary to Defendants' argument (MTD at 20), the absence of insider stock sale allegations does not negate the strong inference of scienter. *See infra* 16-17.

13

seed money for a merger with another pharmaceutical company producing an entirely different drug. *See* AlloVir Nov. 7, 2024 SEC Form 8-K, available at: www.sec.gov/ix?doc=/Archives/edgar/data/1754068/000119312524253747/d870301d8k.htm (requiring $100 million net cash to support valuation). Accordingly, Defendants' motives support an inference of scienter.

**D.      The Strong Inference of Scienter Outweighs Any Nonfraudulent Inference**

Plaintiffs' "allegations, 'taken collectively,' give rise to a 'cogent and compelling' inference that [AlloVir] elected not to disclose" the results of the DSMBs' futility analyses "not because it believed [that it was] meaningless but because it understood [the withheld information's] likely effect on the market." *Matrixx*, 563 U.S. at 49. "To determine whether an inference of scienter is 'strong,' a court must engage in 'a comparative evaluation' by weighing the 'inferences urged by the plaintiff' against 'competing inferences.'" *Shash v. Biogen, Inc.*, 84 F.4th 1, 13 (1st Cir. 2023) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Plaintiffs are not required to allege an inference that is more compelling than a competing inference because any tie supports proceeding to discovery. Moreover, while a court may consider plausible nonculpable explanations, it must still assume the truth of Plaintiffs' well-pleaded allegations in its comparative analysis. *Id*. at 323; *Rosen v. Textron, Inc*., 321 F. Supp. 2d 308, 324-25 (D.R.I. 2004) ("It would be improper at the motion to dismiss phase….to prefer the Defendants' explanation").

The AC alleges facts supporting a strong inference of scienter that is far more compelling, or at the very least equal to, Defendants' asserted nonculpable inference: that they were completely in the dark about the results of the DSMBs' analyses for nearly a year, that the Trials, all with different start dates, different endpoints, different timeframes for analysis, and different enrollments, all had futility analyses completed on the same day, and on that same day Defendants

apprised the market. MTD at 17. That baseless, non-fraudulent inference is unbelievable. The AC's allegations support a far more plausible inference of scienter.

It is more likely that Defendants knowingly misrepresented the status of the Trials, concealed the futility of the Trials, and trumpeted the outdated Phase 2 Data, misleading investors that the Trials could conclude and posoleucel could be commercially viable. Defendants' assertion that investing in the Trials and raising capital indicates they believed positive results were probable is tenuous at best. MTD at 17. Concealing the futility of the MVP Phase 3 Trial while expending resources on the other two trials to keep up the façade is entirely consistent with a strong inference of scienter. *See Biogen, Inc.*, 84 F.4th at 14 (where defendants "invested tremendous resources into carefully analyzing [ ] data. ... repeatedly discussed [ ] said data. ... the logical inference is that [defendants] knew" that statement that data supported FDA approval was misleading). Desperate to keep the Company afloat for as long as possible and take advantage of what was likely their last chance to raise funding from investors, Defendants continued investing in the Trials, despite the futility of doing so.[10] Defendants' reliance on *Harrington v. Tetraphase Pharms. Inc.*, 2017 WL 1946305, at *6 (D. Mass. May 9, 2017) and *Vallabhaneni v. Endocyte, Inc.*, 2016 WL 51260, at *13 (S.D. Ind. Jan. 4, 2016) are inapposite because, both cases involved allegations that defendants knew a trial was futile from the start but designed it and invested in it anyways, unlike here where the Defendants continued investing in the Trials despite learning of the futility of doing so during the pendency of the Trials.

---

[10] Moreover, the capital raised during the Class Period was not earmarked for the exclusive use of funding the Trials as Defendants contend (MTD at 17), the capital could "fund operations." Ex. 25. Additionally, AlloVir's cash position was its most valuable asset in the merger announced on November 8, 2024. *See* November 8, 2024 Press Release (ir.allovir.com/news-releases/news-release-details/allovir-and-kalaris-therapeutics-announce-agreement).

