UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

JENNIFER ZERBATO, Individually
and on Behalf of All Others
Similarly Situated,

                    Plaintiffs,          Civil Action
                                         No. 24-10152-DJC
V.

                                         February 19, 2025
ALLOVIR, INC., et al.,                   1:57 p.m.

                    Defendants.

_____




TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE DENISE J. CASPER

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA   02210




DEBRA M. KANE, RMR, CRR, FCRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA   02210
debrakane0711@gmail.com

APPEARANCES:

FOR THE PLAINTIFFS:

JEFFREY ROBERT McEACHERN, ESQ.
MICHAEL STEPHEN BIGIN, ESQ.
Bernstein Liebhard LLP
10 East 40th Street
New York, NY 10016
212-779-1414
bigin@bernlieb.com
jmceachern@bernlieb.com

THEODORE M. HESS-MAHAN, ESQ.
Hutchings, Barsamian, Mandelcorn, LLP
110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
781-431-2231
thess-mahan@hutchingsbarsamian.com

FOR THE DEFENDANTS:

CAROLINE H. BULLERJAHN, ESQ.
LAURA NOERDLINGER, ESQ.
JUSTIN WARD, ESQ.
NICOLE MARRO, ESQ.
Goodwin Procter, LLP
100 Northern Avenue
Boston, MA 02210
617-570-1359
cbullerjahn@goodwinlaw.com
lnoerdlinger@goodwinlaw.com
jward@goodwinlaw.com

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Denise J. Casper, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on February 19, 2025.)

THE CLERK:  All rise.

(The Court entered the courtroom.)

THE CLERK:  Court is in session.  Please be seated.

Civil action 24-10152, Zerbato v. AlloVir, Inc., et al.

Would counsel please state your name for the record.

MR. McEACHERN:  Jeffrey McEachern for the plaintiffs.

THE COURT:  Good afternoon.

MR. BIGIN:  Michael Bigin, Bernstein Liebhard, for the plaintiff.

THE COURT:  Good afternoon.

MR. HESS-MAHAN:  Theodore Hess-Mahan, local counsel for the lead plaintiffs.

THE COURT:  Good afternoon.

MS. BULLERJAHN:  Good afternoon, your Honor.  Caroline Bullerjahn of Goodwin Procter on behalf of the defendants.

THE COURT:  Good afternoon.

MS. NOERDLINGER:  Good afternoon, your Honor.  Laura Noerdlinger from Goodwin Procter on behalf of the defendants.

MR. WARD:  Good afternoon.  Justin Ward for defendants.

THE COURT:  Good afternoon.

MS. MARRO:  Good afternoon, your Honor.  Nicole Marro for defendants.

THE COURT:  Good afternoon.

Counsel, I know we're here on the defendants' motion to dismiss.

I'll just let both sides know I've read the motion papers through the reply brief.  I obviously have a sense of your arguments, but I'm prepared to hear argument, counsel.

MS. BULLERJAHN:  Thank you, your Honor.

Your Honor, again, I'm here on behalf of the defendants today, AlloVir, Inc.; Dr. Diana Brainard, who is the CEO of AlloVir; and Mr. Vikas Sinha, who is the CFO and president of AlloVir.

AlloVir is a clinical stage immunotherapy company that was founded in Boston in 2013 and they went public in 2020, and they had 100 or so employees at its peak, all of whom were 100 percent dedicated to helping patients.  Specifically, they were focused on patients undergoing potentially life-saving stem cell transplants who were at particularly high risk of contracting viral infections.  This was a highly unmet need, as there are currently limited therapies for viral infections in the post-transplant setting.  Posoleucel was AlloVir's primary

drug product, which was a virus specific T cell drug therapy that AlloVir believed had the potential to treat and prevent six different specific viruses in high-risk stem cell patients.

As with all clinical phase biotech companies, AlloVir's goal was to obtain FDA approval for posoleucel and to bring to market to either prevent viral infections in stem cell transplant patients or to treat specific viral infections that those patients experienced.

And AlloVir, your Honor, was well on its way to achieving that goal.  From 2013, when the company was founded, until 2022, the company conducted several phase 1 and phase 2 clinical trials in posoleucel.