15

Defendants next argue that "it makes no sense" to design the Trials with a DSMB futility analysis "while intending to hide the results." MTD at 18. This argument misses the mark. First, Defendants included a futility analysis because at the time, with positive Phase 2 Data in hand, it appeared that the futility analysis may never come into play, *i.e.*, a 5% or 10% chance of success based on partial enrollment is an exceptionally low bar and the futility analysis should be a quick and easy checkpoint. The most probable inference is that when designing the Trials, Defendants thought including futility analyses would provide an opportunity to present positive preliminary results during the pendency of the Trials. When the DSMB analysis was negative, Defendants concealed the results. Second, it is irrelevant whether when Defendants designed the Trials, they may not have intended to hide the results. Scienter is not evaluated at the time the Trials were designed, before the Class Period, it is evaluated when the misrepresentations are made.[11] Thus, this does not cut against the strong inference of scienter.

Additionally, Defendants benefitted substantially by concealing the DSMB results and keeping the Company in business for an extra year. Defendants took a gamble by concealing the results from the first DSMB analysis hoping at least one of the next two would be positive and overshadow the bad news, no matter how remote that possibility was. Revealing one trial's futility would undoubtedly call into question posoleucel's efficacy in the then-pending trials, so Defendants did not tell the public for as long as possible. *See infra* 3-5, 13. Defendants' gamble kept the Company afloat, benefitting them significantly during this extra year.[12]

---

[11] *Sousa v. Sonus Networks,* 261 F. Supp. 3d 112 (D. Mass. 2017) is not to the contrary because "wishful thinking" prior to the Class Period can evolve into scienter by the start of the Class Period.

[12] Defendants' reliance on *In re N. Telecom Ltd. Sec. Litig.,* 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000) is nonsense because it involves a summary judgment motion after "extensive discovery," and "misstates the standard." *See Gruber v. Gilbertson*, 2021 WL 2482109, at n.3 (S.D.N.Y. June 17, 2021). Defendants' other cases fare no better. *See In re WEBMD Health Corp. Sec. Litig.*, 2013

Finally, Defendants' contention that the lack of sales or increases in Individual Defendants' stock holdings during the Class Period negates the strong inference of scienter, is wrong. MTD at 18. The absence of insider stock sale allegations does not negate Defendants' motive or a strong inference of scienter. *See, e.g., Tellabs*, 551 U.S. at 325 (lack of insider sales is not fatal to scienter). Indeed, the lack of significant sales here is consistent with concealing a fraud because it is "reasonable to refrain from selling stock during the Class Period to avoid the appearance of wrongdoing." *Collier*, 9 F. Supp. 3d at 74. Thus, the absence of significant stock sales does not undercut an otherwise well-supported strong inference of scienter. At best, the lack of significant insider trading is a neutral factor when viewing scienter holistically.[13] Accordingly, the AC adequately alleges scienter.

## III.    THE AC ALLEGES ACTIONABLE MISLEADING STATEMENTS AND OMISSIONS

### A. Plaintiffs Allege Misrepresentations and Omissions with Particularity

The AC alleges each misleading statement with particularity. Under Rule 9(b) and the PSLRA, the AC must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading" 15 U.S.C. §78u-4(b)(1)(B). "Although the pleading requirements under the PSLRA are strict, they do not change the standard of review for a motion

---

WL 64511, at *13 (S.D.N.Y. Jan. 2, 2013) (non-fraudulent inference of bad business decisions more plausible than inference of scienter; Here, the non-fraudulent inference is utterly implausible); *In re iRobot Corp. Sec. Litig.*, 527 F. Supp. 3d 124, 143 (D. Mass. 2021) (defendants' positions alone do not raise inference of scienter; Here Plaintiffs do not rely on such an inference).

[13] Defendants' cases merely stand for the unremarkable proposition that insider sales can bolster scienter, not that a lack of significant insider sales negates scienter. MTD at 19 (citing *Sanders v. AVEO Pharm., Inc.*, 2015 WL 1276824, at *10 (D. Mass. 2015) ("the absence of such trading does not preclude an inference of scienter"); *Fire & Police Pension Ass'n of Colo. v. Abiomed*, 778 F.3d 228, 246 (1st Cir. 2015) ("insider trading *may* offer some support for inferences of scienter."); *Local No. 8 IBEW Ret. Plan & Trust v. Vertex Pharms.*, 838 F.3d 76, 84 (1st Cir. 2016) (same); *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 44 (1st Cir. 2017) (same).

to dismiss." *Aldridge*, 284 F.3d at 78. They certainly "do not require a plaintiff to plead evidence" to survive a motion to dismiss. *In re Cabletron Sys., Inc.*, 311 F.3d 11, 33 (1st Cir. 2002). To the contrary, "courts will allow private securities fraud complaints to advance past the pleadings stage when some questions remained unanswered, provided the complaint as a whole is sufficiently particular to pass muster under the PSLRA." *Id*. at 32.