THE COURT:  Counsel, as I understand it, it's only phase 3 that's at issue here.

MS. BULLERJAHN:  Correct, your Honor.  Based on the positive clinical phase 2 clinical trial results, the company initiated three separate clinical phase 3 trials that are at the heart of this case.

The first was the prevention trial, your Honor, which was to test posoleucel for the prevention of six specific viruses in high-risk stem cell transplant patients, both pediatric and adult patients.

The cystitis trial, which is referred to in the amended complaint as the VHC trial, was to study posoleucel for the treatment of virus-associated hemorraghic cystitis

infections in stem cell transplant patients.

And then the adenovirus trials, a third separate trial, to study posoleucel for the treatment of adenovirus infections in pediatric and adult patients after stem cell transplants.

So as the amended complaint concedes, your Honor, all three of the phase 3 trials were randomized, double-blind and placebo controlled, which your Honor may know means that the patients enrolled across all three trials, the site investigators and the doctors who conducted the trial and the trial sponsor, here AlloVir and all of its employees, did not know whether the patients enrolled in the trials were given posoleucel or a placebo, and that remained the case throughout the course of the trial.

As with all clinical trials, each of the three trials had a written clinical trial protocol, which set forth in detail how the trial was to be conducted. They also each had a statistical analysis plan, or SAP, to explain how the data from the trial would be unblinded and analyzed.

The trial protocols were amended many times throughout the course of the trials to account for developments that occurred during the trials as they progressed.

The protocols in the SAPs included provisions for the utilization of independent Data Safety Monitoring Boards, or DSMBs, for each of the trials. Those DSMBs were comprised of

doctors, physicians; and the purpose of the DSMB was to monitor the trials for safety and also to conduct a futility analysis and a sample size re-estimation during the course of each trial.

AlloVir's decision to utilize independent DSMBs and to conduct utility analyses was entirely voluntary.  FDA regulations do not require utilization of DSMBs or futility analysis to be conducted by DSMBs.

The protocols, importantly, did not provide a date certain on which the futility analyses were to be performed for each trial.  Rather, the documents provided that a futility analysis would be performed at some point after a specified number of patients had been enrolled in the trial and remained in the trial for a specified amount of time.

So for the prevention trial, the documents -- the protocol reflected that the futility analysis would be performed after the first, quote, 121 subjects had completed week 14 of the trial.

For the cystitis trial, the analysis would be conducted, quote, once the first approximately 60 patients reached week 24.

And for the adenovirus trial, the analysis would be conducted, quote, approximately -- after approximately 40 participants had completed day 29.

Throughout the phase 3 trials, AlloVir updated

investors on the status of enrollment across the phase 3 trials. So in January of 2023, which, as you know, is the beginning of the class period, the company disclosed that it anticipated completion of enrollment across the trials by the end of that year, 2023.

In November of 2023, however, the company updated investors that it was, quote, working with urgency to complete enrollment and that patients continued to enroll across the trials at that point in time.

As your Honor likely knows, drug development and clinical trials are incredibly highly risky and unpredictable, and AlloVir expressly warned investors about the risks associated with its phase 3 trials. Those risk warnings for the relevant period are set forth in Exhibit 3 to the defendants' motion to dismiss brief -- or excuse me, Exhibit 2.

Thank you, Laura.

But I wanted to highlight one particular risk factor today.

So in the company's 10-K for 2022, which was filed in the beginning of 2023, the company warned, quote, we could also encounter delays if a clinical trial is suspended or terminated by a Data Safety Monitoring Board for such trial. Such authority may impose such a suspension or termination due to a number of factors, including failure to demonstrate a benefit from using the drug.

Unfortunately, that warned-of risk came to pass, and on December 22, 2023, AlloVir announced that it was discontinuing the three phase 3 trials because the independent DSMBs for each of these studies had recommended stopping the respective trials for futility.

This, of course, was devastating for the company who was forced to lay off 95 percent of its workforce as the company publicly disclosed in January of 2024.

So, like clockwork, your Honor, the initial complaint in this action followed immediately thereafter, was filed on January 19, 2024.  And the amended complaint challenges virtually every single statement made by the company between January 10, 2023 and December 21, 2023 regarding four kind of buckets of subject matter.