The AC amply satisfies this standard by alleging with particularity: the date, place, context, and content of each alleged misrepresentation and omission; the reasons why each was misleading when made; and facts supporting the reasons why each was misleading when made. *See* Rule 9(b); 15 U.S.C. § 78u-4(b)(1). Defendants' repeatedly touted posoleucel's Phase 2 Data, represented the status of the Trials as ongoing, enrolling, and anticipating results, while deliberately and misleadingly omitting that the DSMBs' analyses, which Defendants were apprised of, showed that the Trials were futile. *See supra* 3-5. Indeed, Defendants created the false impression that it was viable to commercialize posoleucel while knowing the DSMBs' analyses meant the opposite.

Defendants cannot ignore the factual underpinnings of the AC and claim the particularized allegations are speculative. Defendants rely on cases that could not allege the key fact alleged here: knowledge of when the drug trial failed. MTD at 20 (citing *Kader v. Sarepta Therapeutics, Inc.*, 2016 WL 1337256, at *14 (D. Mass. Apr. 5, 2016) (FDA denial of trial fails to show prior knowledge of failed trial)).[14] Here, Plaintiffs' allegations do not suffer from a timing issue because the timeline alleged is amply supported by documents Defendants created and publicized after the Trials' termination. *See supra* 3-5, 8.

---

[14] *Homology*, 2024 WL 1436025, at *12 (falsity only supported by FDA **subsequently** stopping trial); *Ganem v. InVivo Therapeutics*, 845 F.3d 447, 456 (1st Cir. 2017) (Unlike here, allegations of falsity were consistent with trial's requirements).

18

### B.    There Is No Safe Harbor for the Misleading Statements and Material Omissions

Plaintiffs adequately allege actionable misleading misstatements and material omissions that are not protected by the PSLRA safe harbor. The safe harbor protects statements that are: purely "forward-looking," not made with knowledge that the statement is misleading, and accompanied by "meaningful cautionary statements." 15 U.S.C. § 78u-5(c); *In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 195 (1st Cir. 2005). Omissions are not protected by the PSLRA safe harbor. *See OvaScience, Inc.*, 321 F. Supp. 3d at 254. In evaluating whether a statement is purely forward-looking, "a court must examine which aspects of the statement are alleged to be false." 414 F.3d at 213. "The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement." *Id*. at 213. With respect to cautionary language is not meaningful if it merely warns "about future risk [but fails] to disclose that the risk has [already] transpired." *Gerneth v. Chiasma, Inc*., 2018 WL 935418, at *4 (D. Mass. Feb. 15, 2018) (Casper, J).

Defendants' argument that the safe harbor immunizes them from liability (MTD at 21-22) fails for multiple reasons.[15] At the outset, many of the alleged misstatements are pure "[o]missions of existing facts [which] are not forward-looking statements and are not protected by the PSLRA safe harbor." *OvaScience, Inc.*, 321 F. Supp. 3d at 254. Specifically, Defendants made several

---

[15] The 20 alleged misstatements that Defendants claim are protected by the safe harbor (MTD at 22, n. 21) actually fall within the exceptions because each was made with actual knowledge each was misleading and none were accompanied by meaningful cautionary language. Additionally, omissions are not forward-looking statements. ¶¶103(one slide), 109, 113, 122, 135, 145. Representations about past results are also not forward-looking (¶¶103, 105, 107, 109, 111, 113, 115, 118, 120, 122, 130, 135, 140, 147, 152) nor are allegations of falsehood that do not exclusively relate to the forward-looking aspect of the statement. ¶¶103, 105, 107, 109, 111, 113, 115, 118, 120, 122, 128, 130, 132, 135, 138, 140, 142, 147, 150, 152, 154.