The first is the indisputably positive phase 2 clinical results.

The second are factual statements that the phase 3 trials were ongoing.

Third, statements about the anticipated timing of data read-outs for the trials in 2024.

And finally, general optimistic statements about AlloVir's business and its prospects for posoleucel.

Plaintiffs assert that these statements were all false and misleading because the defendants allegedly knew at the time that these statements were made throughout 2023 that the

trials were futile.  More specifically, plaintiffs speculate that each respective DSMB communicated its recommendation for discontinuation due to futility to the company on the following dates:  The prevention trial by January 10, 2023, so at the beginning of the class period; the cystitis trial several months later on September 2, 2023; and the adenovirus trial by October 10, 2023.

THE COURT:  And you say "speculate" because, in your view, there's no factual basis for those dates?

MS. BULLERJAHN:  Correct, your Honor, and I can get into why that is our view.

THE COURT:  You may.

MS. BULLERJAHN:  Plaintiffs backed into these dates, your Honor, based upon information, the protocols and SAPs that I previously referred to, which were published after the end of the class period in December of -- excuse me, in April of 2024.

So for the prevention trial -- and bear with me, your Honor, I just want to walk through this calculation because it's very important.

So the prevention trial the plaintiffs observed enrolled 377 patients over the course of 89 weeks for that trial.  Plaintiffs took 377, divided it by 89, and came up with a figure of 4.23.  They then deduced that the company must have enrolled four to five patients per week for each and every week of the 89-week trial.

The prevention trial started -- it's undisputed it started on March 22, 2022.  And so applying that four-to-five patient assumption that they calculated, plaintiffs then calculated that the prevention trial must have enrolled 121 patients by October 4, 2022.

Based on those assumptions, plaintiffs then deduced that the last patient enrolled would have reached week 14 by January 10, 2023.

Plaintiffs then assume that on that very same day, on January 10, 2023, the independent statistician for the prevention trial -- so there was an independent statistician that the DSMBs were to work with for each of the trials -- that that independent statistician received the unblinded clinical trial data on that day, analyzed that data, communicated the data analysis results to the DSMBs, the DSMBs convened on that very day, despite the fact that they are comprised of doctors who have day jobs, who discussed that clinical data, came up with a futility determination, and communicated that determination to the company, all on one day, January 10, 2023.

They then go through a similar exercise and calculation for the cystitis trial and the adenovirus trial.

So, your Honor, these arbitrary dates are the entire foundation of the entire complaint.

But to use a phrase that Judge Sorokin utilized in dismissing the Harrington v. Tetraphase case, plaintiffs' dates

are derived from, quote, mathematical gymnastics and flawed assumptions that ignore the reality of clinical trials and are at odds with the very documents that the plaintiffs rely upon. And the PSLRA and the case law of this circuit and district just require more to allege securities fraud.

So, your Honor, as we laid out in our briefs, there are two independent bases for dismissal here:  One, the speculation articulated by plaintiffs in the amended complaint fails to give rise to, in our view, any inference of *scienter*, let alone the requisite strong inference; and number two, the speculation is also insufficient to plead a false and misleading statement.  And then, in addition, there are additional arguments as to why they are not false and misleading, they aren't actionable puffery, they are subjective statements of opinion, et cetera.

So for the latter no false or misleading statements argument, your Honor, we're going to rest on our briefs, as well as Exhibit 1 to our motion to dismiss brief, which we ticked through each and every single alleged misstatement in the complaint and identified the reason or reasons, because many of them are inactionable for several reasons, why, in our view, under the applicable law those statements are inactionable.

I do, if your Honor will permit me to, want to spend a little bit of time on our *scienter* arguments.

THE COURT:  You may.

MS. BULLERJAHN:  Thank you.

So, your Honor, as I said, the amended complaint should be dismissed because plaintiffs' speculation as to what the defendants knew and when they knew it about the DSMB futility determinations is insufficient to raise an inference of *scienter*.

THE COURT:  And, counsel, am I correct that the protocols don't say anything about when the futility study would be completed and/or communicated to the company?