Class Period statements that exclusively reported past or present facts, such as statements publishing and making representations about the Phase 2 Data. Plaintiffs do not dispute the Phase 2 Data, but rather allege that these statements were misleading when made because Defendants *omitted* the material fact that by then Defendants knew the available data from the Trials showed they were futile, that posoleucel would not become commercially viable for these applications, and the Phase 2 Data was meaningless. *See* ¶¶103, 109, 113, 122, 135, 145. Such misleading omissions are not afforded safe harbor protection.

Defendants' other misleading statements[16] include representations about the present status of the Trials and are not protected by the safe harbor because the allegations do not exclusively relate to the forward-looking aspect of the statement. For example, Defendants stated:

> The three Phase 3 studies are expected to complete enrollment by the end of 2023, enabling potential data readouts from all three trials in 2024. The three registrational trials were informed by the positive results of proof-of-concept studies with posoleucel for both treatment and prevention. In the CHARMS Phase 2 treatment trial, 95% of allogeneic HCT patients with one or more treatment-refractory infections achieved a clinical response with posoleucel.

¶115. Because this statement, and Defendants' similar statements (*supra* n. 15) and omissions, pertained to the *present* status of the futile Trials, Defendants' then-current expectations of the Trials, described the results of the *past* trials, and are couched in the *present and past* tense, the safe harbor does not shield Defendants from liability.[17] *Compare e.g.,* ¶130 ("We continue to be encouraged by the potential of posoleucel"); and ¶138 ("We are very pleased with our progress to

---

[16] *e.g.,* ¶¶103, 105, 107, 109, 111, 113, 115, 118, 120, 128, 130, 132, 138, 140, 147, 150, 152, 154.

[17] In contrast, the allegations of falsehood in the cases relied on by Defendants (MTD at 21, n. 20), unlike here, plainly related to the forward-looking aspects of the statements. *See Hackel v. AVEO Pharms., Inc.*, 474 F. Supp. 3d 468, 478 (D. Mass. 2020) (allegations of falsehood about projected timeline forward-looking); *Tetraphase Pharms.*, 2017 WL 1946305, *4, *7-8 (same); *Homology,* 2024 WL 1436025, at *14 (statement and allegations of falsehood that product "ha[d] the potential to be converted to a registrational trial.").

date and are on track to report data from all three studies in the second half of 2024.") *with Carbonite*, 22 F.4th at 8 ("[W]e have put something out that we think is just completely competitive and just a super strong product"); *see also Ovascience, Inc.*, 321 F. Supp. 3d at 254 ("the element of Defendants' statements that pertained to the status of [d]efendants' current expectations or status were not forward-looking, and are not protected by the safe harbor").

Furthermore, as set forth above (*supra* 3-5, 7-10), Plaintiffs allege particularized facts showing that Defendants' misleading statements were made with actual knowledge that they were misleading. Accordingly, Defendants' statements are not afforded protection by the safe harbor.

Finally, the safe harbor is inapplicable because Defendants failed to accompany the alleged misstatements with meaningful cautionary language. Cautioning of "potential" future problems that in fact have already come to fruition is not meaningful. *Glazer Cap. Mgmt.*, *L.P.* v. *Forescout Techs., Inc.*, 63 F.4th 747, 781 (9th Cir. 2023) ("…in the context of the safe harbor: cautionary language is not 'meaningful' if it discusses as a mere possibility a risk that has already materialized."). The reason is clear – cautioning of a risk that has already occurred is "deceit[ful]." *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375 (1983). That is exactly what Defendants did here. The cautionary language Defendants identify ((a) ***future risk*** of the Trials being terminated; (b) a product candidate ***may fail*** to demonstrate efficacy; (c) product candidates ***may not*** have favorable results in later clinical trials; and (d) Trials ***may not be completed*** on schedule (MTD at 22)), provides no shield for Defendants because it failed to disclose that the perils it warned of had already transpired. For example, the cautionary language accompanying Defendants' statements that they were "very pleased with our progress [of the Trials] to date" and that as a result they had "accelerated" the Trials (¶¶140, 142), only cautions of risks—that the Trials ***may*** fail, ***may not***

21

complete on schedule, that past results *may not* be predictive—that were anything but potential, they had already materialized. Thus, the cautionary language does not insulate Defendants from liability.[18] Accordingly, the safe harbor is inapplicable.