MS. BULLERJAHN:  Absolutely, your Honor.  That was a point that I was going to get to.

So the protocols do not have a date certain by which the futility analyses would be performed, right.  They have -- they kind of baked in flexibility to account for the fact -- and I'll talk through this -- the unpredictability and the challenges of enrollment in clinical trials.  So you're absolutely correct, your Honor.

So this case, in our view, is very similar to the iRobot case that your Honor dismissed where there are no, quote, clear allegations of admissions.  There are no internal records or witness discussions suggesting that defendants were aware that they were withholding vital information.

So a few points here, your Honor.

First, there is not a single confidential witness

allegation in this case, which, as you probably well know, is unusual for securities class actions.  And I think it's particular notable here, your Honor, because the company laid off 95 percent of its workforce the same month that this complaint was filed originally.

There are no internal contemporaneous documents, reports.  No indication whatsoever that anyone within the company had any access to the blinded clinical trial data related to the trials --

THE COURT:  So, meaning, not just no inside information about alleged false statements, but no inside information about a date that knowledge of the futility results before the date in December of 2023.

MS. BULLERJAHN:  Correct, your Honor, exactly.

So, again, right, the plaintiffs really kind of have to resort to this mathematical gymnastics -- I just love this phrase, I'm probably going to repeat it a few times.  You know, and they're also just based on flawed, implausible assumptions.

So, first, as I said, they necessarily by taking 377 patients dividing by 89 weeks, they necessarily assume that clinical trial enrollment is constant and the same each week of a trial, right.  That, in our view, is just completely implausible.  It ignores how exceptionally challenging and unpredictable and choppy clinical trial enrollment is.  These are -- this is a very sick patient population.  These are

people who are having stem cell transplants to likely save their lives. And, you know, AlloVir had to not only get sites up and running, your Honor, when the phase 3 prevention trial was launched, but they had to find those patients and convince them to enroll in a clinical trial for an experimental drug. And then stay enrolled in that trial, that's another issue that often comes up in clinical trials, patients drop out of the trial midway through, right. So that's another challenge that clinical stage companies face.

And so --

THE COURT: Counsel, I'll give you a few more minutes just so I can give your brothers equal time.

MS. BULLERJAHN: Yes, understood, your Honor. Thank you.

And just to highlight, your Honor, that kind of the arbitrariness, if you will, of plaintiffs' math -- so we actually did some math of our own, and we took plaintiffs' assumptions and their methodology and we assumed that AlloVir enrolled two patients per week every single week of the trial, right, so which is still probably aggressive in light of the realities and challenges of enrollment in clinical trials, but if you apply a two-patient per week assumption, that means the DSMB recommendation applying plaintiffs' methodology would have been handed down and communicated to the company on August 25, 2023. So that means every single alleged misstatement prior to

that point is, by definition, inactionable.

And so, you know, the key here, your Honor, is where do you draw that line, right?  If the company were to learn of the DSMB recommendations after the last alleged misstatement here, which was on November 2nd, I believe, 2023, then the entire case should be dismissed.

And the point is, is that that is why -- that's precisely the PSLRA requires more.  You can't just guesstimate.  You have to actually support the alleged dates with actual facts, and the amended complaint fails to do so here.

Two very quick additional points on *scienter*, your Honor.

Number one, you know, we find Harrington v. Tetraphase to be really on point here, and in there, Judge Sorokin dismissed the case because, again, he determined that -- the plaintiffs in that case alleged that the company knew that its trial, that its drug was dead in the water once the trial ended, immediately upon ending of the trial.  And what Judge Sorokin said was, no, they're engaging in mathematical gymnastics to get to that point; it is speculation and it is unrealistic for them to assert that, you know, all of this data analysis could have been done instantaneously the day the trial ended.

Plaintiffs made that same assumption here.  So I talked through the kind of assumptions about enrollment.  They

also make, in our view, implausible, flawed assumptions about the fact that all of this data analysis was going to be done by the independent statistician, communicated to the DSMB, DSMB assesses it, analyzes it, makes a decision and communicates the decision, they assume that all happened in a single day. That's just completely implausible, your Honor.

I just want to make two more quick points.  I know I'm taking a good amount of time, your Honor.