### C. Any Misleading Statements Couched as Opinions Are Actionable

Plaintiffs adequately alleged actionable misstatements regardless of whether some are statements of opinion. Opinion statements are actionable when, like here, the statement does "not fairly align with the facts known at the time." *Biogen, Inc.*, 84 F.4th at 12 (statement "I think our data are all consistent with that" actionable where plaintiffs point to certain data evidencing that statement did not "fairly align with the facts known [] at the time."); *Omnicare v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015) (statements actionable where they (1) convey false "embedded" facts, (2) omit "material" facts, and (3) are not believed by the speaker).

Parties agree that the AC alleges two misleading opinion statements. ¶¶111, 147. Defendants also signal that another seventeen misleading statements are opinions. ¶¶103, 105, 107, 109, 113, 115, 118, 120, 122, 125, 130, 132, 135, 138, 140, 145, 150. Those seventeen statements, however, are objective statements of fact. For example, statements reporting the Phase 2 Data and statements characterizing the Phase 2 Data as "positive" (*e.g.,* ¶¶115, 120) "spoke to a present state of affairs" (*i.e.,* the present state of the Trials) rather than "a belief about future events." *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *13 (S.D.N.Y. Nov. 26, 2018). Such representations when read in context are misleading statements of fact. *Carbonite*, 22 F.4th at 8.

---

[18] Defendants' cited cases are inapplicable because the cautionary language in those cases, unlike here, speaks to unrealized risks. *See* MTD at 22, n. 24 citing *Homology*, 2024 WL 1436025, at *14 ("statements conveyed substantive information about the risk that ultimately materialized"); *AVEO Pharms.*, 474 F. Supp. 3d at 479 (same); *In re Praecis Pharms., Inc. Sec. Litig.,* 2007 WL 951695 (D. Mass. Mar. 28, 2007) (same); *Gregory v. ProNAi Therapeutics*, 297 F. Supp. 3d 372, 404 (S.D.N.Y. 2018) (cautionary language did not "warn of a risk that had already come to pass").

Even if all nineteen misleading statements can be characterized as opinions, they are actionable because the statements do not "fairly align[] with the facts known to the speaker." *Id*. For example, Defendant Brainard's statements that "I think that we have a good batting average in terms of having successfully done this with our other trials. ... we also, I think, have a little bit more luxury because posoleucel is already in Phase III …" (¶147) and "[w]e continue to focus our efforts on rapidly advancing the [Trials] ... We continue to be encouraged by the potential of posoleucel as a transformative therapeutic for transplant patients." (¶130) do not fairly align with the fact that by this time, Defendant Brainard knew that the DSMBs for two of the Trials had already communicated to Defendants that the Trials were futile and as a result there was no reason to be encouraged about the (then-futile) Trials when the statements were made. *See also* ¶138 (statement that "[w]e are excited to be advancing our company's [Trials]" and "…We are very pleased with our progress to date" does not fairly align with facts known about futility of Trials). Based on Defendants' statements touting the Phase 2 Data, representing that enrollment in the Trials was robust and progressing nicely, and that posoleucel was proceeding through the FDA approval process (*e.g.*, ¶¶109, 111, 122, 130, 138, 147), a reasonable investor would have concluded Defendants were unaware of damning contrary facts—like the existing futility of Trials—that rendered the continuation of the Trials pointless.[19] *See In re Transkaryotic Therapies, Inc. Sec. Litig.*, 319 F. Supp. 2d 152, 161-62 (D. Mass. 2004) (opinion statements such as: "we believe that the totality of our renal and cardiac data is compelling and we believe that Replagal

---

[19] Defendants' cited cases do not help them. *Tetraphase* had insufficient allegations because "knowing that it was "unlikely" that the trial would succeed is not the same as knowing the trial would fail." 2017 WL 1946305, at *6. Here, there was no uncertainty because as the AC alleges Defendants knew the Trials had already failed at the time the statements were made. Defendants' reliance on *Endocyte* is also misplaced because there were insufficient allegations showing the opinion statements were false. 2016 WL 51260, at *10, 15.

can be approved on this data" are actionable because "they are statements of present belief that are material and are conceivably in direct contradiction to known facts" and, therefore, "inappropriate to dispose of . . . on a motion to dismiss.").