Number one, there really are zero allegations in the complaint of any personal benefit to either of the individual defendants here, right.  So they did not engage in any discretionary stock sales during the class period, which, as Judge Young held in Frequency Therapeutics, undercuts an inference of *scienter*.

To the contrary, your Honor, they actually increased their shareholdings in the company during the class period, which the 1st Circuit has held also undercuts an inference of *scienter*.

And, you know, what plaintiffs really are left with on motive allegations are kind of the generalized motive allegations that courts within this district have repeatedly dismissed.  Even your Honor in bluebird -- the plaintiffs allege that the defendants were motivated to raise money in June of 2023 in an offering.  But as you held in bluebird bio, your Honor, allegations that a company, quote, sorely needed

capital were insufficient to show *scienter* in that case.  We think the same applies here.

And then, of course, your Honor, under Tellabs, you have to balance, right, balance the fraudulent inferences that the plaintiffs are attempting to draw and then non-fraudulent inferences that we are drawing from their allegations.  And we believe that the far more compelling inference here is that the defendants disclosed the DSMB recommendations promptly after receiving them.

And there are a few things that I want to just quickly point to that support that inference.

Number one, the protocols and SAPs, as we talked about, provide for flexibility as to when the DSMBs could complete their analyses.  There is no deadline or date certain for this analysis to take place.

Number two, the protocols were amended several times throughout the course of the trials to update for developments, and none of them say that this analysis had been done.

AlloVir continued to enroll patients throughout 2023. They raised money because they had every intention of funding the trials through completion and into 2024.

And again, as I noted, the individual defendants didn't sell any stock, and to the contrary actually increased their stock holdings, your Honor.

So with that, those are the key points I wanted to

make.  Thank you.

THE COURT:  Thank you.

Counsel, I'll hear from you.  Thank you.

MR. McEACHERN:  Thank you, your Honor.  Again, my name is Jeffrey McEachern on behalf of the plaintiffs.

THE COURT:  Good afternoon.

MR. McEACHERN:  Good afternoon.

So to take a step back for a moment, this case is about defendants' materially misleading statements and omissions that failed to disclose that one or more of AlloVir's three phase 3 trials were futile during an 11-month period from January 2023 through December 2023.

Defendants argue that plaintiffs have failed to allege facts giving rise to a strong inference of *scienter* and that plaintiffs have failed to allege an actionable misstatement or omission.  Both of defendants' arguments fail, and the motion to dismiss should be denied in its entirety.

So I'll start with *scienter*.  Here, the complaint alleges particularized facts that give rise to a strong inference of *scienter* that is at least as strong as defendants' asserted non-culpable inference of innocence.  Specifically, the complaint alleges facts that set forth that by the first day of the class period, January 10, 2023, defendants knew that the multi-virus prevention trial, or as I'll refer to it the MVP trial, was futile.  And after that, during the class period

defendants learned that the other two trials, the VHC and the AdV trials, were futile as well.

Armed with this knowledge, defendants boldly make misleading statements touting the earlier phase 2 data for these trials, which was meaningless in light of the futility of phase 3, and misrepresented the status of the phase 3 trials as ongoing, enrolling, and that results were expected in due course when the trials completed.

Defendants' statements, importantly, omitted the then-present existing fact that was the most significant to investors at the time, that the trials were futile.  And it's defendants' own documents that set forth the basis of plaintiffs' allegations here.

So for each phase 3 trial, AlloVir contemporaneously created study documents, the SAPs, the statistical analysis plans, and the study protocols, the SPs.  These were signed by representatives from AlloVir and filed with the FDA and the NIH.  These documents were only made public after the end of the class period, and as -- at a high level, these study documents described protocols for each phase 3 trial.  And looking at them closely, you can see that AlloVir designed each of its trials with a Data Safety Monitoring Board, or a DSMB. AlloVir directed the DSMB for each trial to perform an early analysis for futility, basically to look at the preliminary results from the first tranche of patients that enrolled, and,

if based on these results the trial has 5 percent or only a 10 percent chance of success following AlloVir's study documents, the DSMBs were directed to apprise AlloVir of the futility of the trials.  So --

THE COURT:  And so, counsel, I understand the point about the protocols and sort of what they set out about these independent boards and the futility, but doesn't the Court have to make several jumps of inferences to suggest knowledge by the defendants?