Accordingly, all of the alleged misleading statements of opinions (or fact) were known to be false at the time made and are actionable.

### D.    The Statements Are Not Immaterial Puffery

The alleged misstatements are not puffery. Defendants pluck certain parts of the alleged misstatements out of their context and contend, without analysis, that sixteen are sufficiently vague so as to constitute inactionable corporate optimism. *See* MTD at 24-25, n. 26. Not so.

First, whether a statement amounts to puffery is a question of materiality, and only if the materiality of the statement is so obvious that reasonable minds could not differ is the issue appropriately resolved as a matter of law. *Rosenbaum Cap. LLC v. Boston Commc'ns Grp., Inc.*, 445 F. Supp. 2d 170, 176 (D. Mass. 2006) ("disputes over the materiality of allegedly false or misleading statements must be reserved for the trier of fact."). Here, that is plainly not the case because AlloVir's "own assessment" regarding, for example, the progress of the Trials and the significance of the Phase 2 Data certainly "alter[s] the total mix of information" for a reasonable investor. *Id*; *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988); *see also, e.g.*, ¶150 ("AlloVir continues to progress its highly innovative lead therapeutic candidate, posoleucel"); ¶135 (characterizing Phase 2 Data as displaying a "dramatic response").

Second, these statements discuss the Phase 2 Data, describe that the Trials were ongoing, describe the timing of the Trials, and misrepresent the potential of the Trials, all without mentioning that the Trials had already failed. Each of these statements played a central role in Defendants' press releases and other presentations to the public and were relied on by investors and analysts when valuing the Company. Indeed, many of these statements were made in the

context of responding to analysts who asked targeted questions about the status of the Trials. *See, e.g.,* ¶¶135, 145, 147. Thus, none of the misleading statements are immaterial as a matter of law.[20] *See Textron, Inc.*, 321 F. Supp. 2d at 320 ("[W]hether a particular statement is mere puffery or actionable misstatement must be determined by looking not only to the challenged language itself, but also the context in which the statement was made"); *Bergeron v. Ridgewood Sec. Corp.,* 610 F. Supp. 2d 113, 135 (D. Mass. 2009) ("What might be innocuous 'puffery' … standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation").

### E.  The Claim Against Sinha Should Not Be Dismissed

Defendant Sinha "signed the Form 10–K", and "accepted" its contents, which made actionable statements. Thus, the claim against him stands. ¶22; *Cabletron*, 311 F.3d at 41.

### CONCLUSION

For the foregoing reasons, the Court should deny the Motion in its entirety. [21]

Dated: November 12, 2024                          Respectfully submitted,

                                                 **HUTCHINGS BARSAMIAN
                                                 MANDELCORN, LLP**
                                                 /s/ *Theodore M. Hess-Mahan*
                                                 Theodore M. Hess-Mahan (BBO #557109)
                                                 110 Cedar Street, Suite 250
                                                 Wellesley Hills, MA 02481
                                                 Telephone: (781) 431-2231
                                                 Facsimile: (781) 431-8726
                                                 thess-mahan@hutchingsbarsamian.com

                                                 *Local Counsel for Lead Plaintiffs*

---

[20] Defendants' reliance on *In re Biogen Inc., Sec. Litig.*, 193 F. Supp. 3d 5, 41 (D. Mass. 2016), *aff'd* 857 F.3d 34 (1st Cir. 2017) is misplaced because there the inactionable statements were vague representations about potential revenue from an already commercially viable product, unlike here, where the misrepresentations are unambiguous and relate to a product that is still in development.

[21] Because the AC states a 10(b) claim, the 20(a) claim stands. *Collier*, 9 F. Supp. 3d at 76-77.

**BERNSTEIN LIEBHARD LLP**
Michael S. Bigin (*pro hac vice*)
Jeffrey R. McEachern (*pro hac vice*)
10 East 40th Street
New York, NY 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218
Email: bigin@bernlieb.com
        jmceachern@bernlieb.com

*Lead Counsel for Plaintiffs and the Proposed Class*

26

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on November 12, 2024.

*/s/Theodore M. Hess-Mahan*
Theodore M. Hess-Mahan