So even if you just take -- I think you were talking about the first, the MVP trial, doesn't it take a few leaps for me to conclude that they had knowledge as of January 10th of 2023 of futility?

MR. McEACHERN:  Your Honor, we don't think that these are leaps per se.  We think that what we've done is simple division.

AlloVir stated that there was 377 patients that enrolled in this trial.  The trial ran for 89 weeks.  These are AlloVir's own documents that say that.  That's four to five patients per week.

THE COURT:  But isn't that assuming -- isn't that assuming, as your sister argued, a steady enrollment?  Doesn't it also assume that the board then conducted its futility study as soon as the enrollment was complete?  And then, doesn't it also assume that they communicated those results to the company

by January 10th?

MR. McEACHERN:  So just to go back to enrollment real quick --

THE COURT:  Sure.

MR. McEACHERN:  -- and I'll address the latter parts of your question after that.  With respect to the enrollment for the AdV trial, for example, the third trial that was determined to be futile, defendants' own documents -- defendants' own documents state that this trial enrolled two to three patients per month.  So, for example, for that trial, we're not even doing any division.  And for the other two trials, what we're doing is the same math that defendants did for the last trial and applying that to the same two trials.  So we would contend that if this division is good enough for AlloVir to use, it's good enough for plaintiffs to use.

And I think that you had a follow-up question in terms of -- just remind me, please.

THE COURT:  Yeah, but doesn't that -- okay.  Let's assume that it's not speculative to suggest that the rate of enrollment is the same for each of the trials.  Doesn't it also assume that the board then not just conducted but completed their study going back to the first trial by January, whatever the date was, January 10th, and then also then communicated it to the company on the same day?

MR. McEACHERN:  So I don't think it assumes that.

AlloVir's DSMBs, or to take specifically its DSMB for the prevention trial --

THE COURT:  Right.

MR. McEACHERN:  -- AlloVir had these study documents in which it created a directive for this DSMB to do its job, to look at the results of the first 121 patients that reach 14 weeks, and to look at the results at that point and determine if there was a 10 percent or a 5 percent chance of success.

We allege that the DSMBs followed its directive.  I don't think -- let me back up.

There's nothing to suggest that the DSMB did not follow its directive.

THE COURT:  Yeah, but I guess what I'm getting at is the flip of what I asked your sister, which is, there's nothing about the directive that talks about the timing of completion of it or its communication to the company.

MR. McEACHERN:  Correct.  There's nothing that says that it has to be completed by a certain date.  We get there, you know, like I said, by the trials' enrollment rates, which for one of the trials was reported, for the other two trials we reverse engineered it by using the same math that defendants did.  And as they enrolled these trials, you know, it's defendants' own documents that say that it is the DSMB's determination once it reaches a certain point within the trial to make a recommendation at this time.  And we allege that the

DSMB followed its directive from the company for all three trials.

I think that answers your question.

THE COURT:  Thank you.

MR. McEACHERN:  Okay.

So I would also add that with the prevention trial being futile in January 10, 2023, the inference of *scienter* gets even stronger as the class period goes on.  So it's important to note that the VHC trial became futile in September 2023.  And then, shortly after that, it's the AdV trial that becomes futile on October 10, 2023.  So I won't walk through the math again for that.

But what we would contend, your Honor, is that the facts allege, that are based on defendants' own documents, they establish that defendants knew that these trials were futile by October 2023, all three of them, and nevertheless, they boldly made misleading statements in November 2023.

And we would contend, your Honor, that these are the quintessential facts that give rise to a strong inference of *scienter*.  These are clear allegations based on defendants' own documents, documents that were internal for the entirety of the class period, only made public after the class period that establish that defendants spoke about the trials and the status of the trials while they were aware that they were withholding vital information from investors.

In addition to alleging facts that support the defendants knowingly made misleading statements, plaintiffs have other allegation --

THE COURT: So I guess the part that -- so -- and I know there was a focus on this in the papers, too. Is there something about the timing of the release of these documents after the class period that you're asking me to draw some inference from?

MR. McEACHERN: We think that that supports the inference of *scienter*. These documents were created contemporaneously with the trial, with each trial, and as my sister said, that they were edited multiple times throughout the class period, edited multiple times for each trial, and nevertheless, these documents were not public.

So it's only after the class period that investors learned that these DSMB analyses had taken place.

THE COURT: Yeah, but what they learn is that there was these independent boards that were to do futility analysis once they reached certain enrollment levels, but when they reach those certain enrollment levels weren't clear and when they completed their analysis wasn't clear and when they communicated that to the company wasn't clear.

So I guess I'm not sure -- are the plaintiffs pointing to the timing of those documents becoming public as adding to the inference here?

MR. McEACHERN:  Not necessarily the timing.  I think what we're using -- what we're pointing to with respect to the inference is that this is not something that was a publicly available document during the class period.  So perhaps an investor, if it was public, could have looked at this document and figured out, hey, there was supposed to be a futility analysis when this trial reached 121 patients, shouldn't that have happened by now?  And we think it goes to that inference of *scienter*.

In addition to alleging facts that supports that defendants knowingly made misleading statements, there are other allegations that plaintiffs use to support *scienter*, and I'll just touch briefly on the core operations doctrine.

So this product, posoleucel, it is singularly important to AlloVir.  AlloVir has never had another product that has been commercialized.  They have never had another product even reach phase 3.  So this is, in defendant Brainard's own words, a billion-dollar opportunity, and not just a billion-dollar opportunity for somebody like Google or Tesla, this is a billion-dollar opportunity for a company that's never had any revenue.

In addition, defendants repeatedly spoke about these trials, repeatedly spoke about the status of the drug.  And when you take the sheer significance of this product to AlloVir and the plus factor of defendants knowingly making misleading

statements to investors, withholding that vital information, we think that that signifies that the core operations doctrine supports *scienter*.

THE COURT:  But I'm not sure -- so how does it operate here?  Because am I incorrect -- my memory is core operations talks about sort of who knew what when, but I didn't get that there was any allegation that there's someone, you know, sort of beneath the named individual defendants that had knowledge that you're alleging the key defendants didn't.

So I guess I'm not -- I mean, I understand the argument, and I'm not sure the defendants necessarily dispute sort of this was the drug that was going to make or break them, right, so accepting that, I'm just not sure how the doctrine advances the plaintiffs' argument.

MR. McEACHERN:  We think that the doctrine advances plaintiffs' argument because if anybody were to know about the status of these trials or the futility of these trials, it would be the top of the company.

And to go further about -- into the motive, which we also allege supports *scienter*, defendants have this strong motive to keep up the facade.  You know, like you said, you know, accepting that posoleucel is of the most importance -- of the utmost importance to the company, you know, what happened after the revelation of these trials being futile is very indicative of the motive to conceal the futility results.

THE COURT:  You mean in terms of laying off all their employees and all of that?

MR. McEACHERN:  Correct.  The company utterly collapsed, the stock price plunged over 60 percent in a single day.  The company laid off 90 percent of its employees in the company of 100 employees approximately -- that's everyone except for the C suite.

THE COURT:  Right.  But isn't it also correct that the individual defendants, I think the CFO and the CEO, still owned stock at that time?  Like, meaning, weren't they equally bearing the stock price decline?

MR. McEACHERN:  Yes, it's my understanding that the defendants, the individual defendants, owned stock and held stock at this period.  We think that them -- that the individual defendants not selling stock during the class period is consistent with our strong inference of *scienter*.  By that I mean we allege that these -- that the company and all defendants were withholding this vital information.  And of course, if the individual defendants, the CEO and CFO, go out right before these trials and are just unloading their stock, that would raise a lot of red flags, especially in a company of AlloVir's size with this many employees.  If these individual defendants had never had large stock transactions in the past, that raises a pretty big red flag.

So we think that the strong inference of *scienter* is

not negatively impacted by the lack of insider sales.  At best, it's a neutral factor when viewing the *scienter* holistically.

And just to further touch on the motive and concealing these results, so we think this is illustrated through, you know, the two options that defendants were facing in January 2023 in light of the futility of the MVP trials.  So option A is admit defeat, and that essentially begins the wind-down of the company, and that's evidenced by what did happen when the futility results were revealed.  Or defendants have option B, and that's conceal the results, do not admit defeat.  Of course, it's highly likely that the other two trials for the same drug, slightly different application, will also be futile, but it's the option that is not a 100 percent guaranteed rate of failure.  And with that in mind, defendants chose option B, and they bet the farm in this reckless gamble and it cost class period investors millions.

We would also contend that the motive is illustrated by the capital raise that happened during the class period.  In June 2023, months after the MVP trial was determined to be futile and on the verge of receiving these other two results of the -- the other two results of the futility analysis for the remaining trials, defendants raised $70 million in capital. And that ultimately was used as seed money in a merger that they executed after the class period.  It was essentially their most prized asset after the class period.

So viewing this holistically of the facts alleged that the defendants had contemporaneous knowledge of the futility trials yet made the misleading statements withholding the most vital information from investors during the period, the core operations doctrine supported by its plus factors, the motive to keep up the facade, the capital raise with the stock price inflated, the subsequent company collapse, the 95 percent of employees being laid off instantaneously, this all supports a strong inference of *scienter* that is stronger than defendants' asserted inference of innocence.

So if you look at defendants' asserted inference of innocence, this is leveraged on all three trials becoming futile on the same exact day.

Now, there are so many variables here, as we've talked through. There are different start dates that are a year apart. There is different enrollment rates. The MVP trial was four to five patients a week; the other two trials as reported by AlloVir were two to three patients a month. There's different enrollment numbers needed to reach the threshold of the DSMB analysis. The MVP trial needed to enroll 121 patients, the VHC trial needed 40 patients, the AdV trial needed 60 patients. There's different time frames that trigger these analyses, there's 14 weeks, there's 24 weeks, there's 29 days.

You put all of this into a matrix, and not to mention

that there's three different committees that are meeting, and the defendants assert an inference that this confluence of factors all happen on the same exact day.  So we think viewing those inferences comparatively, our inference of *scienter* far outweighs the asserted inference of innocence.

THE COURT:  Thank you.

MR. McEACHERN:  And since my sister rested on falsity, I think we will do the same.

THE COURT:  Thank you.

Counsel, brief rebuttal if you want it.

MS. BULLERJAHN:  Very briefly, your Honor.

I just wanted to touch on the very last point that was just made.

So we are not saying that the DSMB recommendations were communicated to the company on December 22nd and they immediately went out to the market with a disclosure.  That is a theory that plaintiffs asserted in their opposition.

But what we are saying, your Honor, and actually, based on the amended complaint's own allegations for the adenovirus trial and the cystitis trial, even applying, in our view, the very flawed methodology that plaintiffs apply, they're alleging that the futility analyses in those two trials happened within a month of each other, right.  The prevention trial required double, more than double the number of patients to be enrolled for a 14-week period before that analysis could

be performed.  So -- and it is undisputed that in May of 2023, the company amended its enrollment criteria for the prevention trial which likely delayed, again, any analysis because there was a new patient population that was being enrolled.

And so even based on plaintiffs' allegations, we actually -- the fact that the futility determinations may have coincided or been close in time to one another to us is actually very plausible based on their own allegations.  But that's not what we're saying, your Honor.

What I'm saying is if all of those coincided at any time after the alleged misstatement, this amended complaint is dead in the water, right, because there can be no knowledge about recommendations that were not rendered to the company at any point in time throughout the class period if that's the case, right.

So I just wanted to briefly touch on that point.

Thank you, your Honor.

THE COURT:  Thank you.

Counsel, I appreciate the arguments on either side.  Hopefully as some of my questions suggested, I've given a fair amount of thought to this before the hearing, and I want to give some further thought to it in light of your arguments, which I will do.  So I'll take the matter under advisement, we'll go from there.  Thank you.

THE CLERK:  All rise.

(Court adjourned at 2:41 p.m.)

- - - - - - - - - - - -

CERTIFICATION

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.


/s/Debra M. Kane                    February 20, 2025
Debra M. Kane, RMR, CRR, FCRR       Date
Official Court Reporter